## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**KENNETH HALL**
> *Plaintiff,*

and

**BYRON SHARPER**
> *Plaintiff-Intervenor,*

**v.**

**STATE OF LOUISIANA, et al**

> *Defendants.*

CIVIL ACTION NO.: 3:12-cv-657
BAJ/RLB

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

<u>**TABLE OF CONTENTS**</u>

PRELIMINARY STATEMENT ……………………………………………………6

FACTUAL AND PROCEDURAL BACKGROUND …………………………………...8

LAW AND ARUGMENT …………………………………………………..8

   I.   APPLICABLE LAW…………………………………………………..8

       A. Legal Standard for Summary Judgment…………………………………..8

       B. Civil Rights Act of 1871, as amended 42 U.S.C. §1983 and 1986………………9

       C. Fourteenth Amendment – Equal Protection Clause………………………9

       D. Fourteenth Amendment – Vote Dilution………………………………...10

       E. Fifteenth Amendment – Right to Vote………………………………..10

       F. Arlington Heights Factors – Intentional Discrimination …………………10

   II.   HISTORY OF RACIAL DISCRIMINATION IN LOUISIANA ………………11

   III.   HISTORY OF BATON ROUGE CITY COURT ………………………………15

   IV.   LEGAL ANALYSIS………………………………………………20

       A. The Statistical Data Shows African Americans Constitute a Majority of the City of Baton Rouge's Population…………………………………………....21

       B. The Defendants Have Engaged in Intentional Discrimination by Failing to Revise and/or Amend Act 609…………………………………………..21

   V.   CONCLUSION………………………………………………29

## **TABLE OF AUTHORITIES**

### **Cases**

*ACORN v. Blanco*,
 (USDC, E.D. LA, No. 06-0611)……………………………………………15

*ACORN, Urban League and Unity 04 v. McKeithen*,
 (CDC, No. 2004-15624)……………………………………………………15

*Baker v. Carr*,
 369 U.S. 186 (1962)………………………………………………………..10

*Blessing v. Freestone*,
 520 U.S. 329, 340 (1997)……………………………………………………9

*Celotex Corp. v. Catrett*,
 477 U.S. 317, 322 (1986)……………………………………………………8

*Chisom v. Roemer* ("Chisom V"), 501 U.S. 380 (1991); *Chisom v. Roemer* ("Chisom IV"), 1989
 WL 106485 (E.D. La. 1989); *Chisom v. Edwards* ("Chisom III"), 839 F.2d 1056 (5th Cir.
 1988); *Chisom v. Edwards* ("Chisom II"), 90 F. Supp. 1524 (E.D. La. 1988); *Chisom v.
 Edwards* ("Chisom I"), 659 F. Supp. 183 (E.D. La. 1987)………………………*passim*

*Clark v. Roemer* ("Clark-2 III"), 750 F. Supp. 200 (M.D. La. 1990); *Clark v. Roemer* ("Clark-
 2II"), 777 F. Supp. 445 (M.D. La. 1990); *Clark v. Edwards* ("Clark-2 I"), 725 F. Supp.
 285 (M.D. La.988)……………………………………………………………*passim*

*Cooper v. Fowler*,
 (CDC, No. 87-19205)………………………………………………………15

*Diversified Group, Inc. v. Van Tassel*,
 806 F.2d 1275, 1277 (5th Cir. 1987)………………………………………………8

*Ferrand v. Schedler*,
 (USDC, E.D. LA No. 11-926)………………………………………………...15

*Hays v Edwards*,
 (USDC, W.D.LA No. 92-1522 c/w 95-1241)………………………………………15

*Gomillion v. Lightfoot*,
 364 U.S. 339 (1960) …………………………………………………………10

*Jones v. Edwards*,
 674 F.Supp. 1225 (E.D. LA 1987)……………………………………………15

*Ketchum v. Byrne*,
    740 F.2d 1398, 1406 (7th Cir. 1984)………………………………………………………11

*Louisiana House of Representatives v. Ashcroft*,
    (USDC, DC, DC, No. 02-CV-00062)………………………………………………………15

*Maine v. Thiboutot*,
    448 U.S. 1 (1980)……………………………………………………………………………9

*Major v. Treen*,
    574 F.Supp. 325 (E.D. LA 1983)……………………………………….....................15

*Maxwell v. Foster*,
    (USDC, W.D.LA, No. 98-1378)……………………………………………………………15

*McCoy v. City of Monroe*,
    747 So.2d 1234 (La. App. 2nd Cir. 12/8/99)………………………………………………9

*Quant v. Edwards*,
    (USDC, E.D.LA No. 84-3841)………………………………………………………………15

*Reverend Jerry Johnson v. State of Louisiana, et al.*,
    Civil Action No. 541,528, 19th Judicial District Court, East Baton Rouge Parish, State of
    Louisiana…………………………….................................................................................26

*Reynolds v. Sims*,
    377 U.S. 533, 555 (1964)…………………………………………………………………..10

*Rodney v. McKeithen*,
    (USDC, M.D.LA No. 3:1992-CV-735)……………………………………………………15

*Rogers v. Lodge*,
    458 U.S. 613, 622-27 (1982)……………………………………………….................11

*Strauder v. West Virginia*,
    100 U.S. 303 (1880)………………………………………………………………………..9

*Valteau v. Edwards*,
    (USDC, E.D.LA, No. 84-1293)……………………………………………………………15

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252, 266-67 (1977)………………………………………………………………11

*Voter Information Project v. Baton Rouge*,
    612 F.2d 208 (5th Cir. 1980)………………………………………………..12, 15

*Wilson v. St. Francisville*,
(USDC, M.D.LA No. 92-765)………………………………………………………...15

**Constitutional Provisions**

Fourteenth Amendment…………………………………………………………..9, 14, 29

Fifteenth Amendment…………………………………………………………………14, 19

**Statutes, Rules and Legislative Materials**

Fed. R. Civ. P. 56 (c)……………………………………………………………………..8

Fed. R. Civ. P. 56(a)…………………………………………………………………… 8

42 U.S.C. §§ 1983 and 1986 and §1988……………………………………………...9, 29

42 U.S.C. § 1973………………………………………………………………*passim*

LSA-R.S. §13:1952 Section 1(4)(a) (b) and (c) (Judicial Election Plan) ………………..*passim*

**Books, Law Review Articles and Journals**

Failinger, Marie (2009). "Equal protection of the laws". In Schultz, David Andrew. *The Encyclopedia of American Law*. Infobase. pp. 152–53………………………………..10

## PRELIMINARY STATEMENT

Plaintiff Kenneth Hall and Plaintiff-Intervenor Byron Sharper brought this action challenging the validity, under the United States Constitution and federal statutes, of elections to Baton Rouge City Court.   The Louisiana Legislature passed Act 609 in 1993, LSA-R.S. §13:1952 Section 1(4)(a) (b) and (c) (hereinafter referred to as the "Judicial Election Plan").   Act 609 apportioned and redistricted Baton Rouge City Court from a city-wide at-large system to a multi-member system consisting of two multimember districts (Election Section 1 and Election Section 2) utilizing the city of Baton Rouge's population and racial demographics data according to the 1990 United States Census.

The Defendants are in denial as to their legal obligations to comply with the U.S. Constitution, the 1871 Civil Rights Act, and the 1965 Voting Rights Act; and they have engaged in a pattern or practice of intentional discrimination on the basis of race.   The Defendants endeavor to maintain and enforce the Judicial Election Plan to both discriminate against and to dilute African-American votes, and such action remains intransient—refusing to revise the Judicial Election Plan despite repeated pleas from disenfranchised electors and constituents.   As applied to current demographics, the continued use of the Judicial Election Plan: (a) dilutes the voting power of African Americans and results in the under-representation of African American judges to the Baton Rouge City Court; (b) intentionally discriminates against African Americans; and (c) violates the equality of voting and fair representational principle under the Fourteenth Amendment, as evidenced by the clear legislative intent in Act 609.

Plaintiff Hall resides and votes in Election Section 2, the majority-minority sub-district consisting of three judicial offices (Divisions "A", "C" and "E").   All candidates elected to judgeships in Election Section 2, since 1993 were White.   Plaintiff Hall desires to participate in

the electoral and political processes of the State of Louisiana and the municipal electoral and political processes of the City of Baton Rouge on the basis of equality with other citizens without having his voting strength racially diluted or debased.

Plaintiff-Intervenor Sharper resides and votes in Election Section 1, the minority-majority sub-district consisting of two judicial offices (Divisions "B" and "D").  All candidates elected to judgeships in Election Section 1, since 1993 were African American.   Plaintiff-Intervenor Sharper desires to participate in the electoral and political processes of the State of Louisiana and the municipal electoral and political processes of the City of Baton Rouge without his politically cohesive vote being dimensioned or structurally diluted, individually and collectively with other African Americans, based on his numerical majoritarian status.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Kenneth Hall and Plaintiff-Intervenor Byron Sharper (hereinafter referred to as "Plaintiffs") brought this action challenging Defendants' long-standing systemic violations of the Fourteenth Amendment's Equal Protection Clause and the Fifteenth Amendment's right to vote. Hall - Docs. 1, 74, 76, and 180; Sharper – Docs. 128, 133, and 181. Plaintiffs now seek summary judgment with respect to Defendants' violations under the Fourteenth and Fifteenth Amendments to the United States Constitution.

The Defendants have engaged in persistent, purposeful, and intentional efforts to diminish the voting strength of African American voters, and to exclude them from the political process.[1] This litigation was filed by aggrieved individuals in order to vindicate the voting rights of the city of Baton Rouge's African American population. The complaints allege the Defendants have been operating and enforcing the Judicial Election Plan over fourteen years and have been

---

[1] *See* handwritten notes of former Louisiana Attorney General First Assistant Ken Dejean regarding Louisiana's official policy not to abide by the Voting Rights Act of 1965 (Doc. 160-2), attached hereto as Exhibit E.

engaging in discriminatory practices, all designed to (1) keep the number of White voters at the highest possible figure and keep the number of African Americans at the lowest possible figure in Election Section 2; (2) prevent fair representation of African Americans vote; and (3) prevent African Americans citizens from acting as a politically cohesive group in electing candidates of their choice.

## LAW AND ARGUMENT

### I.    APPLICABLE LAW

#### A.  Legal Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), (quoting Fed. R. Civ. P. 56 (c)); *see Diversified Group, Inc. v. Van Tassel*, 806 F.2d 1275, 1277 (5th Cir. 1987).  A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

#### B.  Civil Rights Act of 1871, as amended 42 U.S.C. §§ 1983 and 1986

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' [T]his provision safeguards certain rights conferred by federal statutes."  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)).  "Recovery under Section 1983 requires a plaintiff to allege and prove two essential elements: (1) that the defendants' conduct occurred under the color of state law, and (2) that the defendant's conduct deprived the

plaintiff of a right, privilege, or immunity secured by the Constitution or a law of the United States." 42 U.S.C.A. Section 1983; *McCoy v. City of Monroe*, 747 So.2d 1234 (La. App. 2nd Cir. 12/8/99).

Furthermore, Section 1988(b) provides that "In any action or proceeding to enforce a provision of section[]...1983...the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction."

### C.  Fourteenth Amendment – Equal Protection Clause

The Fourteenth Amendment to the United States Constitution provides that no person shall be denied the equal protection of the laws.  The Supreme Court in *Strauder v. West Virginia*, 100 U.S. 303 (1880), stated that the Equal Protection Clause was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States.  The Clause mandates that individuals in similar situations be treated equally by the law.[2]

### D.  Fourteenth Amendment – Vote Dilution

The concept of vote dilution as minimizing or canceling out minority voting strength antedates the Voting Rights Act, as is clear from court decisions just before the Voting Rights legislation and in much older race-related actions such as passage of white primary laws (Krousser, 1992).  The redrawing of Tuskegee, Alabama's boundaries that was overturned in

---

[2] *See* Failinger, Marie (2009). "Equal protection of the laws". In Schultz, David Andrew. *The Encyclopedia of American Law*. Infobase. pp. 152–53.

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) did not deny blacks an opportunity to vote; it changed their ability to effect outcomes (citing *Baker v. Carr*, 369 U.S. 186 (1962)).  J. Brennan cited *Gomillion* to the effect that "vote impairment" was justiciable under the Equal Protection Clause of the Fourteenth Amendment.  The standard for the court to evaluate whether a violation of the 14th Amendment of the Constitution occurred is the "totality-of-the circumstances test", even in multimember situations.

### E.  Fifteenth Amendment – Right to Vote

The Fifteenth Amendment to the United States Constitution provides that the right of citizens to vote shall be not be denied or abridged by any State on the basis of race or color.  Furthermore, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

### F.  Arlington Heights Factors – Intentional Discrimination

To prove racial discrimination in violation of the Fourteenth Amendment's Equal Protection Clause and the Fifteenth Amendment's right to vote, Plaintiffs must prove the Defendants acted with discriminatory intent.  To demonstrate discriminatory intent, Plaintiffs can, but need not offer direct evidence.  Instead, Plaintiffs may rely on circumstantial evidence to show the Defendants purposefully discriminated against the Plaintiffs on the basis of race.  See *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977) (direct and circumstantial evidence can be used to show intentional discrimination under the Equal Protection Clause); *Ketchum v. Byrne*, 740 F.2d 1398, 1406 (7th Cir. 1984) ("In [*Rogers v. Lodge*, 458 U.S. 613, 622-27 (1982)], the Supreme Court affirmed the district court's findings of

intentional discrimination based on indirect and circumstantial evidence and endorsed its reliance on a 'totality of the circumstances' approach.").

Additionally, courts rely on the totality of circumstances test to evaluate claims of racial vote dilution under the Fourteenth Amendment's Equal Protection Clause. The test allows courts to infer an "invidious discriminatory purpose … from the totality of the relevant facts," including the discriminatory effect of a redistricting scheme, by considering either circumstantial or direct evidence. *Rogers*, 458 U.S. at 618.

## II.    HISTORY OF RACIAL DISCRIMINATION IN LOUISIANA

The experience in Louisiana since 1982 shows that voting discrimination in the state persists, attempts to dilute African-American votes are commonplace, and many white officials remain intransigent — refusing to provide basic information required under Section 5 to the U.S. Department of Justice (hereinafter referred to as the "DOJ"). African Americans have been excluded from local decision-making processes, and African-American officials who advocate for non-discriminatory voting changes have confronted retaliation.

Prior to the adoption of the Voting Rights Act, the State of Louisiana maintained a policy of submerging African American voters in at-large elections. However, the State's attempts to submerge minority voters in at-large elections did not disappear with the DOJ's first Section 5 objection on June 26, 1969. In fact, the State has continued to attempt to expand and reinforce at-large voting for boards of aldermen, judges, and school boards throughout the 1980s, 1990s, and even as recently as this decade.[3] In 1988, Louisiana adopted anti-single-shot devices in circuit court elections (drawing a Section 5 objection) and added more at-large judges to the

---

[3] See Affidavit of Donald R. Johnson, attached hereto as Exhibit A. House Bill 1151 of the 2014 Regular Session was introduced by Representative Ponti seeking to eliminate two sub-districts and return Baton Rouge City Court to an at-large system.

circuit courts (drawing another Section 5 objection).[4]   Despite DOJ objections (and requests for more information, which the State ignored), the State attempted to add at-large or multi-member judicial seats again in 1989, twice in 1990, 1991, 1992, and 1994, and again adopted anti-singleshot devices in 1990.[5]   In its 1991 objection letter, the DOJ noted blatant noncompliance with Section 5.  As the objection letter notes, the state had gone ahead and held at-large elections for uncleared judgeships from its last two submissions, and that White judges were now sitting in these seats.[6] These facts manifest a willful disregard for the Voting Rights Act mandates.

Starting in 1977, Louisiana's system for electing judges to the City Court in the city of Baton Rouge, Louisiana and in the parish of East Baton Rouge was alleged to violate the U.S. Constitution.[7]  Beginning in 1986, the State of Louisiana's system for the election of judges was alleged to violate the Voting Rights Act.   In the *Clark v. Roemer*[8] line of cases, African-American voters and African-American attorneys qualified to be elected judges to various courts throughout the State's court system finally decided that enough vote dilution was enough.  In a case alleging that the use of multimember districts to elect judges operated to dilute African-American voting strength in violation of Section 2 of the Voting Rights Act, the parties stipulated to facts that provided the most compelling evidence of African Americans' inability to

---

[4] Letter from Wm. Bradford Reynolds, Assistant Attorney General, Civil Rights Division, U.S. DOJ, to Kenneth C. Demean, Chief Counsel, State of Louisiana (Sept. 23, 1988).

[5] Letter from James P. Turner, Assistant Attorney General, Civil Rights Division, U.S. DOJ, to Kenneth C. Demean, Chief Counsel, State of Louisiana (May 12, 1989); Letters from John R. Dunne, Assistant Attorney General, Civil Rights Division, U.S. DOJ, to Cynthia Rougeou, Assistant Attorney General, State of Louisiana (Sept. 17, 1990; Oct. 23, 1990; Nov. 20, 1990); Letter from John R. Dunne, Assistant Attorney General, Civil Rights Division, U.S. DOJ, to Angie R. LaPlace, Assistant Attorney General, State of Louisiana (Sept. 20, 1991); Letter from John R. Dunne, Assistant Attorney General, Civil Rights Division, U.S. DOJ, to Richard P. Ieyoub, Attorney General, State of Louisiana (Mar. 17, 1992); Letter from Kerry Scanlon, Assistant Attorney General, Civil Rights Division, U.S. DOJ, to Sheri Marcus Morris, Assistant Attorney General, State of Louisiana (Oct. 5, 1994).

[6] Letter from Dunne to LaPlace of Sept. 20, 1991.

[7] *Voters Information Project v. City of Baton Rouge, et al*., 612 F.2d 208.

[8] *Clark v. Roemer* ("*Clark-2 III*"), 750 F. Supp. 200 (M.D. La. 1990); *Clark v. Roemer* ("*Clark-2 II*"), 777 F. Supp. 445 (M.D. La. 1990); *Clark v. Edwards* ("*Clark-2 I*"), 725 F. Supp. 285 (M.D. La. 1988).

effectively participate in the political process in Louisiana.  For example, of 156 district court judgeships in Louisiana outside of Orleans Parish, only two African Americans had *ever* been elected in the State's history.[9]  During the whole twentieth century, in Orleans Parish — where there has been a consistently high concentration of African Americans as high as two-thirds of the population — only one African American attorney had ever served on the criminal district court and only three had been elected to serve on the civil district court.[10]  Of the 48 Court of Appeal judgeships in the State, only one judge was African-American.[11]  No African-American citizen had ever been elected to any statewide office, to the U.S. Congress, or to the Louisiana Supreme Court.[12]

The vote dilution claims involved all of the Louisiana courts of appeal and most of the State's 41 judicial district courts, including the 19th Judicial District Court.  Section 2 liability was adjudicated against the 19th Judicial District Court, the Family Court of East Baton Rouge Parish, and the Court of Appeal, First Circuit, District 2, which includes the jurisdictional limits of Baton Rouge City Court.  Two Baton Rouge City Court elections were expertly analyzed and utilized by Chief Judge John Parker to find a pattern of "racial polarized voting in judicial elections because the city of Baton Rouge include[d] a significant portion of all residents" of East Baton Rouge Parish.[13] Judge Parker initially found that the State's entire at-large scheme for judicial elections violated Section 2.[14]  Initially, although minority vote dilution had not been proven in every district, the court enjoined elections for all family, district, and appellate courts

---

[9] *Clark v. Roemer*, 725 F. Supp. 285, 288 (MD La. 1988).
[10] *Id.*
[11] *Id.*
[12] *Id.* at 290. Jesse Stone, an African-American attorney, was appointed to a vacancy on the Louisiana Supreme Court for 17 days, from November 2, 1979 through November 19, 1979.
[13] *Clark v. Roemer*, 750 F. Supp. 200 (M.D. La. 1990); *Clark v. Roemer*, 777 F. Supp. 445 (M.D. La. 1990); *Clark v. Edwards*, 725 F. Supp. 285 (M.D. La. 1988).
[14] *Clark v. Edwards*, 725 F. Supp. 285, 302 (M.D. La. 1988).

until the State system could be revised.  The Louisiana Legislature proposed a package of constitutional and statutory changes to address the court's ruling, but the voters rejected them.

Additionally, in *Chisom v. Roemer*,[15] five African-American registered voters in Orleans Parish, along with the Louisiana Voter Registration Education Crusade, filed a class action suit on behalf of all African-American registered voters in the Parish.  These plaintiffs, like those in *Clark v. Edwards*,[16] alleged that the system of electing two at-large Supreme Court justices from the Parishes of Orleans, St. Bernard, Plaquemines and Jefferson violated the Voting Rights Act, the Fourteenth and Fifteenth Amendments to the United States Federal Constitution and, 42 U.S.C. §1983 by impermissibly diluting, minimizing and canceling the voting strength of African American registered voters in Orleans Parish.

The Fifth Circuit held that Section 2 applied to every election in which registered voters were permitted to vote.  In so holding, the court rejected the argument that the Voting Rights Act did not apply to the election of judges because judges were not representatives within the meaning of Section 2 of the Voting Rights Act.[17]  There has been a history of voting rights cases against the State of Louisiana and most of these Defendants.[18]  As is evident from the cases

---

[15] *Chisom v. Roemer* ("*Chisom V*"), 501 U.S. 380 (1991); *Chisom v. Roemer* ("*Chisom IV*"), 1989 WL 106485 (E.D. La. 1989); *Chisom v. Edwards* ("*Chisom III*"), 839 F.2d 1056 (5th Cir. 1988); *Chisom v. Edwards* ("*Chisom II*"), 90 F. Supp. 1524 (E.D. La. 1988); *Chisom v. Edwards* ("*Chisom I*"), 659 F. Supp. 183 (E.D. La. 1987).

[16] *Clark v. Roemer* ("*Clark-2 III*"), 750 F. Supp. 200 (M.D. La. 1990); *Clark v. Roemer* ("*Clark-2 II*"), 777 F. Supp. 445 (M.D. La. 1990); *Clark v. Edwards* ("*Clark-2 I*"), 725 F. Supp. 285 (M.D. La. 1988).

[17] *Chisom v. Edwards*, 839 F.2d 1056, 1064 (5th Cir. 1988).

[18] For example: *ACORN v. Blanco*, (USDC, E.D. LA, No. 06-0611) (suit to secure voting rights in April, 2006 New Orleans elections); *ACORN, Urban League and Unity 04 v. McKeithen*, (CDC, No. 2004-15624) (suit by voting rights groups to keep New Orleans polls open extra hours on November 2, 2004, to remedy system-wide problems with voting machines and provisional ballots); *Louisiana House of Representatives v. Ashcroft*, (USDC, DC, DC, No. 02-CV-00062) (intervention on behalf of African American voters to challenge reapportionment of Louisiana House of representatives); *Maxwell v. Foster*, (USDC, W.D.LA, No. 98-1378) (intervention on behalf of African American voters challenging African American majority legislative district in north Louisiana); *Hays v Edwards*, (USDC, W.D.LA No. 92-1522 c/w 95-1241) (intervention on behalf of African American voters in challenge of African American majority Louisiana congressional district by White voters); *Major v. Treen*, 574 F.Supp. 325 (E.D. LA 1983) (federal class action resulted in reapportionment of Congressional districts of Louisiana; created Louisiana's first African American majority congressional district and one of the first cases to interpret the newly amended Voting Rights Act); *Valteau v. Edwards*, (USDC, E.D.LA, No. 84-1293) (federal statewide class action

cited, the State of Louisiana and the Defendants have a long history of racial and voting discrimination against African Americans.

## III.     HISTORY OF BATON ROUGE CITY COURT

The city of Baton Rouge's method of electing judges to the Baton Rouge City Court has been the subject of legal attack as early as 1980.  See *Voter Information Project v. Baton Rouge*, 612 F.2d 208 (5th Cir. 1980).  Prior to enactment of the Judicial Election Plan, the City Court conducted at-large citywide, place voting system, plurality or majority rule, anti-single shot, and run-off election system in accordance with State law and/or the city of Baton Rouge's Charter and Plan of Government, as amended.

In the 1984 City Court election, Norbert C. Rayford, an African American candidate, received very strong African American support but almost no White votes and lost in a seat vacated by William H. Daniels to White candidate, Douglas Moreau.  In a special election in March 1987, the city of Baton Rouge elected its first African American City Court Judge, Freddie Pitcher, Jr., in a racially polarized and unusual election.[19]  Mr. Pitcher was elected during the pending *Clark* litigation and under a highly coordinated political campaign involving the entire African American community[20] against White candidate, Premela Burns.  Despite this backdrop, Division E of the City Court was created by the Metropolitan Council, Ordinance 8646 on April 27, 1988, to become effective January 1, 1999 and became law by Act 5 of the

---

resulting in the reinstatement of the Presidential Primary in Louisiana which was canceled after Rev. Jesse Jackson announced he sought Democratic nomination); *Quant v. Edwards*, (USDC, E.D.LA No. 84-3841) (federal statewide class action challenging Louisiana's voter registration laws); *Jones v. Edwards*, 674 F.Supp. 1225 (E.D. LA 1987) (three judge court, class action challenging voter purges prior to elections); *Cooper v. Fowler*, (CDC, No. 87-19205) (statewide class action against State of Louisiana and all 64 parish governments improving access to polls for physically handicapped); *Rodney v. McKeithen*, (USDC, M.D.LA No. 3:1992-CV-735) (challenge to failure to redistrict Louisiana parishes of Pointe Coupee, Madison, West Feliciana, East Carroll); *Wilson v. St. Francisville*, (USDC, M.D.LA No. 92-765) (challenge to town council elections); *Ferrand v. Schedler*, (USDC, E.D. LA No. 11-926) (action against the Department of Health and Hospitals, Department of Children and Family Service and Secretary of State for violations under the National Voter Registration Act).

[19] See Affidavit of Trudy White, Exhibit 2.

[20] *See* http://www.thehistorymakers.com/biography/hon-freddie-pitcher-41; *see also* 775 F. Supp. 445; 19th Judicial District Court at http://law.justia.com/cases/federal/district-courts/FSupp/777/445/2259591/.

1988 Regular Session, House Bill 226.   DOJ initially withheld its Section 5 preclearance approval of Act 5, advising the Louisiana Assistant Attorney General, Cynthia Rougeou, that it had received information that the method used to elect city court judges did not provide African American voters with an equal opportunity in the selection of city court judges.   The State of Louisiana and the City of Baton Rouge promptly secured the expert services of Dr. Ronald E. Weber, a political science professor at LSU who had previously worked with the Attorney General's Office to obtain preclearance.   The United States Attorney General reluctantly administratively precleared Act 5 on August 29, 1988, subject to the following cautionary warning:

> "In this regard, we also wish to bring to your attention that our review of this matter has raised concerns that the at-large method of electing the city court, viewed in the totality of the electoral circumstances present in the city, may violate Section 2 of the Voting Rights Act …"

Subsequently, in October 1988, five African American attorneys (Eddie Crawford, Johnnie Jones, Jr., Otha Curtis Nelson, Sr., Ralph Tyson and Curtis Calloway) qualified in a well-coordinated and strategic voting rights campaign against five White candidates (three of which were incumbents) for each of the five divisions (Divisions A, B, C, D, and E) of City Court.  Two African American attorneys, Ralph Tyson and Curtis Calloway, were elected to City Court in a racially polarized election and under unusual circumstances which: (1) included a highly visible African American campaign involving the personal campaign assistance from the second-time presidential candidate, Reverend Jesse Jackson; (2) occurred during the pendency of the *Clark* case; and (3) during the period of very high negative resentment against candidate Timothy Screen by the White community against his brother, then Mayor Pat Screen.

Subsequent to the *Clark* settlement in 1992 regarding the establishment of majority-minority judgeships in the 19th JDC, Family Court, and Court of Appeal, First Circuit, in East

Baton Rouge Parish, two vacancies occurred on Baton Rouge City Court.  Consequently, four White attorneys, Jerry Arbour, Paula Cobb, Rachel Pitcher Morgan and Suzan Ponder qualified to run for Judge Calloway's unexpired City Court term in a special election on April 3, 1993. African American attorney, Larry Dersona, also campaigned running fourth, failing to make the run-off election between Ponder and Morgan.  Suzan Ponder was elected on May 1, 1993 as the second woman to sit on the court replacing Judge Calloway in a racially advertised campaign by the Democratic Party.  The Democratic Party linked Rachel Morgan to her father, the former district attorney for East Baton Rouge Parish, who was generally known in the African American community to be anti-African American and to champion against activities of the local chapter of the NAACP.

Due to the State of Louisiana's violation of the Voting Rights Act of 1965, as indicated in *Clark*, which established racial polarized voting in the city of Baton Rouge judicial district courts, African American voters sought to revise the method in which judges were elected to the Baton Rouge City Court.  The Honorable Donald R. Johnson, an attorney at the time, appeared before the Metropolitan Council for the City/Parish of Baton Rouge, and sought to create an African American district within Baton Rouge to elect city judges.[21]   After being denied this request, Mr. Johnson then requested former State Senator Charles Jones of Monroe to introduce a bill before the Louisiana Legislature to redistrict and apportion Baton Rouge City Court on the basis of equality between African Americans and Whites based on the city's population. Senators John M. Guidry and Charles Jones, principal sponsors, assisted by Senator Marc Morial and Representative Yvonne Dorsey drew the district lines, according to Senator Guidry to eliminate the only remaining "vestige of discrimination in the city" -- City Court.  The legislature adopted these members' specific districting plan with one modification that involved changing a

---

[21] See Affidavit of Donald R. Johnson, p. 1.

17

few of the designated homogenous precincts and established a racially fair sub-districting scheme for the City Court.

Senator Guidry specifically averred before the Legislature during committee hearings and floor debate on the bill that the redistricting and apportioning of City Court's five judgeships were based on the racial percentage of African Americans and Whites according to the 1990 United States Census. Senator Guidry also made public comments and enumerated the underlying mathematical formulae of the city's 43% Black population equating to two judgeships.[22] Utilizing rounded racial percentages, Senate Bill 1126 implemented a racial fairness population quota of 60/40% to allocate three City Court judgeships (Divisions A, C, and E—the White-majority subdistrict) to Election Section 2, and two City Court judgeships (Divisions B and D—the minority-majority subdistrict) to Election Section 1.  Angie Rogers, former Assistant Attorney General, in submitting Act 609 for DOJ approval, stated the reason for the changes to Baton Rouge City Court were "to reapportion the City Court in the City of Baton Rouge into two election sections with specific precincts to provide for a majority black population election section."[23]

The district lines were selected, utilizing select local and racially homogeneous precincts, which were assigned and allocated in Senate Bill 1126 to establish racial equality on City Court directly related to the population of the city of Baton Rouge.  The boundaries that the State utilized to divide the former at-large citywide jurisdiction into Election Sections 1 and 2 were based on race, which predominated over the former citywide districting principle.

Other, more traditional redistricting measures were added in the bill's formation and tabulations, such as intraocular compactness, contiguity, preservation of existing precincts,

---

[22] See Affidavit of Donald R. Johnson, Exhibit 14.
[23] See Affidavit of Donald R. Johnson, Exhibit 14, p. 3.

minimum population deviation from the "ideal" between subdistricts, and compliance with Section 5 of the 1965 Voting Rights Act to prevent non-dilution of minority voting strength. These more general traditional districting principles were included without any discussion or debate as evidenced by the legislative history of Senate Bill 1126. Senate Bill 1126 was supported by both White and African American representatives to establish a proportionate and equal representation scheme to elect judges to City Court and to prevent a single race from serving on the Court.

It was the intent of the legislative sponsors and supporters of Senate Bill 1126 to adopt a state policy to create a population-based majority-minority multimember subdistrict.[24] African American Representatives Raymond Jetson, Sharon Weston, Melvin "Kip" Holden, and White Representative Louis "Woody" Jenkins spoke in favor of the bill. It was generally felt that the responsiveness, independence and fairness of the City's elected judiciary regarding City Court judges could still be maintained with the constituencies established within the districts for which they are responsible.

On June 10, 1993, the Legislature approved Senate Bill 1126, aligning the allocation of five judgeships openly and directly on the racial proportions of the City's population as derived from the 1990 Census. As documented in the Legislative's District Summary of the 1991 Voter Registration Plan for Senate Bill 1126, Election Section 1 had a total population of 87,534 persons (22,915 White, 62,807 Black, 282 Other) with a percent district variance of -0.31%. Election Section 2 had a total population of 131,991 persons (95,508 White, 33,539 Black, 483 Other), with a percent district variance of 0.21%. The absolute population deviation from the ideal district in 1993 for the Judicial Election Plan was less than 1 percent (.52%).[25]

---

[24] See Affidavit of Donald R. Johnson, Exhibit 2.
[25] See Affidavit of Donald R. Johnson, Exhibit 14, p. 14.

## IV.    LEGAL ANALYSIS

The Judicial Election Plan, as applied, discriminates against African Americans predominantly for racial reasons in violations of the Fourteenth and Fifteenth Amendments to the United States Constitution.   The Plan further impermissibly dilutes the voting strength of Plaintiffs and other similarly situated African Americans.  The Judicial Election Plan, as applied, is tantamount to apartheid judicial election system in favor of White candidates running for City Court in Election Section 2 utilizing 1990 population data and 1991 voting registration data. The Judicial Election Plan favors, permits, and maintains the election preference of three White judges from Election Section 2 based on outdated data. The Judicial Election Plan prevents unfairly equalization or proportionality between and within the City Court's Election Districts and among the electors and any qualifying candidates and is a violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

Additionally, the Judicial Election Plan is per se unconstitutional as it has and will continue to adversely affect the individual and collective constitutional rights of Plaintiffs and others similarly situated.   The actions of Defendants complained of herein perpetuate the historical discrimination against African Americans in the State of Louisiana and their actions have the racially discriminatory purpose and/or effect of denying Plaintiffs equal opportunity to elect judicial candidates of their choice.

### A.  The Statistical Data Shows African Americans Constitute a Majority of the City of Baton Rouge's Population.

The 2000 and 2010 United States census showed both an increase in population, as well as material geographic and demographic shifts in the population between City Court sub-districts.  The 2000 United States Census population of the City of Baton Rouge, Louisiana was 227,818 with an African American population of 113,953 or 50.2%. The population of White

persons made up 45.7% of Baton Rouge's population with a population of 104,117.  The African American voting age population of Baton Rouge, Louisiana was less than 50% of the total voting age population in 2000.[26]

As of 2010, Baton Rouge consisted of 229,493 persons with an African American population of 125,155 or 53.4% of the total population. The population of White persons not Hispanic was 86,938 or 38.6% of the City of Baton Rouge.  As of the 2010 Census, the African American voting age population of Baton Rouge, Louisiana was more than 50% of the total voting age population in Baton Rouge, Louisiana. [27]

### B. The Defendants Have Engaged in Intentional Discrimination by Failing to Revise and/or Amend the Judicial Election Plan, Act 609.

African American citizens and voters in Baton Rouge over the past fourteen years repeatedly requested the Defendants to redress the grievous racial and vote disparities alleged in Plaintiffs' petitions, all to no avail.   African American citizens requested the Louisiana Legislature amend the Judicial Election Plan *seven* times: House Bill 1501 of the 2001 Regular Session;[28] House Bill 1505 of the 2001 Regular Session;[29] House Bill 1013 of the 2004 Regular Session;[30] Senate Bill 849 of the 2004 Regular Session;[31] House Bill 945 of the 2006 Regular Session;[32] House Bill 318 of the 2013 Regular Session[33] and House Bill 198 of the 2014 Regular Session.[34]

In 1993 the State of Louisiana might not have foreseen the rapid racial population transformation that occurred in the city of Baton Rouge between 1990 and 2010.  By 2000, the

---

[26] See Exhibit D.
[27] See Exhibit D.
[28] See Affidavit of Donald R. Johnson, Exhibit 3.
[29] See Affidavit of Donald R. Johnson, Exhibit 4.
[30] See Affidavit of Donald R. Johnson, Exhibit 5.
[31] See Affidavit of Donald R. Johnson, Exhibit 6.
[32] See Affidavit of Donald R. Johnson, Exhibit 9.
[33] See Affidavit of Donald R. Johnson, Exhibit 15.
[34] See Affidavit of Donald R. Johnson, Exhibit 11.

population of the city of Baton Rouge became 50% African American.  Consistent with this shift in the majority of the City's population, Judge Donald R. Johnson requested State Representatives Michael Jackson and Yvonne Welch to introduce legislation to reapportion City Court consistent with the legislative intent of Act 609.[35]  Representative Welch introduced House Bill 1501 (2001) and Representative Jackson introduced House Bill 1505 (2001), both to reapportion Baton Rouge City Court to provide that "[t]hree judges shall be elected by election section one, and two judges shall be elected by election section two" of the subdistricts established by Act 609, maintaining the existing subdistrict boundaries as established by Act 609.  Neither bill was voted favorably out of committee.

Changes in the racial demographics in Baton Rouge continued.  By the year 2004, African Americans had clearly become the new majority in population Baton Rouge. Recognizing these population changes, Judge Donald R. Johnson again requested Representative Michael Jackson to introduce a bill to amend the Judicial Election Plan, to adjust the allotment of judgeships and the boundaries of Election Sections 1 and 2 in accordance with the same policy the State utilized in 1993.[36]  A similar bill was filed in the Louisiana Senate by Senator Donald Cravins to address this same issue.  Judge Johnson, along with African American City Court Judges Yvette Alexander and Trudy White,[37] lobbied members of the House and Senate Governmental Affairs Committees in support of House Bill 1013 (2004) and Senate Bill 849 (2004) to reapportion and redistrict City Court.[38]   White City Court Judges Suzan Ponder, Alex Wall, and Laura Davis along with their agent or attorney, Christian Peck, lobbied White members of the legislature and the House and Governmental Affairs Committee against the bills

---

[35] See Affidavit of Donald R. Johnson, p. 2.
[36] See Affidavit of Donald R. Johnson, p. 2.
[37] See Affidavit of Trudy White, p. 6, attached hereto as Exhibit B and Affidavit of Yvette Alexander, p. 1, attached hereto as Exhibit C.
[38] See Affidavit of Donald R. Johnson, Exhibit 7.

to protect their incumbency and to avoid a potential election against each other, at the expense of African American residents in Baton Rouge.[39]    Attorney Christina Peck spoke in opposition to the bill alleging that the Baton Rouge City Court was subject to the Voting Rights Act and accordingly any changes to the subdistricts should be based on voting age population.  However, this information was incorrect given Act 609 was based on the City's population.[40]

As a result of Hurricane Katrina, there was as influx of citizens into the Baton Rouge area, drastically changing the population.  African Americans now constituted a supermajority of Baton Rouge's population.  In 2006, Judge Donald R. Johnson again requested Representative Michael Jackson file a bill amending the Judicial Election Plan.  Representative Jackson secured the assistance of State Representative Avon Honey.[41]    Representative Honey filed House Bill 945 (2006) ahead of the scheduled Fall 2006 City Court elections.  House Bill 945 was heard before the House and Governmental Affairs Committee on May 17, 2006.  Judges Trudy White and Yvette Alexander appeared in support of the bill.[42]  Judge Johnson, State NAACP President Ernest Johnson,[43] and Representative Honey testified and explained to the Committee that the demographics of the city of Baton Rouge had changed dramatically; that the African American total population had increased and the total White population had decreased.  And based upon the construction of Act 609, the Judicial Election Plan needed to be amended to reflect the change in demographics.[44]  Members of the House and Governmental Affairs Committee were

---

[39] See Affidavit of Donald R. Johnson, Exhibit 8.
[40] See Affidavit of Trudy White, p. 7.
[41] See Affidavit of Donald R. Johnson, p. 3.
[42] See Affidavit of Trudy White, p. 10.
[43] See Affidavit of Ernest Johnson, attached hereto as Exhibit J.
[44] See Transcription of House and Governmental Affairs Committee dated May 17, 2006 (Doc. 125-1), attached hereto as Exhibit F.

not in agreement to report the bill favorably so Representative Honey requested the bill be deferred.[45]

As a result of the testimony given before the Committee in 2004 and in 2006, it was clearly understood that the inherent problem of maintaining the established lines provided in the Judicial Election Plan was racially biased in favor of White candidates and voters.  It was known that more complex voting rights problems operated structurally to prevent African Americans from participating as equally as voters and effectively as candidates for City Court elections. Nevertheless, Louisiana stifled its fair policy and refused to modify the Judicial Election Plan when African Americans became the majority in population in the same manner it did in 1993 when Whites were the majority.

Again recognizing the shift in population,[46] Judge Johnson requested that a bill be filed to amend the Judicial Election Plan.   In the summer of 2012, Judge Johnson asked State Representative Alfred Williams to file a sixth bill to reapportion and redistrict City Court consistent with the policy the State adopted in 1993.[47]   House Bill 318 (2013) was brought to the House and Governmental Affairs Committee on May 1, 2013.  Representative Alfred Williams testified that the demographics had changed significantly according to the 2010 United States Census, and as such, the Judicial Election Plan should be amended to reflect the current demographics.[48]  House Bill 338 (2013) received a House and Governmental Affairs Committee favorable vote, but it failed before the full House of Representatives, having been defeated by the vote of only White legislators.

---

[45] See Minutes of House and Governmental Affairs Committee dated May 17, 2006 (Doc. 70-5), attached hereto as Exhibit G.
[46] According to the 2010 Census, African American citizens constituted a majority of the city's population, 55 percent, and a plurality of the voting age population, 50 percent.
[47] See Affidavit of Donald R. Johnson, p. 3.
[48] See Affidavit of Donald R. Johnson, Exhibit 10.

Lastly, Representative Williams filed a seventh bill to amend the Judicial Election Plan. House Bill 198 (2014) was brought before the House and Governmental Affairs Committee on April 16, 2014. Representative Alfred Williams again testified that the demographics had changed significantly according to the 2010 United States Census, and as such, the Judicial Election Plan should be amended to reflect the current demographics. House Bill 198 was defeated in Committee. Instead, the Committee voted out House Bill 1151, filed by White State Representative Erich Ponti, which amended the Judicial Election Plan by removing the sub-districts and re-instituted an at-large system.[49] House Bill 1151 was approved by the House of Representatives and sent to the Senate for approval on April 24, 2014. While in committee before the Senate and Governmental Affairs, an amendment was introduced to change the scheme from at-large to a multi-member district whereby Election Section 1 would elect two judges and Election Section 2 would elect two judges and one judge would be elected from the city at large.[50] African American legislators spoke out against the Senate Amendments.

House Bill 1151, if passed by the Senate, would only perpetuate the racial discrimination of which Plaintiffs complain. The bill is not consistent with the State's 1993 policy of fairness and equal representation of the City Court. African American votes would continue to be diluted and African Americans would continue to be unable to elect their preferred candidates as a result of racial bloc voting, racial appeals to White voters, disparity between African American candidates and White candidates in securing campaign contributions, and a disparity in African American candidates receiving support from special interest groups and political action committees.[51]

---

[49] See Affidavit of Donald R. Johnson, p.3.
[50] See Affidavit of Donald R. Johnson, Exhibit 13.
[51] See Affidavit of Trudy White, pp. 13-14.

25

Additionally, African American citizens formally and informally requested the Baton Rouge Metro-Council to amend the Judicial Election Plan by submitting a resolution to the Louisiana Legislature. African American citizens appeared before the Metro-Council on December 12, 2012 requesting that they approve and adopt a resolution amending Act 609 to change the subdistrict lines and provide a minority-majority subdistrict electing three judges and a majority-majority subdistrict electing two judges. The Metro-Council did not submit a resolution to the Louisiana Legislature.

African American citizens and African American Judges of City Court requested City Court's White Judges to join and assist them in seeking changes to Act 609. Judges Trudy White and Yvette Alexander constantly advocated that Baton Rouge City Court should adequately reflect the City's population.[52] The White judges did not join or assist them with amending Act 609 but instead sought to maintain the Judicial Election Plan to protect their incumbency.[53] In fact, during the House and Governmental Affairs Committee hearing on May 19, 2004, Judges Wall, Davis and Ponder testified that if House Bill 1013 passed they would have to run against each other for two judicial seats.[54]

Moreover, in the spring of 2006, just ahead of the 2006 fall elections to Baton Rouge City Court, a state action was filed against the State of Louisiana, the Governor, the Attorney General and the Secretary of State, in the matter of *Reverend Jerry Johnson v. State of Louisiana, et al*., Civil Action No. 541,528, Div. 25, 19th Judicial District Court, East Baton Rouge Parish, State of Louisiana, challenging the validity of the Judicial Election Plan. The suit sought to amend Act 609.[55] Additionally, African American citizens requested Governor Jindal, Attorney General

---

[52] See Affidavits of Judge Trudy White and Judge Yvette Alexander.
[53] See Affidavit of Judge Trudy White, p. 2.
[54] See Affidavit of Donald R. Johnson, Exhibit 8, pp. 11-13; 22-24.
[55] See Affidavit of Trudy White, Exhibit 1.

Caldwell, and the Louisiana Legislature to hold public hearings to respond to the claims of racial grievances asserted herein, all to no avail. White elected officials have been and continue to be nonresponsive to the requests of Baton Rouge's African American citizens.

The significant increase in the City of Baton Rouge's African American population and the shift and movement of the population from a supermajority White city to a supermajority African American city, meant that the sole African American minority-majority subdistrict and its allotment of judgeships should have increased to reflect such change, consistent with the pro rata racial population. This trend of proportional population growth, as well as the shift of Baton Rouge's population from majority White to majority African American, was present the last two decades and the trend is expected to continue through this decade.

Since the 2000 United States Census, the Defendants have known about the demographics in the electorate for City Court, but have remained intransigent, refusing to amend the Judicial Election Plan; thereby failing to remain consistent in the application of the Judicial Election Plan's standards (city population/precinct/judgeship allotments), which the Defendants entitled the former majority-Whites in the Judicial Election Plan, to majority rule and proportional representation in the elections of judges to City Court.

After the 2010 United States Census, it became obvious that the population and demographics had drastically changed in the city of Baton Rouge whereby African American citizens became a supermajority of the city's population, [56] voting age population and registered voters. Yet, the Defendants failed to apply the same standards and policy to alter the composition of the City Court to adequately reflect the change in the demographics, which further diminished

---

[56] See Exhibit D.

and minimized the political power of African American voters.[57] The Defendants have failed to articulate or enunciate a state interest in its operation of Act 609.

The Defendants, systematically and intentionally, used their knowledge of growth and voting patterns of the city of Baton Rouge to maintain an overpopulated majority White Election Section 2 and an overpopulated majority African American Election Section 1 for the 2006 and 2012 City Court elections.  The effect of overpopulating Election Section 2 and under populating Election Section 1 was brought to the attention of the Louisiana Legislature in 2004 by Christina Peck.[58]  Although Mrs. Peck was wrong in her assertion that the Judicial Election Plan was based on voting age population, she testified that the current subdistricts reflect the 1990 census information and that Election Section 1 was underpopulated.  Ms. Peck acknowledged Louisiana would need to correct the population deviations between Election Sections 1 and 2 after the 2010 United States Census.[59]  The systematic and intentional overpopulating of African American voters and under populating White voters in Election Section 1 results in "packing" of African American voters in Election Section 1; and thus, denies African Americans equality of voting and the ability to participate equally in the electoral process. Additionally, the systematic and intentional overpopulating of White voters and under populating African American voters in Election Section 2 results in the "cracking" of African American voter strength; and thus, denies African Americans equality of voting and to participate equally in the electoral process.  As opined by Dr. Richard Engstrom,

> "[t]he current election system for the Baton Rouge City Court dilutes the African American vote in the city. The preferred candidates of choice of African American voters in judicial elections in Baton Rouge are African Americans, as

---

[57] The Defendants have not indicated what the State's policy is regarding the election of judges to the Baton Rouge City Court. They did not provide an answer to this question in Interrogatories nor in the Requests for Admissions.
[58] See Committee Minutes of House and Governmental Affairs Committee, dated May 19, 2004 (Doc. 70-4), attached hereto as Exhibit H.
[59] See Affidavit of Donald R. Johnson, Exhibit 8.

> documented by the results of the racially polarized voting analysis contained in my initial Report.  According to the 2010 Census, African Americans constitute a majority of the city's populations, 54.48 percent.  They also constitute a plurality, almost a majority, of the voting age population (VAP), 49.98 percent as of 2010, compared to 43.94 percent for whites and 6.08 for others.  They also constitute a majority, 53.21 percent, of the voter registration in the city as of April 1, 2014.  Yet African Americans have been able to elect only two African Americans to the City Court out of the five judges on that court.  This is a function of only two of the five seats on that court being allocated to the only majority African American election section, that being Section 1."[60]

Because of demographic trends and growth patterns, this dilution will be exacerbated throughout the decade, a fact known to the Defendants.  In fact, alternative and more current City Court redistricting plans were available and provided to the Defendants that showed lower population deviations were not only possible but easily attainable and practicable.  These alternative plans redistributed City Court judgeships geographically according to updated population figures and without dilutive effect.[61]

The Judicial Election Plan is irrational on its face and as applied given the current demographics of the City of Baton Rouge.  The natural result deprives African American citizens of the benefit of the principle of equality of voting and equal representational rights.  There is no legitimate state interest, which, when consistently applied, can explain or justify the maintenance of the Judicial Election Plan. Unless City Court's election sections of equal population are established, City Court judges will continue to be elected from a discriminatory, diluted, and malapportioned plan in violation of the federal constitution and statutory law set forth above.

---

[60] See Dr. Engstrom Supplemental Report, pp. 1-2, attached hereto as Exhibit I.

[61] See illustrative maps and population figures attached to House Bills 1013, 945, 318, and 198.  Also, Dr. Engstrom opined that, "[n]ot only does House Bill No. 318 introduced in the legislature in 2013, and reintroduced in 2014 as House Bill No. 198, clearly demonstrates that a non-dilutive election arrangement can be created for the City Court in Baton Rouge, so also does Plaintiff's Plan A.  Both would do so despite the racially polarized voting that is pronounced in judicial elections in Baton Rouge."  Exhibit I, p. 4.

## CONCLUSION

Plaintiffs have shown through circumstantial evidence that the Defendants intentionally discriminated against Plaintiffs and all those similarly situated.  Defendants' failures to amend the Judicial Election Plan after repeated attempts by the African American community constitute evidence of intentional discrimination.  There are no genuine issues of material fact and Plaintiffs are entitled to judgment as a matter of law.  Plaintiff Hall and Plaintiff-Intervenor Sharper asks this Honorable Court find violations of the Fourteenth and Fifteenth Amendments to the United States Constitution and find Defendants liable under the 1871 Civil Rights Act, as amended, 42 U.S.C. § 1983, as amended §1986, and issue an award of attorney's fees under 42 U.S.C. § 1988.

**RESPECTFULLY SUBMITTED:**

 s/ *Ronald R. Johnson*
Ronald R. Johnson (La Bar Roll No. 14402)
Law Offices of Ronald R. Johnson
5550 North Foster Drive
Baton Rouge, Louisiana 70805
Telephone: (225) 356-3408
Facsimile: (225) 356-4438
ronaldjohnson@bellsouth.net

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 2nd day June, 2014, a true and correct copy of the foregoing Memorandum in Support of Motion for Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record.

Baton Rouge, Louisiana, this 2nd day of June, 2014.

  /s/ *Ronald R. Johnson*
**RONALD R. JOHNSON**