## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**KENNETH HALL**
              *Plaintiff,*
and

**BYRON SHARPER**
              *Plaintiff-Intervenor*,

                                    **CIVIL ACTION NO.: 3:12-cv-657**
**v.**                                        **BAJ/RLB**

**STATE OF LOUISIANA, et al**

         *Defendants.*

---

## <u>FINAL PRE-TRIAL ORDER</u>

## NATURE OF THE ACTION

**THE PARTIES**

1. Plaintiff, Kenneth Hall, is an African American citizen, resident and qualified voter of the State of Louisiana and the city of Baton Rouge, residing in Election Section 2.

2. Plaintiff-Intervenor, Byron Sharper, is an African American citizen, resident and qualified voter of the State of Louisiana and the city of Baton Rouge, residing in Election Section 1.

3. Defendant, State of Louisiana, is a sovereign State of the United States of America and is subject to the requirements of the United States Constitution and the requirements of the Voting Rights Act of 1965 and the 1871 Civil Rights Act.

4. Defendant, Bobby Jindal, is the Chief Executive Officer of the State of Louisiana, and is named in only his official capacity as the Governor of the State of Louisiana.

5. Defendant, James õBuddyö Caldwell, is the Chief Legal Officer of the State of Louisiana, and is named in only his official capacity as the Attorney General of the State of Louisiana.

6. Defendant, Tom Schedler, is the Chief Election Officer of theState of Louisiana, and is named in only his official capacity as the Louisiana Secretary of State, who has authority and responsibility over all elections in Louisiana.

7. Defendant, Melvin õKipö Holden, is the Mayor-President of the city of Baton Rouge and the parish of East Baton Rouge and in that capacity serves as the Chief Executive of the city, and he is sued only in his official capacity as the Mayor-President of Baton Rouge.

8. Defendant, City of Baton Rouge, Louisiana, is an incorporated political subdivision of the State of Louisiana.

9. Defendant, Parish of East Baton Rouge, Louisiana, is a political subdivision of the State of Louisiana.

**JURISDICTION**

10. The parties agree, except as set forth in paragraph (a) below, that this Court has jurisdiction under 42 U.S.C § 1331 to hear the claims for legal and equitable relief, in that this is an action for Declaratory and Injunctive Relief pursuant to Section 2; bail-in of the State of Louisiana pursuant to Section 3 of the Voting Rights Act of 1965, *as amended*, 42 U.S.C §1973; the Fourteenth and Fifteenth Amendments to the Constitution; for damages, costs, and litigation expenses pursuant to the Civil Rights Act of 1871, *as amended*, 42 U.S.C. §§1983, 1986;and for attorneyøs fees pursuant to 42 U.S.C. §1988 and 42 U.S.C §1973*l*(e).

   a. The Defendants assert that the Court lacks subject matter jurisdiction over Defendants in their official capacities as the Defendants have 11th Amendment sovereign immunity.

11. Venue is properly in this Court under 28 U.S.C. §1391(b), in at least one of the Defendant resides in the Middle District of Louisiana. None of the Defendants have challenged venue.

<u>**SUBSTANCE OF CLAIMS AND DEFENSES**</u>

**I.  PLAINTIFF AND INTERVENOR**

**CONSTITUTIONAL CLAIMS**

Plaintiff and Intervenor, African American citizens and registered voters in the City of Baton Rouge, claim that the continued maintenance and operation of Act 609 intentionally discriminates against them on the basis of race in violation of the Fourteenth and Fifteenth

Amendment to the United States Constitution. Act 609, as is presently constructed, is structurally dilutive and effectively minimizes or cancels out the voting strength of the minorities in the city of Baton Rouge in violation of the Fourteenth and Fifteenth Amendment to the United States Constitution. The Defendants failure to amend and/or revise Act 609, in light of the current demographics, is invidious discrimination in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

**A. By continuing to operate and maintain Act 609 in light of current demographics Defendants intentionally discriminate against minorities in violation of the Fourteenth Amendment Equal Protection Clause. (Doc. 1, ¶46)**

12. The Fourteenth Amendment due process clause provides in relevant part: "[n]o state shall make or enforce any law which shall … deprive any person of life, liberty, or property, without due process of law…." U.S. Const. amend. XIV.

13. The Supreme Court in *Strauder v. West Virginia*, 100 U.S. 303 (1880), stated that the Equal Protection Clause was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States.  The Clause mandates that individuals in similar situations be treated equally by the law.

14. A showing of an arbitrary and capricious or invidious action or distinction between citizens and voters is required.  Court must find that the State has not only distinguished between citizens and voters, but that such distinctions are arbitrary and capricious or invidious." *Holshouser v. Scott*, 335 F. Supp. 928, 933 (1971).

15. To prove racial discrimination in violation of the Fourteenth Amendment's Equal Protection Clause Plaintiff and Intervenor must prove the Defendants acted with

discriminatory intent. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977).

16. Additionally, Plaintiff and Intervenor must prove that Act 609 was either conceived or operated as a purposeful device to further racial discrimination, *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 1499,64 L.Ed.2d. 47 (1980), and that its purpose was invidiously to minimize or cancel out the voting potential of racial minorities. *See White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

17. To demonstrate discriminatory intent, Plaintiff and Intervenor can, but need not offer direct evidence. Instead, Plaintiff and Intervenor may rely on circumstantial evidence to show the Defendants purposefully discriminated against them on the basis of race. See *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977).

18. Discriminatory effect may be demonstrated through circumstantial evidence of discriminatory intent. *See Johnson v. DeGrandy*, 512 U.S. 997, 1565 (1994); *Ketchum v. Byrne*, 740 F.2d 1398, 1406 (7th Cir. 1984).

19. The Supreme Court affirmed that intentional discrimination can be based on indirect and circumstantial evidence and endorsed its reliance on a ˉtotality of the circumstancesø approach. See *Rogers v. Lodge*, 458 U.S. 613, 622-27 (1982).

20. Courts rely on the totality of circumstances test to evaluate claims of racial vote dilution under the Fourteenth Amendmentøs Equal Protection Clause. The test allows courts to infer an õinvidious discriminatory purpose í from the totality of the relevant facts,ö including the discriminatory effect of a redistricting scheme, by considering either circumstantial or direct evidence. *Rogers*, 458 U.S. at 618.

21. "Proof of the second and third *Gingles* factors - demonstrating racially polarized voting that enables the white majority usually to defeat the minority's preferred candidate - is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process." *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994), *en banc*, *cert. denied*, 514 U.S. 1083 (1995).

**B. Continued operation of Act 609 (two at-large/multi-member election sections) dilutes the minority voting strength in violation of the Fourteenth Amendment Equal Protection Clause. (Doc. 1, ¶48)**

22. The Equal Protection Clause õrequires that a State make an honest and good faith effortö to avoid vote dilution. *Reynolds v. Sims*, 377 U.S. at 577.

23. Courts rely on the totality of circumstances test to evaluate claims of racial vote dilution under the Fourteenth Amendmentøs Equal Protection Clause. The test allows courts to infer an õinvidious discriminatory purpose í from the totality of the relevant facts,ö including the discriminatory effect of a redistricting scheme, by considering either circumstantial or direct evidence. *Rogers*, 458 U.S. at 618.

**C. Continued operation of Act 609(a statutory racial equality-based plan) has resulted in mal-apportioned sub-districts without justification in violation of the Fourteenth Amendment's Due Process Clause (Doc. 1, ¶48)**

24. Nothing prohibits the court from using "the one-person-one-vote" standard to aid in determining whether an election practice violates the Due Process Clause. As a result, the inapplicability of the constitutional "one-person-one-vote" standard to judicial elections is not a bar to the development of judicially manageable standards for measuring vote dilution pursuant to the Due Process Clause.

25. The "the one-person-one-vote" has been borrowed to devise an appropriate remedy in a Section 2 involving judicial election minority vote dilution. *Martin v. Mabus*, 700 F.Supp. 327 (S.D. Miss. 1988).

**D. Act 609 is Now a Racially Gerrymandered Election Plan(Doc. 1, ¶)**

26. Deviations from population equality in judicial districts can only be based on ölegitimate considerations incident to the effectuation of a rational state policy.ö *Reynolds v. Sims*, 377 U.S. 533, 579 (1964).

27. Whenever a State government decides to selectively incorporate the Equal Protection Clause of the Fourteenth Amendment to select persons by popular election to perform judicial functions, the Amendment örequires that each qualified voter must be given an equal opportunity to participate in that election.ö*Reynolds v. Sims*, 377 U.S. 533 (1964).

28. Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination under the Equal Protection Clause. *Regents v. Univ. of Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.)  This rule obtains with equal force regardless of race or those burdened or benefitted by particular classification. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (plurality opinion).

29. öStrict scrutiny must be applied to all governmental classification by race.ö *Croson*, 488 U.S. at 520.

30. Laws classifying citizens on the basis of race cannot be upheld unless they are narrowly tailored to achieving a compelling state interest. *Croson*, 488 U.S. at 494.

31. Equal protection principles apply not only to legislation that contains explicit racial distinctions, but also to laws neutral on their face but unexplainable on grounds other

than race.  *Shaw v. Reno*, 509 U.S. 630, 644, 113 S.Ct. 2816, 2825, 125 L.Ed.2d 511 (1993).

**E.  Act 609's election system weighs the white vote more heavily than the African American vote in violation of the Fourteenth Amendment. (Doc. 1, ¶47)**

32.  The United States Supreme Court has indicated that one person's vote cannot be given a weight greater than that given to others.  *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

33.  "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote – whatever their race  and wherever their home may be in that geographical unit.  This is required by the Equal Protection Clause of the Fourteenth Amendment.  The concept of ‑we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications."  *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 808, 9 L.Ed.2d. 821 (1963).

**F.  Continued operation of Act 609 violates the principle of majority rule. (Doc. 1, ¶47)**

34.  To establish a Majority Rule violation, Plaintiff and Intervenor must prove that, regardless of their substantial majority, the election scheme minimizes the strength of their voting majority.  Preamble to the United States Constitution and principles of the Fourteenth and Fifteenth Amendments.

**G.  By continuing to operate and maintain Act 609, Defendants abridge minorities right to vote in violation of the Fifteenth Amendment. (Doc. 1, ¶ 46)**

35.  The Fifteenth Amendment to the United States Constitution provides: "[t]he right of citizens of the United States to vote shall be not be denied or abridged by the United

States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

36. Furthermore, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

37. The right of suffrage is a fundamental matter in a free and democratic society; since right to exercise franchise in free and unimpaired manner is preservative of other basic civil and political rights any alleged infringement of right of citizens to vote must be carefully and meticulously scrutinized.*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).

38. "The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." *Allen v. State Bd. of Elections*, 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969).

39. Governing principles require the voidance of "statutes that, however speciously defined, obviously discriminate against colored citizens." *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960).

40. The Fifteenth Amendment "nullifies sophisticated as well as simple-minded modes of discrimination." *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939).

**H. Election Practices that Enhance Discrimination**

41. Courts should look at "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37.

42. Use of numbered posts enhances vote dilution by defeating single shot voting. *Rogers v. Lodge*, 458 U.S. 613, 627 (1982).

43. Majority vote requirements can obstruct the election of minority candidates by giving white voting majorities a 'second shot' at minority candidates who have only mustered a plurality of the votes in the first election." *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993).

## STATUTORY CLAIMS

Plaintiff and Intervenor, who are African American registered voters residing in the city of Baton Rouge, claim that Baton Rouge City Court's at-large method of electing judges to the Baton Rouge City Court dilutes the voting strength of African Americans in the City of Baton Rouge in violation of Section of the Voting Rights Act, 42 U.S.C. § 1973. The current voting scheme essentially guarantees that: (1) no African-American will be elected to City Court from Election Section 2 of Act 609, and (2) no more than two African Americans will be elected to City Court under Act 609. Act 609 is presently operated and maintained with a discriminatory purpose in violation of Section 2 in light of recent demographics.

### A. Section 2 of the Voting Rights Act (Doc. 1, ¶ 48)

44. Section 2 of the Voting Rights Act, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right í to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided by subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the

State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

45. While explaining that ö[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be consideredö in evaluating an alleged violation, subsection (b) cautions that önothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.ö  42 U.S.C. § 1973(b).

46. öPassage of the Voting Rights Act of 1965 was an important step in the struggle to end discriminatory treatment of minorities who seek to exercise one of the most fundamental rights of our citizens: the right to vote.ö  *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009).

47. öThe essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.ö  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

48. The Supreme Court has ölong recognizedö that at-large voting schemes have the potential to öoperate to minimize or cancel out the voting strength of racial minorities in the voting population.ö  *Gingles*, 478 U.S. at 47.

49. The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters.ö  *Gingles*, 478 U.S. at 47.

50. Section 2 of the Voting Rights Act applies to every election in which registered voters are permitted to vote.  *Chisom v. Edwards*, 839 F.2d 1056, 1064 (5th Cir. 1988).

51. Section 2 prohibits what is referred to as "minority vote dilution" – the minimization or cancelling out of minority voting strength.  Section 2(a) of the Act prohibits any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen ... to vote on account of race or color.  42 U.S.C. § 1973(a).

52. In a *Gingles'* theoretical analysis, the Court held that to establish a claim of actionable vote dilution under Section 2, Plaintiff and Intervenor must establish three "necessary preconditions":[1]

   a)  The minority groups at issue are "sufficiently large and geographically compact t constitute a majority in a single-member district,"[2]

   b)  The minority group must be "politically cohesive," meaning that their members vote in a similar fashion; and,

   c)  There must be evidence of racial-bloc voting[3] (i.e., racially polarized voting) in which the majority tends to vote "sufficiently as a bloc to enable it ...  usually to defeat the minority's preferred candidate." *See Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986); *see also Growe v. Emison*, 507 U.S. 25, 401-41 (1993).

53. Lay witness testimony may show political cohesion and racial bloc voting.  *Monroe v. City of Woodville, Miss.* 881 F.2d 1327 (5th Cir. 1989); *Houston v. Haley*, 859 F.2d 341 (5th Cir. 1988).

54. *Gingles* "rejected a blanket numerical threshold for white bloc voting because *** [t]he amount of white bloc voting that can generally minimize or cancel black voters' ability to

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

[2]  A minority group must constitute more than 50 percent of the voting-age population in a proposed majority-minority district.  *See Barlett v. Strickland*, 129 S.Ct. 1231 (2009).

[3] The *Gingles* opinion gives the following definition of racial bloc voting:  "Stated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group."  *Gingles*, at 478 at 48-49.  "The amount of white bloc voting that can generally minimize or cancel black voters' ability to elect representatives of their choice will vary from district to district according to a number of factors." *Gingles*, 478 at 56.

elect representatives of their choice *** will vary from district to district according to a number of factors." *Gingles*, 478 U.S. 30, 56.

55. Racial bloc voting varies "from district to district" and "according to a variety of factual circumstances." *Gingles*, 478 U.S. 30, 55-56, 58.

56. There is "no simple doctrinal test for the existence of legally significant of racial bloc voting." *Gingles*, 478 U.S. 30, 58.

57. Reasons for racially polarized voting are irrelevant on the Section 2 inquiry. *Gingles*, 478 U.S. 30, 61-64 (plurality opinion).

58. Statistical evidence need not be flawless. *Meek v. Metropolitan Dade County, Fla.*, 985 F.2d 1471, (11th Cir. 1990). Uncontroverted statistical evidence can be sufficient to establish minority political cohesiveness as a matter of law. *Solomon v. Liberty County, Florida*, 899 F.2d 1012, (11th Cir. 1990).

59. The District Court, however, is not obligated to accept statistical evidence[4] or the conclusions of experts as conclusive on the question whether racially polarized voting exists. Rather, the District Court may examine the election results offered by both sides, as well as the circumstances surrounding those elections, and determine for itself, with or without expert conclusions as to which elections are aberrational, whether the white majority votes sufficiently as a bloc so as to usually defeat the minority-preferred candidate. *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143 (5th Cir. 1993).

60. Traditionally, courts rely on three statistical methods to examine the question of polarization: öhomogenous precinct analysis,ö bivariate ecological regression analysisö

---

[4]*Teague v. Attala County, Miss.*, 17 F.3d 796 (5th Cir. 1994); *Magnolia BarAss'n, Inc. v. Lee*, 994 F.2d 1143 (5th Cir. 1993).

and "ecological inference." *See Rodriguez v. Bexar County*, 385 F.3d 853, 865-66 (5th Cir. 2004); *LULAC v. Perry*, 548 U.S. 399, 467 (2006).

61. The Fifth Circuit has cautioned the district courts about reading too much into "exogenous election results." *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1329 (5th Cir. 1989), on petition for rehearing, 897 F.2d 763 (5th Cir. 1990).[5]

62. The *Gingles* requirements "cannot be applied mechanically and without regard to the nature of the claim." *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

63. *Gingles* suggests flexibility in the face of sparse data: "where a minority group has begun to sponsor candidates just recently the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." *Gingles*, 106 S.Ct. at 2770 n. 25.

64. Because a claim of vote dilution must be evaluated with a functional, rather than a formalistic, view of the political process, the Supreme Court has emphasized the importance of "'an intensely local appraisal of the design and impact;" of the electoral structure, practice, or procedure at issue. *Gingles*, 478 at 79.

65. Once these preconditions are established, "the court considers whether, -on the totality of circumstances,' minorities have been denied an -equal opportunity' to -participate in the political process and to elect representatives of their choice." *Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (quoting 42 U.S.C. § 1973(b)).

66. Judicial assessment of the totality of the circumstances requires a "searching practical evaluation of the -past and present reality." *Gingles*, 478 U.S. at 45.

---

[5] *Westwego Citizens for Better Government v. City of Westwego*, 872 F.2d 1201, 1208, n. 8 (5th Cir. 1989); Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496 (5th Cir. 1987); *Clark v. Calhoun County*, 88 F.3d 1393, 1397 (5th Cir. 1996) (stating that results of exogenous elections are "less probative" and of "limited relevance"); the Middle District followed suit in *Oren v. Foster*, Civil Action No. 96-3130 (M.D. La. 1999) *citing Clark v. Edwards*, 777 F.Supp. 445, 460 (M.D. La. 1990).

67. The key to this inquiry is an examination of the seven principal factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act, the so-called "Senate factors." *Id*. at 44-45 (citing S. REP. NO. 97-417 at 28-29 (1982), 1982 U.S.C.C.A.N. 177, 206-07 (the "Senate Report")).

68. Those factors, are:

    a) The history of voting-related discrimination in the state or political subdivision;

    b) The extent to which voting in the elections of the state or political subdivision is racially polarized;

    c) The extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

    d) The exclusion of members of the minority groups from candidate slating processes;

    e) The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

    f) The use of over or subtle racial appeals in political campaigns; and

    g) The extent to which members of the minority groups have been elected to public office in the jurisdiction. *See Gingles*, 478 U.S. at 44-45; Senate Report No. 97-417 (1982).

69. Additional factors that may be probative of vote dilution in some cases are:

    a.  Whether there is significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and

    b.  Whether the policy underlying the state or political subdivisionøs use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.  *Gingles*, 478 U.S. at 37.

70. õThis list of typical factors in neither comprehensive nor exclusive.ö  *Gingles*, 478 U.S. at 45.

71. Plaintiff and Intervenor need not prove a majority of these factors, nor even any particular number of them in order to sustain their claims.  Instead, õthese factors are simply guideposts in a broad-based inquiry in which district judges are expected to roll up their sleeves and examine all aspects of the past and present political environment in which the challenged electoral practice is used.ö  *Goosby v. Hempstead, N.Y.*, 956 F. Supp. 326, 331 (E.D.N.Y. 1997).

72. The Supreme Court did not confine review of vote dilution claims to the factors enumerated in the opinion: õWhile the enumerated [Zimmer] factors will often by pertinent to certain types of Sec. 2 violations, particularly vote dilution claims, other factors may also be relevant and may be considered.ö  *Gingles*, 106 S.Ct. at 2674.

73. õAs both amended § 2 and its legislative history make clear í  the trial court is to consider the totality of circumstances and to determine, based upon a searching practical reality, whether the political process is equally open to minority voters.ö *Gingles*, 478 U.S. at 79.

74. Vote dilution õmay be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters.ö  *Gingles*, 478 U.S. at 46, n. 11.

**B.  Structural Dilution under Section 2 of the Voting Rights Act (Doc. 1, ¶46-48)**

75. Unlike the theoretical basis for a *Gingles'* type of impairment, Plaintiff and Intervenor assert system or structural dilution -- where minority (African American) and majority (White Americans) voters prefer different candidates, the non-numerical majority (White Americans), by virtue of their numerical inferiority, defeat the minorities preferred candidate.

76. In this non-*Gingles'* theoretical analysis, this Court should find that to establish a claim of actionable vote dilution under Section 2, Plaintiff and Intervenor must establish the following: (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district inside of the challenged subdistrict; or sufficiently large and geographically compact to constitute a majority in a new and increased numerical-member multi-member district; (2) the minority group must be politically cohesive in either the challenged district; or in the enlarged multi-member district; and (3) the non-majority (White Americans) have voted sufficiently as a bloc to enable it to defeat the minority's preferred candidate in an election.

77. Once these conditions are established, the court did not consider any other circumstance, other than whether historically minorities have been denied an equal opportunity to participate in the political process and to elect representatives of their choice.

78. Judicial assessment of the historical circumstances would require a õsearching practical evaluation of the ±past and present realityö consistent with *Gingles*, 478 U.S. at 45.

**C.  The State of Louisiana should be bailed-in under Section 3c of the Voting Rights Act (Doc. 180)**

79. Section 3c of the Voting Rights Act, as amended, provides:

a. If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any state or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such a state or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such a period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title: Provided, that such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice or procedure.

42 U.S.C. § 1973a(c).

80. During the pendency of this litigation, the Supreme Court issued its decision in *Shelby County, Alabama v. Holder*, 570 U.S. ____, 2013 LEXIS 4917 (June 25, 2013), a challenge to the constitutionality of Section 5 and the coverage formula established in Section 4 of the Voting Rights Act.

81. In its decision, the Court invalidated only the coverage formula in Section 4 of the Voting Rights Act.

82. The Court's decision did not affect the validity or constitutionality of Section 5 preclearance provisions.

83. No question was raised before the Supreme Court as to the constitutionality of Section 3(c), and nothing in *Shelby County* decision affects that section: Section 3(c) of the

Voting Rights Act was not at issue in the *Shelby County* case and remains valid and enforceable.

84. Unlike the Court's concerns with Section 4, Section 3(c) is not based on any predetermined formula— it is "justified by current needs" and "is sufficiently related to the problems that it targets." *Nw. Austin v. Holder*, 557 U.S. 193, 203 (2009).

85. When the Voting Rights Act was first drafted in 1965, the House Committee introduced the bail-in language, citing the new measure as introducing "judicial remedies to deal with voting discrimination in the so-called pockets of discrimination— areas outside those in which the prohibitions of section 4(a) suspending literacy tests are in effect." H.R. Rep. No. 439.

86. The House Report for the amended bill explains that Section 3(c) follows a "traditional case-by-case approach." H.R. Rep. No. 439.

87. The House Report stated the intended purpose for Section 3(c) as "providing for judicial scrutiny of new or changed voting requirements, to insure against erection of new and onerous discriminatory voting barriers by State or political subdivisions which have been found to have discriminated." H.R. Rep. No. 439.

88. The bail-in provision of the Voting Rights Act is triggered by acts of intentional discrimination by jurisdictions, like the State of Louisiana.

89. The application of a Section 3(c) remedy, in short, involves the following elements:

    a. a finding that a jurisdiction has violated the Fourteenth, Fifteenth Amendment or other United States Constitutional amendments;

b.  consideration by the Court of sub-state level actions (local political subdivisionsø constitutional violations) to evaluate the constitutional violation and the need for an equitable remedy;

c.  imposition of a preclearance requirement, known as õbail-inö or õpocket trigger,ö by this Court, thus requiring retention of jurisdiction by this Court for preclearance actions, the length of which retention is in the discretion of the Court;

d.  inclusion of potentially more changes subject to preclearance than just the changes at issue in the dispute before the Court;

e.  coverage of any designated changes since commencement of this suit (October 2012);

f.  this Courtøs application of the same non-retrogression and non-discriminatory purpose standards formerly applied by the Department of Justice and the D.C. District Court under Section 5, since the language is identical;

g.  after imposition of a preclearance requirement, the continuing option of administrative preclearance for the State.

**D.  Section 5 of the Voting Rights Act. (Doc. 1)**

90. Section 5 of the Voting Rights Act, as amended, provides:

a.  Whenever a State or political subdivision í  shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 í

b.  Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of subsection (a) of this section.

91. In light of the United States Supreme Court ruling in the case of *Shelby County v. Holder*, 133 S.Ct. 2612 (2013), Louisiana is no longer a covered jurisdiction under Section 4(b) of the Voting Rights Act and is not presently required to obtain preclearance under Section 5 of the Voting Rights Act.

### E. Civil Rights Act of 1871 Civil Rights Act, 42 U.S.C. § 1983, as amended, § 1986. (Doc. 1)

92. Section 1983 provides in relevant part:

   a. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. §1983.

93. A private right of action for deprivation of civil rights under color of law is afforded by 42 U.S.C. §1983.

94. To prevail on a Section 1983 claim, Plaintiff and Intervenor must prove that a person acting under color of state law deprived them of a right secured by the Constitution or the laws of the United States. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).

95. To adequately state a claim under Section 1983, Plaintiff and Intervenor must support their claims with specific facts demonstrating a constitutional deprivation and may not rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).

96. Thus, for Plaintiff and Intervenor, to recover, they must show that the State of Louisiana, the Attorney General, the Secretary of State, the City of Baton Rouge and the Parish of East Baton Rouge deprived them of a right guaranteed by the Constitution or the laws of the United States.  They must also prove that the constitutional and statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1971, 128 L.Ed.2d.811 (1944).

97. A showing of Defendants' unresponsiveness to particularized minority needs and polarized voting can combine to demonstrate intentional exploitation of electorate's bias for purpose of challenge to the electoral system under the Voting Rights Act. *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), *cert denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980).

98. "Denying includes inaction as well as action.  And denying the equal protection of the laws include the omission to protect, as well as the omission to pass laws for protection." *Bell v. Maryland*, 378 U.S. 226, 84, S.Ct. 1814, 12 L.Ed.2d. 822, 845-46 (1964).

99. "These views are fully consonant with [the Supreme] Court's recognition that state conduct which might be described as 'inaction' can nevertheless constitutes responsible 'state action' within the meaning of the Fourteenth Amendment." *Bell v. Maryland*, 12 L.Ed.2d at 46.

### F. Plaintiff and Intervenor are entitled to an award of damages, reasonable costs of litigation and attorney's fees pursuant to 42 U.S.C. § 1988(b). (Doc. 1)

100. Section 1988(b) provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988 (b).

**G. Plaintiff and Intervenor are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1973*l*(e). (Doc. 1)**

101.     Section 1973*l*(e) provides, "In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs."

**H. A Prevailing Party is entitled to an award of attorney's fees.**

102.     A prevailing plaintiff in a voting rights case or civil rights case is presumptively entitled to an award of fees, unless special circumstances would render such an award unjust. *Newman v. Piggie Park Enters. Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

103.     "Congress considered vigorous enforcement to vindicate civil rights a high priority and entrusted plaintiffs to effectuate this policy." *Dean v. Riser*, 240 F.3d 505, 507 (5th Cir. 2001).

104.     The policy in favor of awarding fees to civil rights plaintiffs is necessary to carry out Congress's intention that individuals injured by discrimination act as "private attorneys general," vindicating a policy that Congress considered of the highest priority. *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989).

105.     "A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either pendent lite or at the conclusion of the litigation." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989).

106.    The Supreme Court has interpreted the term ôprevailing partyö generously, so that plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation that achieves some of the benefit the parties sought in bringing suit. *Id*. at 791ô92, 109 S.Ct. 1486; *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

107.    A plaintiff prevails when he obtains an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement. *Farrar v. Hobby*, 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

108.    A judicially sanctioned settlement, such as through the entry of a consent decree, may confer prevailing party status even without a judicial determination that the plaintiffs' rights have been violated. *Maher v. Gagne*, 448 U.S. 122, 126 n. 8, 129, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

109.    However, private settlements and a ôdefendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lack[] the necessary judicial imprimatur on the change.ö *Buckhannon*, 532 U.S. at 605.

110.    ôThe touchstone of the prevailing party inquiry ... is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.ö *Sole v. Wyner*, 551 U.S. 74, 82, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007).

111.    Based on these principles, the Fifth Circuit holds that, for prevailing-party status: (1) a plaintiff must obtain judicially sanctioned relief, such as a judgment on the merits or a consent decree (judicial imprimatur); (2) the relief must materially alter the legal relationship between the parties; and (3) the relief must modify the defendant's behavior in a way directly benefiting the plaintiff at the time the relief is granted. *Petteway v.*

*Henry*, 738 F.3d 132, 136637 (5th Cir. 2013); *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir.2008).

## II.    DEFENDANTS

### Defendants - State of Louisiana, Governor Jindal and Attorney General Caldwell

112.    Jurisdiction is disputed solely as it relates to subject matter jurisdiction over the Attorney General and Governor for purposes of the Civil Rights Act relief and the violations of the 14th and 15th Amendment pursuant to the 11th Amendment.

113.    Jurisdiction is disputed solely as it relates to subject matter jurisdiction over the Attorney General and Governor for purposes of the Civil Rights Act relief and the violations of the 14th and 15th Amendment pursuant to the 11th Amendment.

114.    The Plaintiffs are only suing the Defendants in their official capacities which prohibits suit under § 1983. A Plaintiff must õallege specific conduct giving rise to a constitutional violationö against a government official in his individual capacity to state a § 1983 claim. *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir. 2002).  Therefore the Governor and the Attorney General are not proper party defendants under § 1983.

115.    Despite this Honorable Courtøs ruling that the *Ex Parte Young* exception applies in this matter, the Governor and the Attorney General are still entitled to Eleventh Amendment immunity here regarding suits for alleged past actions based on the United States Constitution.  Only prospective injunctive relief is available against states or state employees in their official capacities. *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 336 n. 74 (5th Cir.2009).

116.    As a matter of law the Attorney General and the Governor, have no role in the continued or future implementation of the 1993 Judicial Plan.  *See* Louisiana Constitution

Article IV, § 5 and § 8; La. R.S. 49:251 *et seq.*  The Judicial Plan of 1993 provides no authority or duty to the Governor or the Attorney General.  The creation and/or assignment of voting districts is within the authority of the legislative branch of the State of Louisiana.  La. Const. art. III, § 1;  La. R.S. 13:1952. The Louisiana Legislature created the current Election Sections for the election of City Court Judges and is the proper authority to change or amend the geographic boundaries of those Election Sections.  See La. Const. art. III, § 1. Alternatively, the City of Baton Rouge can amend its Plan of Government.  See Plan of Government, Section 11.04.

117.    The Attorney General and Governor submit that they cannot redress the harm alleged by the Plaintiff, no case or controversy exists against them.

118.    Enjoining the Attorney General or Governor would not redress the harm alleged in the Plaintiffsø complaint    .

119.    The Attorney General and Governor do not have the ability to remedy the actions in the Plaintiffsø complaints.

120.    The authority and powers of the Attorney General and Governor as set forth by the Louisiana Constitution are completely contrary as a matter of law to those set forth in the Plaintiffsø allegations.

121.    As a matter of law and despite the Plaintiffsø allegations to the contrary, neither the Attorney General nor the Governor has authority under Louisiana law to enact, maintain, or administer voting qualifications or prerequisites to voting, or election standards, or procedures.

122.      The Attorney General and Governor expressly deny any and all allegations of intentional and/or inadvertent racial discrimination based upon the creation and/or assignment of voting districts for the election of judges for Baton Rouge City Court.

123.      The State of Louisiana, Governor, and Attorney General aver that any claims brought by Plaintiffs based on Section 3 of the Voting Rights Act of 1965, are premature, as there has been no finding of any violation by the Governor of the Fourteenth or Fifteenth Amendment of the United States Constitution, nor any other provision of or amendment to the United States Constitution, and such a finding is a prerequisite for this Court to implement any "bail-in" provision under Section 3(c) of the Voting Rights Act.

124.      The State of Louisiana, Governor, and Attorney General aver that each defendant is a separate and distinct entity, and the claims against each defendant must be separately determined, including any claim for damages and/or attorneys' fees.

125.      The State of Louisiana, Governor, and Attorney General aver that there has been no violation of Section 2 of the Voting Rights Act of 1965 in connection with judicial elections for the Baton Rouge City Court.

126.      The State of Louisiana, Governor, and Attorney General aver that they have not violated the Plaintiff or Intervenor's 14th and/or 15th Amendments of the United States Constitution with regard to the Baton Rouge City Court current judicial election plan.

127.      The State of Louisiana, Governor and Attorney General aver that they are not guilty of any violation complained of by the Plaintiffs.

**Defendant - Secretary of State**

128.      The Secretary of State has not violated the Fourteenth Amendment.

129.      The Secretary of State has not violated the Fifteenth Amendment.

27

130.     The Secretary of State has not violated the First Amendment.

131.     The Secretary of State has not violated 42 U.S.C. 1983.

132.     The Secretary of State has not violated the Voting Rights Act.

133.     The Secretary of State has not discriminated against the Plaintiffs.

134.     The Secretary of State has not failed to perform any of his duties.

135.     The Secretary of State cannot provide Plaintiffs with the relief they request

136.     The Secretary of State cannot provide Plaintiffs with any prospective relief.

137.     The Secretary of State does not have the ability and/or authority to reapportion election districts.

138.     The Secretary of State does not have the ability and/or authority to decline to hold or certify elections.

139.     The Secretary of State does not have the ability and/or authority to enact legislation.

140.     The Secretary of State does not have the ability and/or authority to make any findings related to the unconstitutionality of election districts.

141.     The Secretary of State does not have the ability and/or authority to investigate claims related to the constitutionality of election district apportionment.

142.     The Secretary of State does not have the ability and/or authority to report claims related to the constitutionality of election district apportionment.

**Defendants City of Baton Rouge, Parish of East Baton Rouge and Mayor-President Melvin "Kip" Holden**

### Section 2 Claims

143.    The City of Baton Rouge, the Parish of East Baton Rouge and Melvin "Kip" Holden, in his capacity as the Mayor-President of the City of Baton Rouge and the Parish of East Baton Rouge (collectively the "City-Parish Defendants") do not have proper authority to grant Plaintiff and Intervenor the relief which they seek under Section 2 of the Voting Rights Act.  The creation of voting districts and/or assignment of divisions to voting districts for the election of City Court Judges for the City of Baton Rouge is within the authority of the legislative branch of the State of Louisiana, who created the current system of electing City Court Judges from Election Sections, created the Election Sections for the election of City Court Judges, and assigned divisions of the City Court to those Election Sections, by virtue of the Act 609 of 1993.  The legislative branch of the State of Louisiana is the proper authority to create, change or amend the geographic boundaries of the Election Sections and/or assign divisions of the City Court to these Election Sections.

144.    The City-Parish Defendants deny all claims of intentional and/or inadvertent racial discrimination based upon the creation, assignment and/or maintenance of voting districts for the election of City Court Judges for the City of Baton Rouge.

29

## ABANDONED CLAIMS

145.     Plaintiff and Intervenor have abandoned the First Amendment claims against all Defendants.

146.     The Section 5 Claim under the Voting Rights Act is abandoned, pursuant to the court's ruling in the light of the United States Supreme Court's Ruling in *Shelby County v. Holder*, 133 S.Ct. 2612 (2013).

147.     Defendants assert the Section 3 Claim under the Voting Rights Act is premature, pursuant to the Court's ruling.  Section 3 is a remedy that is not applicable at this time. Plaintiff does not agree that the remedy is premature.

## RELIEF SOUGHT

148.     Plaintiff and Intervenor are requesting Declaratory and Injunctive Relief pursuant to Section 2 of the Voting Rights Act of 1965, 42 U.S.C. §1973; bail-in of the State of Louisiana pursuant to Section 3c of the Voting Rights Act of 1965, 42 U.S.C §1973c;damages, inclusive of costs and litigation expenses under the Fourteenth and Fifteenth Amendments to the Constitution pursuant to pursuant to the Civil Rights Act of 1871, *as amended*, 42 U.S.C. §§1983, 1986;and for attorney's fees pursuant to 42 U.S.C. §1988 and 42 U.S.C §1973*l*(e).

149.     Defendants aver that attorneys' fees calculated in accordance with the Lodestar formula are due by the Plaintiff and Intervenor should the Defendants prevail.

## DISCOVERY

150.     Plaintiff and Intervenor state that all discovery of fact and experts have been completed.  Additionally, Plaintiff and Intervenor were not provided with Defendants trial exhibits and witness list until June 25, 2014.  Plaintiff and Intervenor have not been

provided with Defendants trial exhibits. Defendants have indicated they would make the exhibits available for review as of June 25, 2014.

151.    The State of Louisiana cannot state at this time that discovery is completed as the trial exhibit and witness lists of the Plaintiff and Intervenor were not provided until June 25, 2014.  Defendants provided Plaintiffs' Counsel with the vast majority of their exhibits on or before June 24, 2014.  Moreover, the Plaintiff and Intervenor continue to conduct discovery on public bodies named as Defendants to this action by sending public records requests.

## MOTIONS

152.    The following motions and matters are pending and must be resolved before trial:

a.  Doc. 206 Plaintiff's Motion for Class Certification

b.  Doc. Plaintiff's Request for Judicial Notice as to Adjudicative Facts

c.  Doc. 288 Plaintiff and Intervenor's Partial Motion for Summary Judgment

d.  Doc. 293 Plaintiff and Intervenor's Motion in *Limine* To Preclude Dr. Weber's Report and Testimony

e.  Plaintiff and Intervenor's Motion in *Limine* To Exclude Dr. Weber's Report and Testimony regarding system or structural dilution

f.  Plaintiff and Intervenor's Motion in *Limine* To Exclude Michael Beychok's Report and Testimony Regarding Causes or Explanations

g.  Plaintiff and Intervenor's Request for Judicial Notice as to Scholarly Articles, Newspaper and Media Publications, and Adjudicative Facts

h.  Doc. 289 Defendants Governor Jindal and Attorney General Motion for Summary Judgment

i.  Doc. 290 Defendant Secretary of State Motion for Summary Judgment

j.  Doc. 291 Defendant Secretary of State Motion for Summary Judgment as to Byron Sharper

k.  Doc. 311 Defendants Motion to Strike Exhibits attached to Motion for Partial Summary Judgment

l.  Doc. 313 Plaintiff Motion to Withdraw Joel Porter as Attorney of Record

m.  Defendants' Motions in Limine - Dates have not yet passed

## UNDISPUTED FACTS

153.    By agreeing that the following facts may be treated as true for purposes of this trial, the parties are not necessarily agreeing that each of them is material or relevant.

**CENSUS AND POPULATION FIGURES**

154.    The Bureau of the Census, U.S. Department of Commerce, conducted a decennial census in 1990, 2000, and 2010 of Louisiana and of all the other states under Article I, Section 2, of the U.S. Constitution.

**ELECTION RETURNS**

155.    Parties will stipulate to the Race of the candidates running in the elections analyzed by all experts.

**LOUISIANA LEGISLATURE**

156.    Parties will stipulate to the number and race of the current members of the Louisiana Legislature as identified on their qualifying documents.

**LOUISIANA COURTS**

157.    Parties will stipulate to the number and race of the current judges of the following courts:

     a.  Baton Rouge City Court

**BATON ROUGE CITY COURT**

158.    Prior to enactment of Act 609 of 1993, Baton Rouge City Court conducted an at-large citywide, by divisions, run-off election system in accordance with State law and the Baton Rouge Plan of Government in effect at the time.

159.    Louisiana's current election system to elect judges to Baton Rouge City Court is codified at LSA-R.S. §13:1952 Section 1(4)(a) (b) and (c).

160.    Baton Rouge City Court is currently divided into five divisions (A, B, C, D, and E).

161.    Proposal of creation of Division E is stipulated to by attachment of Metropolitan Council, Ordinance 8646 enacted April 27, 1988.

162.    Creation of Division E is stipulated to by Act 5 (House Bill 226) of the 1988 Regular Session.

163.    DOJ approval of Act 5 of 1988 is stipulated to by attachment of DOJ letter to Louisiana Attorney General

164.    In October 1988, five African American attorneys (Eddie Crawford, Johnnie Jones, Jr., Otha Curtis Nelson, Sr., Ralph Tyson and Curtis Calloway) qualified and campaigned as candidates for each of the five divisions (Divisions A, B, C, D, and E) of Baton Rouge City Court.

165.    Two African American attorneys, Ralph Tyson and Curtis Calloway, were elected to City Court in 1988, defeating White candidates, "Jerry" Arbour and "Tim" Screen, in an at-large election, respectfully.

166.    In 1992, two vacancies (Division B and Division E) occurred on Baton Rouge City Court as a result of Judges Ralph Tyson and Curtis Calloway being elected to the 19th Judicial District Court.

167.    Four White attorneys (Jerry Arbour, Paula Cobb, Rachel Pitcher Morgan and Suzan Ponder) and one African American attorney (Larry Dersona) qualified to run for Judge Curtis Calloway's unexpired City Court term in Division E, a special election on April 3, 1993.

168.     Suzan Ponder was elected in a special election on May 1, 1993 as the second woman to sit on the Baton Rouge City Court replacing Judge Curtis Calloway in Division E.

169.     Senate Bill 1126 became law as Act 609 of the 1993 Regular Session.

170.     Act 609 of 1993 is codified at La. R.S. §13:1952 Section 1(4)(a) (b) and (c).

171.     Parties will stipulate to the Legislative Record of Act 609 of 1993.

172.     Parties will stipulate to the preclearance submission record of Act 609 of 1993.

173.     Act 609 of 1993 apportioned and redistricted Baton Rouge City Court from a city-wide at-large system to a multi-member system consisting of two multimember districts (Election Section 1 and Election Section 2).

174.     Plaintiff Hall, at the time of filing this suit and currently, is registered to vote in Election Section 2, the majority-White sub-districtconsisting of three judicial offices (Divisions õAö, õCö and õEö).

175.     All candidates elected to judgeships in Election Section 2, since 1993 were White.

176.     Plaintiff-Intervenor Sharper, at the time of filing this suit and currently, is registered to vote in Election Section 1, the majority African American sub-districtconsisting of two judicial offices (Divisions õBö and õDö).

177.     All candidates elected to judgeships in Election Section 1, since 1993 were African American.

178.     Baton Rouge City Court judges currently serve six year terms.

179.     Baton Rouge City Court Judgesø jurisdiction in coterminous with the geographical boundaries of the City of Baton Rouge.

180.    The most recent regular election for City Court was held November 2012, with a run-off in Division A of Election Section 2 in December 2012, and the next regularly scheduled election will be in 2018.

181.    In the city of Baton Rouge, candidates running for city court judge must be attorneys, must have been admitted to the practice of law in Louisiana for at least five years prior to the election, must have been domiciled in the city for one year preceding the election, shall not practice during the term of office and are not required to reside in the election section from which they qualify to run.

182.    Candidates for judge in the city of Baton Rouge do not run from party primaries. Instead, all candidates for City Court judge run in a single non-partisan primary. If no candidate receives a majority in the primary, then the two top candidates compete in a general election, with the candidate receiving the majority of the vote being declared the winner.

183.    City Court of Baton Rouge exists only within the territorial limits of the City of Baton Rouge Louisiana.

184.    Citizens and voters within the City of Baton Rouge are the only qualified electors to vote for City Judge of Baton Rouge City Court.

## ADDITIONAL FACTS

185.    Parties will stipulate to the authenticity of the contents of the settlement entered in *Clark v. Edwards* andthe Consent Decree entered into *Chisom v. Edwards*.

186.    Parties will stipulate that Justice Bernette J. Johnson intervened in the *Chisom v. Edwards* suit by stipulating to the authenticity of a copy of the record in that matter from her intervention until conclusion of the matter.

187.    Parties will stipulate to the authenticity of the Legislative Record of Senate Bill 429 of the 2009 Regular Session.

188.    Parties will stipulate to the authenticity of the Legislative Record for Senate Bill 1126 (Act 609) of the 1993 Regular Session.

189.    Parties will stipulate to the authenticity of the Legislative Record for House Bill 1501 of the 2001 Regular Session.

190.    Parties will stipulate to the authenticity of the Legislative Record for House Bill 1505 of the 2001 Regular Session.

191.    Parties will stipulate to the authenticity of the Legislative Record for House Bill 1013 of the 2004 Regular Session.

192.    Parties will stipulate to the authenticity of the Legislative Record for Senate Bill 849 of the 2004 Regular Session.

193.    Parties will stipulate to the authenticity of the Legislative Record for House Bill 945 of the 2006 Regular Session.

194.    Parties will stipulate to the authenticity of the Legislative Record for House Bill 318 of the 2013 Regular Session.

195.    Parties will stipulate to the authenticity of the Legislative Record for House Bill 198 of the 2014 Regular Session.

196.    Parties will stipulate to the authenticity of the Legislative Record for House Bill 1151 of the 2014 Regular Session.

197.    Parties will stipulate to the authenticity of the record of *Reverend Jerry Johnson v. State of Louisiana, et al*., Civil Action No. 541,528, Div. 25, 19th Judicial District Court, East Baton Rouge Parish, State of Louisiana.

## DISPUTED ISSUES OF FACTS

The following are a list of contested issues of fact:

**PLAINTIFF AND INTERVENOR**

**United States Census Data**

198.    The Census Bureau announced and certified the official enumeration of the population of Baton Rouge, Louisiana for 1990. The African American voting age population of Baton Rouge was less than 40% of the total voting age population.

199.    The Census Bureau announced and certified the official enumeration of the population of Baton Rouge, Louisiana for 2000.  The African American voting age population of Baton Rouge was less than 50% of the total voting age population.

200.    The Census Bureau announced and certified the official enumeration of the population of Baton Rouge, Louisiana for 2010.  The African American voting age population of Baton Rouge was over 50% of the total voting age population.

**City of Baton Rouge**
**Selected Demographics 1990-2010**

| Census | Total | White | Percent | African American | Percent | Differential ê |
|--------|-------|-------|---------|------------------|---------|----------------|
| 1990 | 219,531 | 118,429 | 53.94% | 96,679 | 44.04% | 9.9 |
| 2000 | 227,818 | 104,117 | 45.70% | 113,953 | 50.02% | -4.32 |
| 2010 | 229,493 | 90,348 | 39.37% | 125,155 | 54.54% | -15.17 |



201.     According to the 2010 United States Census, the median family income in the City of Baton Rouge was $45,964.  Median household income for the City of Baton Rouge was $33,748; it was $48,316 for Whites and $25,760 for African Americans. The median income of African American households was therefore 53.32% of that of White households.  See Table S1903. See Table DP03.[6]

202.     According to the 2010 United States Census, 38.79% of White households in the city of Baton Rouge had incomes less than $10,000; 33.90% had incomes between

---

[6] All tables identified herein were accessed through the American Community Survey and are attached as Exhibits to Plaintiff and Intervenor's Exhibit List.

$10,000 and $24,999; and 52.64% had incomes of $25,000 or more. By contrast, 58.97% of African American households in the city of Baton Rouge had incomes less than $10,000; 48.29% had incomes between $10,000 and $24,999; and 41.59% had incomes of $25,000 or more.

203.    According to 2010 United States Census, 15,399 Whites in the city of Baton Rouge had incomes that fell below the poverty level; 37,103 African Americans had poverty-level incomes. The total number of persons in the city of Baton Rouge with incomes below the poverty level was 54,986.  African Americans therefore comprised 67.48% of all persons below poverty level in the city of Baton Rouge.  By contrast, Whites comprised 28.01% of persons below poverty level.

204.    According to the 2010 United States Census, 47.55% White persons in the city of Baton Rouge 25 years and older were high school graduates; 47.13% of African Americans in this age group were graduated from high school. Whites who had four or more years of college account for 63.60% and 28.36% of African Americans had four or more years of college.

205.    According to the 2010 United States Census, there were 91,474 total occupied housing units in the city of Baton Rouge; there were 40,321 occupied housing units with a White householder; and there were 45,008 occupied housing units with an African American householder. Of the occupied housing units 54.60% with a White householder were owner-occupied; 40.69% of units with an African American householder were owner-occupied.

**History of Discrimination**

206.     The State of Louisiana has a long history of racial and voting discrimination against minorities. *Louisiana v. United States*, 380 U.S. 145 (1965); *Anderson v. Martin*, 375 U.S. 399 (1964).

207.     The State of Louisiana was once a state where slavery was sanctioned by law, and vestiges of discrimination persisted for some time, which affected the rights of African American persons to register to vote or otherwise to participate in the democratic process.

208.     While the total number of new African American judges is impressive compared to the bleak totals of a few decades earlier, many election observers complain that the Louisiana Legislature, which has become more conservative politically, has not provided equity for African American inhabitants when redrawing district lines after the 2000 or 2010 censuses.

209.     In the twenty century, no African American citizen has been elected to statewide office in the State of Louisiana.   The current offices include but are not limited to: Governor, Lieutenant Governor, Treasurer, Secretary of State, Attorney General, Commissioner of Agriculture, Commissioner of Insurance, and Commissioner of Elections.

210.     In the twentieth century, only four minorities have been elected to the United States Congress from the State of Louisiana.

211.     In the twentieth century, no African American citizen has been elected to the United States Senate from the State of Louisiana.

212.     In the twentieth century, only one African American has been elected to the Louisiana Supreme Court.

213.     Beginning in 1980, African Americans alleged that the at-large election scheme for election of City Court judges in Baton Rouge and state judges in East Baton Rouge Parish diluted the voting strength of African Americans persons residing in the city of Baton Rouge and East Baton Rouge Parish in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution. *Voting Information Inc. v. Edwards*, 612 F.2d 208 (M.D. La. 1980).

214.     In 1986, the State of Louisiana's system for the election of judges was alleged to violate the Voting Rights Act.  *Clark v. Edwards*, 725 F. Supp. 285 (M.D. La. 1988).

215.     As a result of *Clark* the number of African American judges in the State of Louisiana increased from a half-dozen before 1992 to about six dozen today.

216.     *Chisom v. Edwards*, 659 F. Supp. 183 (E.D. La. 1987), was filed in 1986 alleging that African American citizens of Orleans Parish were denied the benefits of õone person one voteö in choosing two supreme court justices from the same district, while citizens in the rest of the state chose one justice from single member districts.

217.     The House Report on the Fannie Lou Hamer, Rosa Parks & Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 provided that õ[d]espite the progress made by minorities under the Voting Rights Act of 1965, the evidence before Congress reveals that 40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination,ö that õ[p]resent day discrimination experienced by racial and language minority voters is contained in evidence.ö And that õwithout the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to

vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years.ö  2006 Act, §§ 2(b)(3), (5).

218.    When the incumbent chief justice, Catherine Kimball, announced that she would step down on January 31, 2013, Jeffrey Victory, an associate justice who had joined the court on January 1, 1995, claimed that he was the legitimate successor to Chief Justice Kimball because Johnson had first joined the court as an appeal court judge and did not become a supreme court justice until her election in 2000.

219.    The State did not immediately acquiesce and Governor Jindal announced that the State would appeal the ruling.

220.    District Judge Susie Morgan disagreed with Governor Jindal and ruled that *Chisom* made it clear that Justice Johnson was the most senior judge on the Stateøs high court and was entitled to move up to the top seat.

221.    Notwithstanding Governor Jindaløs stance, the Supreme Courtøs Ad Hoc Committee concurred in the federal court ruling and Chief Justice Kimball announced that Justice Johnson would be her successor.

222.    The veto of Senate Bill 429 of the 2009 Regular Session delayedfor several years the creation of a third minority judgeship on the 24th Judicial District Courtin Gretna, Louisiana.

223.    Pursuant to Section 6 of the Voting Rights Act of 1965, 42 U.S.C. Section 1973d, the United States Department of Justice has designated various Louisiana parishes for the appointment of federal examiners (registrars).

224.    Pursuant to Section 8 of the Voting Rights Act of 1965, the United States Department of Justice has sent federal observers to observe elections in the State of Louisiana.

225.    *Clark v. Edwards* held that elections in the 19th Judicial District Court, the Family Court, and the First Circuit Court of Appeals were racially polarized.

226.    "From the effective date of the VRA Section 5 until the Summer of 1972 it was the official policy of the LA. Atty. Gen. <u>not</u> to submit La's voting law changes.  Only about a half dozen were submitted until 1972."[7]

227.    "[I]n 1972 this policy was changed and Louisiana began to submit prior election law changes (from 1965-1971).  An *in globo* submission was made with over 100 prior acts being submitted.  Additionally, Louisiana began submitting election law changes as they were enacted by the Legislature."[8]

228.    The State of Louisiana and the Louisiana Legislature have a continuing duty to comply with the Voting Rights Act of 1965.

229.    East Baton Rouge Parish had the longest school desegregation case in the nation, lasting 47 years. *Davis v. East Baton Rouge Parish School Board*, 214 F. Supp. 624 (M.D. La 1963).

**African American actions to amend act 609**

230.    African American citizens formally and informally requested the Baton Rouge Metro-Council to amend the Judicial Election Plan by submitting a resolution to the Louisiana Legislature.

---

[7]Handwritten notes of First Assistant, Attorney General, Kenneth DeJean, attached as an Exhibit to Plaintiff and Intervenor Exhibit List.
[8]Handwritten notes of First Assistant, Attorney General, Kenneth DeJean, attached as an Exhibit to Plaintiff and Intervenor Exhibit List.

231.    African American citizens and African American Judges of City Court requested City Court's White Judges to join and assist them in seeking changes to Act 609. Judges Trudy White and Yvette Alexander advocated that Baton Rouge City Court should adequately reflect the City's population.

232.    Act 609 apportioned and redistricted Baton Rouge City Court utilizing the city of Baton Rouge's population and racial demographics data according to the 1990 United States Census.

233.    Angie Rogers, former Assistant Attorney General, in submitting Act 609 for the Department of Justice approval, indicated the reason for the changes to Baton Rouge City Court were "to reapportion the City Court in the City of Baton Rouge into two election sections with specific precincts to provide for a majority black population election section."

234.    African American citizens appeared before the Metro-Council on December 12, 2012 requesting that they approve and adopt a resolution amending Act 609 to change the subdistrict lines and provide a minority-majority subdistrict electing three judges and a majority-majority subdistrict electing two judges. The Metro-Council did not submit a resolution to the Louisiana Legislature.

235.    There is no legitimate state interest in maintaining Act 609.

**Racially polarized elections**

236.    The Division 2C contest involved only two candidates, an African American, Joel G. Porter, and the incumbent Judge Alex "Brick" Wall, a white candidate. The winning candidate was Mr. Wall, who received 60.55 percent of the votes. Report of Dr. Engstrom at 6.

237.    Mr. Porter was the choice of the African American voters in this election. Report of Dr. Engstrom at 6.

238.    The estimate of the percentage of African Americans casting ballots for Joel Porter was 58.4 percent.  Report of Dr. Engstrom at 6.

239.    The estimate of Joel Porter's vote among non-African Americans, however, was only 12.1 percent.  Report of Dr. Engstrom at 6.

240.    Non-African Americans constituted a majority of the voters turning out, 62.56 percent. Report of Dr. Engstrom at 6.

241.    Mr. Porter was vetoed by the non-African American voters. Report of Dr. Engstrom at 6.

242.    The Division 2E contest involved three candidates, an African American, Tiffany Foxworth, and incumbent Judge Suzan S. Ponder and "Cliff" Ivey, both White.  Report of Dr. Engstrom at 6.

243.    The leading vote recipient in the November election was Judge Ponder, who received 44.84 percent of the votes.  Report of Dr. Engstrom at 6.

244.    Judge Ponder was followed closely by Ms. Foxworth, with 43.16 percent.  Report of Dr. Engstrom at 7.

245.    The African American voters in this election cast an estimated 85.7 percent of their votes for Ms. Foxworth, while the non-African American support for her is estimated to be only 14.9 percent. Report of Dr. Engstrom at 7.

246.    No candidate received a majority of the votes cast in this election and therefore the top two vote recipients, Ponder and Foxworth, competed in a December runoff election to determine who would win the seat.  Report of Dr. Engstrom at 7.

247.     Judge Ponder won that runoff with 63.05 percent of the votes.  Report of Dr. Engstrom at 7.

248.     Judge Ponder was not the choice of the African American voters, however, Ms. Foxworth was.  Report of Dr. Engstrom at 7.

249.     Among African Americans, the estimate of Ms. Foxworth's vote exceeds 90 percent (92.7).  Report of Dr. Engstrom at 7.

250.     The non-African Americans gave Ms. Foxworth just 12.1 percent of their votes. Report of Dr. Engstrom at 7.

251.     Non-African Americans, who constituted a majority of the voters turning out in the December runoff election, 67.40 percent, vetoed Ms. Foxworth's attempt to be a City Court judge. Report of Dr. Engstrom at 7.

252.     There were two other judicial elections on the November and December ballots in 2012 in which voters in Baton Rouge were presented with a choice of African American and white candidates.  Report of Dr. Engstrom at 8.

253.     One was the election to the District 2, Subdistrict 1, Division B judgeship on the 1st Circuit of the state Court of Appeals.  Report of Dr. Engstrom at 8.

254.     The other election was for the District 5 seat on the state's Supreme Court. Report of Dr. Engstrom at 8.

255.     Only some voters within the City of Baton Rouge may participate in elections for this Court of Appeals seat, and some voters outside the city may as well.  Report of Dr. Engstrom at 8.

256.     All voters in Baton Rouge may participate in elections to the District 5 seat on the Supreme Court, as so many voters in some other parishes. Report of Dr. Engstrom at 8.

257.     The elections for Court of Appeals 1st Circuit and the Supreme Court District 5, like those for City Court, divided voters within Baton Rouge along racial lines.  Report of Dr. Engstrom at 8.

258.     In the November 2012 Court of Appeals election, two African American candidates sought the seat at issue.  These were Gideon T. Carter, III and Trudy M. White.  They competed with one white candidate, incumbent Judge õMikeö McDonald.  Report of Dr. Engstrom at 8.

259.     In the November 2012 election, African American voters in the 102 Baton Rouge precincts in which all, or nearly all, voters resided in the city are reported to have cast almost all of their votes, an estimated 98.7 percent, for either Mr. Carter or Ms. White.  Report of Dr. Engstrom at 8.

260.     The percentage of the votes cast by non-African American voters in the city for either of these candidates is an estimated 30.2.  Report of Dr. Engstrom at 9.

261.     Mr. Carter received a majority of the votes cast by African Americans, an estimated 64.3 percent of them, while receiving an estimated 16.7 percent of those cast by non-African Americans.  Report of Dr. Engstrom at 9.

262.     In these Baton Rouge precincts, African Americans constituted 38.18 percent of the people turning out to vote.  Judge McDonald received the largest vote in these precincts, 43.76 percent.  Mr. Carter was second with 34.25 percent.  Report of Dr. Engstrom at 9.

263.     No candidate received a majority of the votes in the November 2012 election in the district overall, and therefore a runoff was required in December between Mr. Carter

and Judge McDonald, the top two vote recipients in the district.  Report of Dr. Engstrom at 9.

264.      The vote was divided along racial lines.  Report of Dr. Engstrom at 9.

265.      In the runoff election between Mr. Carter and Judge McDonald, African American voters in the 102 Baton Rouge precincts cast an estimated 96.8 percent of their votes for Mr. Carter.  The percentage of the votes cast by non-African American voters in these precincts for Mr. Carter is estimated to be 14.2.  Report of Dr. Engstrom at 9.

266.      In these Baton Rouge precincts, African Americans constituted 33.53 percent of the people turning out to vote.  Mr. Carter received 39.97 percent of the votes.  Report of Dr. Engstrom at 9.

267.      The second exogenous judicial election was that for the District 5 seat on the Supreme Court.  It started in November as a contest for an open seat between John Michael Guidry, an African American, and seven white candidates.  Report of Dr. Engstrom at 9.

268.      The analysis of the District 5 Supreme Court seat election relies on the 153 precincts in Baton Rouge in which all or virtually all of those turning out to vote resided in Baton Rouge.  Report of Dr. Engstrom at 9.

269.      Voters in the Baton Rouge again split along racial lines.  Report of Dr. Engstrom at 9-10.

270.      Mr. Guidry, despite facing seven opponents, received an estimated 79.7 percent of the votes cast by African American voters in Baton Rouge.  His non-African American support is estimated at only 4.5 percent.  African Americans constituted 53.07 percent of

the voters in these precincts and Mr. Guidry finished first with 44.49 percent. Report of Dr. Engstrom at 10.

271.    This was another election that proceeded to a runoff in December.  Mr. Guidry and Mr. Hughes were the candidates in the runoff.  Report of Dr. Engstrom at 10.

272.    The analysis of the runoff relies upon 154 precincts in Baton Rouge.  In this election, Mr. Guidry received almost every vote cast by African American voters in these precincts. The estimate of his support among African Americans is 99.1 percent, while that from the non-African Americans in the city was 30.5 percent.  African Americans constituted 47.90 percent of the turnout in these precincts and Mr. Guidry received 64.91 percent of the votes. He did not win in the district overall however. Report of Dr. Engstrom at 10.

273.    The results of the analyses reported reveal differences in candidate preferences between African American and non-African American voters in Baton Rouge in each of the elections.  The differences are along racial lines.  Report of Dr. Engstrom at 10.

274.    In six of the seven votes the differences are pronounced.  Report of Dr. Engstrom at 10.

275.    These are not õstaleö elections, meaning elections held many, or even several, years ago.  Report of Dr. Engstrom at 10.

276.    There have been no elections in Baton Rouge involving a choice of African American and non-African Americans for a judgeship that occurred more recently then these November and December 2012 elections. Report of Dr. Engstrom at 10.

277.    Voting in these judicial elections in Baton Rouge reveals unmistakable evidence of racially polarized voting.   Report of Dr. Engstrom at 11.

278.    A pattern of racially polarized voting in the City of Baton rouge is "pronounced and persistent."   Report of Dr. Engstrom at 11.

279.    There is no legitimate state interest in maintaining Act 609.

**Construction of single member district within Election Section 2**

280.    House Bill No. 318, introduced in the 2013 session of the Louisiana Legislature, illustrates that an election system for the five judgeships in Baton Rouge City Court can be created that is consistent with state policy and does not dilute the votes of African Americans in the City.  Supplemental Report of Dr. Engstrom at 1.

281.    House Bill No. 198, introduced in the 2014 session of the Louisiana Legislature, illustrates that an election system for the five judgeships in Baton Rouge City Court can be created that is consistent with state policy and does not dilute the votes of African Americans in the City.  Supplemental Report of Dr. Engstrom at 1.

282.    It is possible to construct a sub-district within Election Section 2 with an African American population of 32,575 or 69.71 percent and an African American voting age population of 23,163 or 65.69 percent.  See Report of Nancy Jenson, Corrected Plan A.

283.    Traditional redistricting principles were utilized in construction of Plan A and B, namely: avoidance of gerrymandering any proposed districts; avoidance of dividing precincts; avoidance of compacting a district to create a minority subdistrict; utilize at least 65 percent African American population and 58 percent registered voter population; and proposed district does not protect an incumbent or possible candidate.  See Report of Nancy Jenson.

284.    Plan A, would cleanse the dilution through the adoption of a majority-African American single member district (SMD).  This district would be created from geography

now in the current Section 2.  Supplemental Report of Dr. Engstrom at 3.

285.    In Plan A Section 1 would remain as is with two seats allocated to it.  The new Section 2 would now consist of the remainder of the current Section 2 and also be allocated two seats. Supplemental Report of Dr. Engstrom at 3.

286.    Section 1, with 88,139 people residing in it, would deviate from the ideal district population for a two-seat district of 91,798 by 3,659, or -3.99 percent points. Supplemental Report of Dr. Engstrom at 3.

287.    The new two-seat Section 2 with 94,770 people would deviate from the ideal population of a two-seat district by 2,972, or 3.24 percentage points. Supplemental Report of Dr. Engstrom at 3.

288.    The single-member district, with a population of 46,584, would deviate from the ideal population for a SMD of 45,899, by 685, or 1.49 percent points. Supplemental Report of Dr. Engstrom at 3.

289.    Plan A would continue to employ a place system with a majority vote rule in each of the two-seat sections, although this would no longer contribute to the dilution of the minority vote, as both majority-African American Section 1 and majority-white new Section 2 would each elect two judges. Supplemental Report of Dr. Engstrom at 3-4.

290.    Traditional districting principles have not been subordinated to race in the design of the SMD.  Supplemental Report of Dr. Engstrom at 4.

291.    The four main principles for designing legislative districts are contiguity, compactness, respect for local political subdivision boundaries, and respect for "communities of interest."  Supplemental Report of Dr. Engstrom at 4.

292.    The SMD is contiguous and compact.  The other principles have no relevance for

judicial election districts, as judges do not serve as representatives of specific political subdivisions nor as representatives of specific communities of interest. Supplemental Report of Dr. Engstrom at 4.

293.    It is possible to construct a second sub-district within Election Section 2 with an African American population of 33,181 or 70.07 percent and an African American voting age population of 23,604 or 66.07 percent.  See Report of Nancy Jenson, Corrected Plan B.

294.    African Americans residing in Section 2 are sufficiently large in numbers and are geographically compact to constitute a majority in a SMD.

295.    African Americans are politically cohesive in Section 2 both in their voting preferences and in their voting registration as Democrats.

296.    The White majority within Section 2 votes sufficiently as a bloc to enable them, in the absence of special circumstances, to defeat the African American's preferred candidate in Section 2.

297.    Plaintiff-Intervenor Sharper is a member of a politically cohesive and geographically compact group of African American citizens and voters in the Section 2 of the City of Baton Rouge.

**Structural Dilution**

298.    The current election system for the Baton Rouge City Court dilutes the African American vote in Baton Rouge.  Supplemental Report of Dr. Engstrom at 1.

299.    The preferred candidates of choice of African American voters in judicial elections in Baton Rouge are African Americans, as documented by the results of the racially polarized voting analysis. Supplemental Report of Dr. Engstrom at 1-2.

300.    According to the 2010 Census, African Americans constitute a majority of the city's populations, 54.48 percent.  Supplemental Report of Dr. Engstrom at 2.

301.    African Americans constitute a plurality, almost a majority, of the voting age population (VAP), 49.98 percent as of 2010, compared to 43.94 percent for Whites and 6.08 for others.  Supplemental Report of Dr. Engstrom at 2.

302.    African Americans also constitute a majority, 53.21 percent, of the voter registration in the city as of April 1, 2014.  Supplemental Report of Dr. Engstrom at 2.

303.    African Americans have been able to elect only two African Americans to the City Court out of the five judges on that court.  This is a function of only two of the five seats on City Court being allocated to the only majority African American, Election Section 1, which is 69.37 percent African American in voting age population and 69.37 in voter registration as of April 1, 2014, while the other three are assigned to Election Section 2, the majority White section, which is only 38.25 percent African American in VAP and 38.33 percent in voter registration.  Supplemental Report of Dr. Engstrom at 2.

304.    The inability of African Americans to elect a third preferred candidate is reinforced by the use of a place system combined with a majority vote rule in Election Section 2.  Supplemental Report of Dr. Engstrom at 2.

305.    The place system divides the elections for the three City Court judges into three separate contests.  Candidates file to contest a particular Division, and compete with only the other candidates filing for that same place.  Supplemental Report of Dr. Engstrom at 2.

306.    Voters have one vote to cast in each contest, and candidates must receive a majority of the votes cast in order to win the seat.  If no candidate wins a majority, a

runoff election is held between the top two vote recipients I the initial election. Supplemental Report of Dr. Engstrom at 2.

307.    This system for filling multiple seats enhances the ability of the White majority in Section 2 to control the outcomes for all three Divisions in that Section.  Supplemental Report of Dr. Engstrom at 2.

308.    The same arrangement is used to elect the two judges assigned to Section 1, and enhances the ability of the African American majority in that section to control the outcomes of the two elections in that section.  Supplemental Report of Dr. Engstrom at 3.

309.    The effect is not the same between the sections however. Supplemental Report of Dr. Engstrom at 2.

310.    In Section 1 these features assist the African American majority of 69.37 in VAP and 79.72 in voter registration to control the outcome of two judicial elections, whereas in Section 2 these features assist a white majority of 55.32 percent in VAP and 56.49 percent in voter registration to control the outcome of three judicial elections. Supplemental Report of Dr. Engstrom at 2.

311.    This difference further adds to the overall dilutive effect of the City Court election system.Supplemental Report of Dr. Engstrom at 2.

**African American style/method of campaigning**

312.    With respect to African American political campaigns, especially those in minority sub-districts, the most effective resource is candidate presence, which may be either actual or constructive. Report of Jay Augustine at 2-3.

313.    Candidate presence is õactualö when a candidate, for example, attends and speaks at a predominately African American religious worship service wherein the church's

pastor allows the candidate to address the congregation, giving a tacit approval of the candidate and consequently influencing large blocks of African American voters. *Id.* at 3.

314.	A candidate's presence is "constructive" when, for example, a grassroots political organization prints endorsement literature, often called the organization's "official ballot," and circulates the same throughout the African American community (especially on Election Day), giving the candidate the benefit of constructively appealing to voters, through an organized infrastructure, without having to personally solicit a potential voter's support. *Id.* at 3.

315.	This practice in the African American community is commonplace in cities like Baton Rouge and New Orleans.*Id.* 3.

316.	The practice of literally carrying the origination's "official ballot" into the polling place remains prevalent today, dating back to the time after the Voting Rights Act was passed when large numbers of African Americas-those that were well-read on political issues and those that were not-voted for candidates of their own choosing. *Id.* at 3.

317.	At the local level in the African American community, the practice of personally engaging voters through the church, in lieu of investing financial resources in extensive media or direct mailings, is commonplace. It simply is a social norm in the African American community. *Id.* at 3.

**Municipality of City of Baton Rouge**

318.	The City of Baton Rouge is a home rule governmental city and has charter status.

*Williams v. City of Baton Rouge* at

http://www.ucs.louisiana.edu/~ras2777/localgov/williams.htm.

319.    The City of Baton Rouge is a separate corporate body which exists within the Parish of East Baton Rouge Parish.

**Voting rights act of 1965**

320.    Louisiana has, in the realm of voting, engaged in intentional and purposeful racial discriminationthat would trigger the application of Section 3(c).

321.    Even where constrained by Section 5øs protections, Louisiana still acted contrary to federal law.

322.    The history of Louisianaøs discrimination reinforces the urgent need for pre-enforcement review of Louisiana voting changes.

323.    The State of Louisiana, which was then covered under Section 5 of the Voting Rights Act, 42 U.S.C. §1973c(a), failed to seek administrative preclearance for a number of voting changes that adversely affected African American voters, particularly those in the city of Baton Rouge.

**DEFENDANTS**

324.    James D. "Buddy" Caldwell was elected as Louisiana's 43rd Attorney General in 2007 and then re-elected in 2011.

325.    Bobby Jindal was elected as Governor of Louisiana in 2007 and then re-elected in 2011.

326.    Tom Schedler was elected as Louisiana Secretary of State in 2011.

327.    The contested issues of fact by the parties relate to whether the Plaintifføs and the Intervenorøs right to vote has been violated by the imposition of any voting practice in a manner which results in a denial or abridgement of the right of any citizen to the United

States to vote on account of race or color under Section 2 (a) of the Voting Rights Act of l965, 42 USC 1973(2).

328.    More specifically, the contested issues of fact relate to the election of judges of the City Court of Baton Rouge as provided for by Act No. 609 of the 1993 Regular Session of the Legislature, amending  La. R.S. 13:1952 (4), which became effective to June 15, 1993.

329.    The contested issues of fact relate to the three preconditions which must be met to establish a violation of Section 2 (a) of the Voting Rights Act, as outlined by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

330.    The first precondition which is a contested issue of fact is whether the minority group at issue is sufficiently large and geographically compact to constitute a majority in a single-member district.

331.    The second precondition which a contested issue of fact is whether the minority group is politically cohesive.

332.    The third precondition which is a contested issue of fact is whether the white majority votes sufficiently as a bloc to enable itô  in the absence of special circumstances, such as the minority candidate running unopposedô usually to defeat the minority's preferred candidate.

333.    There is a dispute that the Plaintiff and the Intervenor can meet their burden of proof under the *Gingles* analysis to establish a violation of Section 2(a) of the Voting Rights Act.

334.     In the event that the Plaintiff and the Intevenor can meet their burden of proof under the *Gingles* analysis, the seven factors which must be met under the õtotality of circumstancesö analysis are contested issues of fact.

335.     The first factor which is a contested issue of fact is the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

336.     The second factor which is a contested issue of fact is the extent to which voting in the elections of the state or political subdivision is racially polarized.

337.     The third factor which is a contested issue of fact is the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

338.     The fourth factor which is a contested issue of fact is if there is a candidate slating process, whether the members of the minority group have been denied access to that process.

339.     The fifth factor which is a contested issue of fact is the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

340.     The sixth factor which is a contested issue of fact is whether political campaigns have been characterized by overt or subtle racial appeals.

341.    The seventh factor which is a  contested issue of fact is the  extent to  which members  of the  minority  group have  been elected  to public office in the jurisdiction.

342.    There is a dispute whether the Plaintiff and Intervenor can meet their burden of proof of the seven factors under the "totality of circumstances" analysis.

343.    The contested issues of fact by the parties relate to whether any of the Defendants, who under color of state law, deprived the Plaintiff and the Intervenor of rights, privileges and immunities secured by the Constitution and laws under  the  Section 1983 of the Civil Rights Act, 42 USC 1983.

344.    The contested issues of fact by the parties relate to whether the Plaintiff's and the Intervenor's right to vote under the Fifteen Amendment to the United States Constitution has been violated on  account of race, color, or previous condition of servitude

345.    The contested issues of fact by the parties relate to whether the Plaintiff's and the Intervenor's right to vote under 1st Amendment to the United States Constitution has been violated.

346.    The contested issues of fact by the parties relate to whether the Plaintiff's and the Intervenor's privileges and immunities under the Fourteenth Amendment to the United States Constitution have been abridged.

347.    The contested issues of fact by the parties relate to the preclearance compliance by any Attorney General of the State of Louisiana under Section 5 of the Voting Rights Act, including but not limited to preclearance of amendments to La. R.S. 13:1952(4).

348.    The contested issues of fact by the parties relate to the alleged policy of any Attorney General not to comply with preclearance compliance of the Voting Rights Act.

349.     The contested issues of fact by the parties relate to the constitutionality of La. R.S. 13:1952(4).

350.     The contested issues of fact by the parties relate to the constitutionality of the State of Louisiana Election Code, La. R.S. 18:1-18:1951.

351.     The contested issues of fact by parties relate to whether James õBuddyö Caldwell, Attorney General of the State of Louisiana violated the Plaintifføs and the Intervenorøs right to vote under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

352.     The contested issues of fact by parties relate to whether James õBuddyö Caldwell, Attorney General of the State of Louisiana violated any right of the Plaintiff and the Intervenor under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

353.     The contested issues of fact by parties relate to whether James õBuddyö Caldwell, Attorney General of the State of Louisiana acted with other defendants to violate the Plaintifføs and the Intervenorøs right to vote under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

354.     The contested issues of fact by parties relate to whether James õBuddyö Caldwell, Attorney General of the State of Louisiana intentionally, unintentionally or any manner discriminated against the Plaintiff and the Intervenor.

355.    The contested issues of fact by parties relate to the duties, responsibilities and authority of James õBuddyö Caldwell, Attorney General of the State of Louisiana with respect to the alleged voting rights violation, ability to exercise legislative power including amendment of La. R.S. 13:1952 (4), refusal to enforce La. R.S. 13:1952 (4), and other claims made by the Plaintiff and the Intervenor.

356.    The contested issues of fact by parties relate to whether James õBuddyö Caldwell, Attorney General of the State of Louisiana complied with the preclearance requirements of Section 5 of the Voting Rights Act.

357.    The contested issues of fact by parties relate to whether Bobby Jindal, Governor of the State of Louisiana violated the Plaintifføs and the Intervenorøs right to vote under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

358.    The contested issues of fact by parties relate to whether Bobby Jindal, Governor of the State of Louisiana violated any right of the Plaintiff and the Intervenor under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

359.    The contested issues of fact by parties relate to whether Bobby Jindal, Governor of the State of Louisiana acted with other defendants to violate the Plaintifføs and the Intervenorøs right to vote under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

360.     The contested issues of fact by parties relate to whether Bobby Jindal, Governor of the State of Louisiana  intentionally, unintentionally or any manner discriminated against the Plaintiff and the Intervenor.

361.     The contested issues of fact by parties relate to the duties, responsibilities and authority of Bobby Jindal, Governor of the State of Louisiana with respect to the alleged voting rights violation, ability to exercise legislative power including amendment of La. R.S. 13:1952 (4), refusal to enforce La. R.S. 13:1952, (4) and other claims made by the Plaintiff and the Intervenor.

362.     The contested issues of fact by parties relate to whether Tom Schedler, Louisiana Secretary of State violated the Plaintiff's and the Intervenor's right to vote under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution,  the  Fourteenth Amendment to the United States Constitution, and the  First Amendment to the United States Constitution.

363.     The contested issues of fact by parties relate to whether Tom Schedler, Louisiana Secretary of State acted with other defendants to violate the Plaintiff's and the Intervenor's right to vote under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

364.     The contested issues of fact by parties relate to whether Tom Schedler, Louisiana Secretary of State a intentionally, unintentionally or any manner discriminated against the Plaintiff and the Intervenor.

365.     The contested issues of fact by parties relate to the duties, responsibilities and authority of Tom Schedler, Louisiana Secretary of State with respect  to the alleged

voting rights violation, ability to exercise legislative power including amendment of La. R.S. 13:1952 (4),  refusal to enforce La. R.S. 13:1952 (4), and other claims made by the Plaintiff and the Intervenor.

366.     The contested issues of fact by parties relate to whether the City of Baton Rouge, Parish of East Baton Rouge and Melvin õKipö Holden, in his capacity as the Mayor-President of the City of Baton Rouge and the Parish of East Baton Rouge (the õCity-Parish Defendantsö) intentionally, unintentionally or any manner discriminated against the Plaintiff and the Intervenor.

367.     The contested issues of fact by parties relate to whether the City-Parish Defendants violated any right of the Plaintiff and the Intervenor under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, or the First Amendment to the United States Constitution.

368.     The contested issues of fact by parties relate to whether the City-Parish Defendants acted with other defendants to violate the Plaintifføs and the Intervenorøs right to vote under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the First Amendment to the United States Constitution.

369.     The contested issues of fact by parties relate to the duties, responsibilities and authority of the City-Parish Defendants with respect to the alleged voting rights violation, ability to exercise legislative power including amendment of La. R.S. 13:1952(4), refusal to enforce La. R.S. 13:1952(4), and other claims made by the Plaintiff and the Intervenor.

370.    The contested issues of fact relate to whether the Plaintiff or the Intervenor made any attempt to comply with the provisions of the Plan of Government for the City of Baton Rouge and the Parish of East Baton Rouge to request that an amendment to the Plan of Government to provide for the reapportionment of the Election Sections for the election of the judges for the Baton Rouge City Court be submitted to the qualified voters of the Parish, as provided for in Section 11.09 of the Plan of Government.

## DISPUTED LEGAL ISSUES

**PLAINTIFF AND INTERVENOR**

**A. By continuing to operate and maintain Act 609 in light of current demographics Defendants intentionally discriminate against minorities in violation of the Fourteenth Amendment Equal Protection Clause.**

371.    The Fourteenth Amendment due process clause provides in relevant part: õ[n]o state shall make or enforce any law which shall í deprive any person of life, liberty, or property, without due process of lawí .ö U.S. Const. amend. XIV.

372.    The Supreme Court in *Strauder v. West Virginia*, 100 U.S. 303 (1880), stated that the Equal Protection Clause was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. The Clause mandates that individuals in similar situations be treated equally by the law.

373.    A showing of an arbitrary and capricious or invidious action or distinction between citizens and voters is required. Court must find that the State has not only distinguished between citizens and voters, but that such distinctions are arbitrary and capricious or invidious.ö *Holshouser v. Scott*, 335 F. Supp. 928, 933 (1971).

374.    To prove racial discrimination in violation of the Fourteenth Amendmentøs Equal Protection Clause Plaintiff and Intervenor must prove the Defendants acted with discriminatory intent. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977).

375.    Additionally, Plaintiff and Intervenor must prove that Act 609 was either conceived or operated as a purposeful device to further racial discrimination, *City of*

*Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 1499,64 L.Ed.2d. 47 (1980), and

that its purpose was invidiously to minimize or cancel out the voting potential of racial

minorities. *See White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

376.    To demonstrate discriminatory intent, Plaintiff and Intervenor can, but need not

offer direct evidence.   Instead, Plaintiff and Intervenor may rely on circumstantial

evidence to show the Defendants purposefully discriminated against them on the basis of

race.  See *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-

67 (1977).

377.    Discriminatory effect may be demonstrated through circumstantial evidence of

discriminatory intent.  *See Johnson v. DeGrandy*, 512 U.S. 997, 1565 (1994); *Ketchum v.

Byrne*, 740 F.2d 1398, 1406 (7th Cir. 1984).

378.    The Supreme Court affirmed that intentional discrimination can be based on

indirect and circumstantial evidence and endorsed its reliance on a -totality of the

circumstancesøapproach.  See *Rogers v. Lodge*, 458 U.S. 613, 622-27 (1982).

379.    Courts rely on the totality of circumstances test to evaluate claims of racial vote

dilution under the Fourteenth Amendmentøs Equal Protection Clause.   The test allows

courts to infer an õinvidious discriminatory purpose í   from the totality of the relevant

facts,ö including the discriminatory effect of a redistricting scheme, by considering either

circumstantial or direct evidence.  *Rogers*, 458 U.S. at 618.

380.    "Proof of the second and third *Gingles* factors - demonstrating racially polarized

voting that enables the white majority usually to defeat the minority's preferred candidate

- is circumstantial evidence of racial bias operating through the electoral system to deny

minority voters equal access to the political process." *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994), *en banc*, *cert. denied*, 514 U.S. 1083 (1995).

**B. Continued operation of Act 609 (two at-large/multi-member election sections) dilutes the minority voting strength in violation of the Fourteenth Amendment Equal Protection Clause.**

381.    The Equal Protection Clause õrequires that a State make an honest and good faith effortö to avoid vote dilution. *Reynolds v. Sims*, 377 U.S. at 577.

382.    Courts rely on the totality of circumstances test to evaluate claims of racial vote dilution under the Fourteenth Amendmentøs Equal Protection Clause. The test allows courts to infer an õinvidious discriminatory purpose í   from the totality of the relevant facts,ö including the discriminatory effect of a redistricting scheme, by considering either circumstantial or direct evidence. *Rogers*, 458 U.S. at 618.

**C. Continued operation of Act 609 (a statutory racial equality-based plan) has resulted in mal-apportioned sub-districts without justification in violation of the Fourteenth Amendment's Due Process Clause.**

383.    Nothing prohibits the court from using "the one-person one-vote" standard to aid in determining whether an election practice violates the Due Process Clause. As a result, the inapplicability of the constitutional "the one-person one-vote" standard to judicial elections is not a bar to the development of judicially manageable standards for measuring vote dilution pursuant to the Due Process Clause. *League of  United Latin American Citizens, Council No. 4423 v. Clements,* 986 F. 2d 728 (C.A. 5 (Tex.) 1993).

384.    The "the one-person-one-vote" has been borrowed to devise an appropriate remedy in a Section 2 involving judicial election minority vote dilution. *Martin v. Mabus*, 700 F.Supp. 327 (S.D. Miss. 1988).

**D. Act 609 is Now a Racially Gerrymandered Election Plan in violation of the Fourteenth Amendment's Equal Protection Clause.**

385.    Deviations from population equality in judicial districts can only be based on "legitimate considerations incident to the effectuation of a rational state policy." *Reynolds v. Sims*, 377 U.S. 533, 579 (1964).

386.    Whenever a State government decides to selectively incorporate the Equal Protection Clause of the Fourteenth Amendment to select persons by popular election to perform judicial functions, the Amendment "requires that each qualified voter must be given an equal opportunity to participate in that election."*Reynolds v. Sims*, 377 U.S. 533 (1964).

387.    Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination under the Equal Protection Clause.  *Regents v. Univ. of Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.)  This rule obtains with equal force regardless of race or those burdened or benefitted by particular classification.  *Richmond v. J.A. Croson Co*., 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (plurality opinion).

388.    "Strict scrutiny must be applied to all governmental classification by race." *Croson*, 488 U.S. at 520.

389.    Laws classifying citizens on the basis of race cannot be upheld unless they are narrowly tailored to achieving a compelling state interest.  *Croson*, 488 U.S. at 494.

390.    Equal protection principles apply not only to legislation that contains explicit racial distinctions, but also to laws neutral on their face but unexplainable on grounds other than race.  *Shaw v. Reno*, 509 U.S. 630, 644, 113 S.Ct. 2816, 2825, 125 L.Ed.2d 511 (1993).

**E. Act 609's election system weighs the White vote more heavily than the African American vote in violation of the Fourteenth Amendment.**

391.     The United States Supreme Court has indicated that one person's vote cannot be given a weight greater than that given to others.  *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

392.     "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote – whatever their race – and wherever their home may be in that geographical unit.  This is required by the Equal Protection Clause of the Fourteenth Amendment.  The concept of ʻwe the peopleʼ under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications."  *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 808, 9 L.Ed.2d. 821 (1963).

**F.  Continued operation of Act 609 violates the constitutional principle of majority rule.**

393.     To establish a Majority Rule violation, Plaintiff and Intervenor must prove that, regardless of their substantial majority, the election scheme minimizes the strength of their voting majority.  Preamble to the United States Constitution and principles of the Fourteenth and Fifteenth Amendments.

**G. By continuing to operate and maintain Act 609, Defendants abridge minority's right to vote in violation of the Fifteenth Amendment.**

394.     The Fifteenth Amendment to the United States Constitution provides: "[t]he right of citizens of the United States to vote shall be not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV.

395.    Furthermore, õ[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizenøs vote just as effectively as by wholly prohibiting the free exercise of the franchise.ö  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

396.    The right of suffrage is a fundamental matter in a free and democratic society; since right to exercise franchise in free and unimpaired manner is preservative of other basic civil and political rights any alleged infringement of right of citizens to vote must be carefully and meticulously scrutinized.*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).

397.    õThe right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot.ö  *Allen v. State Bd. of Elections*, 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969).

398.    Governing principles require the voidance of õstatutes that, however speciously defined, obviously discriminate against colored citizens.ö  *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960).

399.    The Fifteenth Amendment õnullifies sophisticated as well as simple-minded modes of discrimination.ö  *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939).

## H. The Defendants use of specific election practices have enhanced discrimination against minorities in violation of Section 2 of the Voting Rights Act.

400.    Courts should look at "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37.

401.    Use of numbered posts enhances vote dilution by defeating single shot voting. *Rogers v. Lodge*, 458 U.S. 613, 627 (1982).

402.	Majority vote requirements can obstruct the election of minority candidates by giving white voting majorities a 'second shot' at minority candidates who have only mustered a plurality of the votes in the first election." *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993).

**I.	Defendants violated Section 2 of the Voting Rights Act.**

403.	Section 2 of the Voting Rights Act, as amended, provides:

(c)	No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right í to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided by subsection (b) of this section.

(d)	A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

404.	While explaining that õ[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be consideredö in evaluating an alleged violation, subsection (b) cautions that õnothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.ö 42 U.S.C. § 1973(b).

405.	õPassage of the Voting Rights Act of 1965 was an important step in the struggle to end discriminatory treatment of minorities who seek to exercise one of the most

fundamental rights of our citizens: the right to vote." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009).

406.     "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

407.     The Supreme Court has "long recognized" that at-large voting schemes have the potential to "operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Gingles*, 478 U.S. at 47.

408.     The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Gingles*, 478 U.S. at 47.

409.     Section 2 of the Voting Rights Act applies to every election in which registered voters are permitted to vote.  *Chisom v. Edwards*, 839 F.2d 1056, 1064 (5th Cir. 1988).

410.     Section 2 prohibits what is referred to as "minority vote dilution" – the minimization or cancelling out of minority voting strength.  Section 2(a) of the Act prohibits any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen … to vote on account of race or color.  42 U.S.C. § 1973(a).

411.     In a *Gingles'* theoretical analysis, the Court held that to establish a claim of actionable vote dilution under Section 2, Plaintiff and Intervenor must establish three "necessary preconditions":[9]

---

[9]*Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

    d) The minority groups at issue are õsufficiently large and geographically compact t constitute a majority in a single-member district,ö[10]

    e) The minority group must be õpolitically cohesive,ö meaning that their members vote in a similar fashion; and,

    f) There must be evidence of racial-bloc voting[11] (i.e., racially polarized voting) in which the majority tends to vote õsufficiently as a bloc to enable it í usually to defeat the minorityøs preferred candidate.ö *See Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986); *see also Growe v. Emison*, 507 U.S. 25, 401-41 (1993).

412.     Lay witness testimony may show political cohesion and racial bloc voting. *Monroe v. City of Woodville, Miss.* 881 F.2d 1327 (5th Cir. 1989); *Houston v. Haley*, 859 F.2d 341 (5th Cir. 1988).

413.     *Gingles* "rejected a blanket numerical threshold for white bloc voting because *** [t]he amount of white bloc voting that can generally minimize or cancel black voters' ability to elect representatives of their choice *** will vary from district to district according to a number of factors." *Gingles*, 478 U.S. 30, 56.

414.     Racial bloc voting varies "from district to district" and "according to a variety of factual circumstances." *Gingles*, 478 U.S. 30, 55-56, 58.

415.     There is "no simple doctrinal test for the existence of legally significant of racial bloc voting." *Gingles*, 478 U.S. 30, 58.

---

[10] A minority group must constitute more than 50 percent of the voting-age population in a proposed majority-minority district. *See Barlett v. Strickland*, 129 S.Ct. 1231 (2009).

[11] The *Gingles* opinion gives the following definition of racial bloc voting: õStated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group.ö *Gingles*, at 478 at 48-49. "The amount of white bloc voting that can generally minimize or cancel black voters' ability to elect representatives of their choice will vary from district to district according to a number of factors." *Gingles*, 478 at 56.

416.     Reasons for racially polarized voting are irrelevant on the Section 2 inquiry. *Gingles*, 478 U.S. 30, 61-64 (plurality opinion).

417.     Statistical evidence need not be flawless. *Meek v. Metropolitan Dade County, Fla.*, 985 F.2d 1471, (11th Cir. 1990).   Uncontroverted statistical evidence can be sufficient to establish minority political cohesiveness as a matter of law. *Solomon v. Liberty County, Florida*, 899 F.2d 1012 (11th Cir. 1990).

418.     The District Court, however, is not obligated to accept statistical evidence[12] or the conclusions of experts as conclusive on the question whether racially polarized voting exists. Rather, the District Court may examine the election results offered by both sides, as well as the circumstances surrounding those elections, and determine for itself, with or without expert conclusions as to which elections are aberrational, whether the white majority votes sufficiently as a bloc so as to usually defeat the minority-preferred candidate. *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143 (5th Cir. 1993).

419.     Traditionally, courts rely on three statistical methods to examine the question of polarization: õhomogenous precinct analysis,ö bivariate ecological regression analysisö and õecological inference.ö  *See Rodriguez v. Bexar County*, 385 F.3d 853, 865-66 (5th Cir. 2004); *LULAC v. Perry*, 548 U.S. 399, 467 (2006).

420.     The Fifth Circuit has cautioned the district courts about reading too much into õexogenous election results.ö  *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1329 (5th Cir. 1989), on petition for rehearing, 897 F.2d 763 (5th Cir. 1990).[13]

---

[12]*Teague v. Attala County, Miss.*, 17 F.3d 796 (5th Cir. 1994); *Magnolia BarAss'n, Inc. v. Lee*, 994 F.2d 1143 (5th Cir. 1993).

[13]*Westwego Citizens for Better Government v. City of Westwego*, 872 F.2d 1201, 1208, n. 8 (5th Cir. 1989); *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir. 1987); *Clark v. Calhoun County*, 88 F.3d 1393, 1397 (5th Cir. 1996) (stating that results of exogenous elections are õless probativeö and of õlimited relevanceö); the

421.     The *Gingles* requirements "cannot be applied mechanically and without regard to the nature of the claim." *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

422.     *Gingles* suggests flexibility in the face of sparse data: "where a minority group has begun to sponsor candidates just recently the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." *Gingles*, 106 S.Ct. at 2770 n. 25.

423.     Because a claim of vote dilution must be evaluated with a functional, rather than a formalistic, view of the political process, the Supreme Court has emphasized the importance of "an intensely local appraisal of the design and impact;" of the electoral structure, practice, or procedure at issue.  *Gingles*, 478 at 79.

424.     Once these preconditions are established, "the court considers whether, -on the totality of circumstances,ø minorities have been denied an -equal opportunityø to -participate in the political process and to elect representatives of their choice.ø *Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (quoting 42 U.S.C. § 1973(b)).

425.     Judicial assessment of the totality of the circumstances requires a "searching practical evaluation of the -past and present reality.ø *Gingles*, 478 U.S. at 45.

426.     The key to this inquiry is an examination of the seven principal factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act, the so-called "Senate factors." *Id*. at 44-45 (citing S. REP. NO. 97-417 at 28-29 (1982), 1982 U.S.C.C.A.N. 177, 206-07 (the "Senate Reportö)).

427.     Those factors, are:

---

Middle District followed suit in *Oren v. Foster*, Civil Action No. 96-3130 (M.D. La. 1999) *citing Clark v. Edwards*, 777 F.Supp. 445, 460 (M.D. La. 1990).

h) The history of voting-related discrimination in the state or political subdivision;

i) The extent to which voting in the elections of the state or political subdivision is racially polarized;

j) The extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

k) The exclusion of members of the minority groups from candidate slating processes;

l) The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

m) The use of over or subtle racial appeals in political campaigns; and

n) The extent to which members of the minority groups have been elected to public office in the jurisdiction. *See Gingles*, 478 U.S. at 44-45; Senate Report No. 97-417 (1982).

428.    Additional factors that may be probative of vote dilution in some cases are:

a. Whether there is significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and

b. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles*, 478 U.S. at 37.

429.     õThis list of typical factors in neither comprehensive nor exclusive.ö *Gingles*, 478 U.S. at 45.

430.     Plaintiff and Intervenor need not prove a majority of these factors, nor even any particular number of them in order to sustain their claims.  Instead, õthese factors are simply guideposts in a broad-based inquiry in which district judges are expected to roll up their sleeves and examine all aspects of the past and present political environment in which the challenged electoral practice is used.ö  *Goosby v. Hempstead, N.Y.*, 956 F. Supp. 326, 331 (E.D.N.Y. 1997).

431.     The Supreme Court did not confine review of vote dilution claims to the factors enumerated in the opinion: õWhile the enumerated [Zimmer] factors will often by pertinent to certain types of Sec. 2 violations, particularly vote dilution claims, other factors may also be relevant and may be considered.ö *Gingles*, 106 S.Ct. at 2674.

432.     õAs both amended § 2 and its legislative history make clear í   the trial court is to consider the totality of circumstances and to determine, based upon a searching practical reality, whether the political process is equally open to minority voters.ö *Gingles*, 478 U.S. at 79.

433.     Vote dilution õmay be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters.ö *Gingles*, 478 U.S. at 46, n. 11.

**J.  Act 609, as presently constructed, structural dilutes the voting strength of African Americans in violation of Section 2 of the Voting Rights Act**

434.     Unlike the theoretical basis for a *Gingles'* type of impairment, Plaintiff and Intervenor assert system or structural dilution -- where minority (African American) and majority (White Americans) voters prefer different candidates, the non-numerical

majority (White Americans), by virtue of their numerical inferiority, defeat the minorities preferred candidate.

435.    In this non-*Gingles'* theoretical analysis, this Court should find that to establish a claim of actionable vote dilution under Section 2, Plaintiff and Intervenor must establish the following: (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district inside of the challenged subdistrict; or sufficiently large and geographically compact to constitute a majority in a new and increased numerical-member multi-member district; (2) the minority group must be politically cohesive in either the challenged district; or in the enlarged multi-member district; and (3) the non-majority (White Americans) have voted sufficiently as a bloc to enable it to defeat the minority's preferred candidate in an election.

436.    Once these conditions are established, the court did not consider any other circumstance, other than whether historically minorities have been denied an equal opportunity to participate in the political process and to elect representatives of their choice.

437.    Judicial assessment of the historical circumstances would require a "searching practical evaluation of the 'past and present reality'" consistent with *Gingles*, 478 U.S. at 45.

**K.  The State of Louisiana should be bailed-in under Section 3c of the Voting Rights Act and should pre-clear all election changes.**

438.    Section 3c of the Voting Rights Act, as amended, provides:

   c.  If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any state or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such a state or political subdivision, the court, in addition to

such relief as it may grant, shall retain jurisdiction for such a period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title: Provided, that such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice or procedure.

42 U.S.C. § 1973a(c).

439.    During the pendency of this litigation, the Supreme Court issued its decision in *Shelby County, Alabama v. Holder*, 570 U.S. ____, 2013 LEXIS 4917 (June 25, 2013), a challenge to the constitutionality of Section 5 and the coverage formula established in Section 4 of the Voting Rights Act.

440.    In its decision, the Court invalidated only the coverage formula in Section 4 of the Voting Rights Act.

441.    The Court's decision did not affect the validity or constitutionality of Section 5 preclearance provisions.

442.    No question was raised before the Supreme Court as to the constitutionality of Section 3(c), and nothing in *Shelby County* decision affects that section: Section 3(c) of the Voting Rights Act was not at issue in the *Shelby County* case and remains valid and enforceable.

443.       Unlike the Court's concerns with Section 4, Section 3(c) is not based on any predetermined formula—it is "justified by current needs" and "is sufficiently related to the problems that it targets." *Nw. Austin v. Holder*, 557 U.S. 193, 203 (2009).

444.       When the Voting Rights Act was first drafted in 1965, the House Committee introduced the bail-in language, citing the new measure as introducing "judicial remedies to deal with voting discrimination in the so-called pockets of discrimination—areas outside those in which the prohibitions of section 4(a) suspending literacy tests are in effect." H.R. Rep. No. 439.

445.       The House Report for the amended bill explains that Section 3(c) follows a "traditional case-by-case approach." H.R. Rep. No. 439.

446.       The House Report stated the intended purpose for Section 3(c) as "providing for judicial scrutiny of new or changed voting requirements, to insure against erection of new and onerous discriminatory voting barriers by State or political subdivisions which have been found to have discriminated." H.R. Rep. No. 439.

447.       The bail-in provision of the Voting Rights Act is triggered by acts of intentional discrimination by jurisdictions, like the State of Louisiana.

448.       The application of a Section 3(c) remedy, in short, involves the following elements:

d.   a finding that a jurisdiction has violated the Fourteenth, Fifteenth Amendment or other United States Constitutional amendments;

e.   consideration by the Court of sub-state level actions (local political subdivisions' constitutional violations) to evaluate the constitutional violation and the need for an equitable remedy;

    f.   imposition of a preclearance requirement, known as "bail-in" or "pocket trigger," by this Court, thus requiring retention of jurisdiction by this Court for preclearance actions, the length of which retention is in the discretion of the Court;

    g.   inclusion of potentially more changes subject to preclearance than just the changes at issue in the dispute before the Court;

    h.   coverage of any designated changes since commencement of this suit (October 2012);

    i.   this Court's application of the same non-retrogression and non-discriminatory purpose standards formerly applied by the Department of Justice and the D.C. District Court under Section 5, since the language is identical;

    j.   after imposition of a preclearance requirement, the continuing option of administrative preclearance for the State.

**L.  Defendants violated the Civil Rights Act of 1871 Civil Rights Act, 42 U.S.C. §1983, as amended, §1986.**

449.    Section 1983 provides in relevant part:

    k.   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. §1983.

450.    A private right of action for deprivation of civil rights under color of law is afforded by 42 U.S.C. §1983.

451.     To prevail on a Section 1983 claim, Plaintiff and Intervenor must prove that a person acting under color of state law deprived them of a right secured by the Constitution or the laws of the United States. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).

452.     To adequately state a claim under Section 1983, Plaintiff and Intervenor must support their claims with specific facts demonstrating a constitutional deprivation and may not rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).

453.     Thus, for Plaintiff and Intervenor, to recover, they must show that the State of Louisiana, the Attorney General, the Secretary of State, the City of Baton Rouge and the Parish of East Baton Rouge deprived them of a right guaranteed by the Constitution or the laws of the United States.  They must also prove that the constitutional and statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1971, 128 L.Ed.2d.811 (1944).

454.     A showing of Defendantsø unresponsiveness to particularized minority needs and polarized voting can combine to demonstrate intentional exploitation of electorateøs bias for purpose of challenge to the electoral system under the Voting Rights Act. *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), *cert denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980).

455.     ôDenying includes inaction as well as action.  And denying the equal protection of the laws include the omission to protect, as well as the omission to pass laws for

protection.ö *Bell v. Maryland*, 378 U.S. 226, 84, S.Ct. 1814, 12 L.Ed.2d. 822, 845-46 (1964).

456.    öThese views are fully consonant with [the Supreme] Courtøs recognition that state conduct which might be described as ÷inactionø can nevertheless constitutes responsible ÷state actionø within the meaning of the Fourteenth Amendment.ö *Bell v. Maryland*, 12 L.Ed.2d at 46.

### M. Plaintiff and Intervenor are entitled to an award of damages, reasonable costs of litigation and attorney's fees pursuant to 42 U.S.C. § 1988(b).

457.    Section 1988(b) provides that öthe court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneyøs fee as part of the costs.ö 42 U.S.C. § 1988 (b).

### N. Plaintiff and Intervenor are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1973*l*(e).

458.    Section 1973*l*(e) provides, öIn any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneyøs fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs.ö

### O. After a finding of liability, Plaintiff and Intervenor will be considered prevailing parties and entitled to an award of attorney's fees.

459.    A prevailing plaintiff in a voting rights case or civil rights case is presumptively entitled to an award of fees, unless special circumstances would render such an award unjust. *Newman v. Piggie Park Enters. Inc*., 390 U.S. 400, 402, 88 S.Ct. 964, 19L.Ed.2d 1263 (1968).

460.    õCongress considered vigorousenforcement to vindicate civil rights a high priorityand entrusted plaintiffs to effectuate thispolicy.ö *Dean v. Riser*, 240 F.3d 505, 507 (5th Cir.2001).

461.    The policy in favor of awarding fees tocivil rights plaintiffs is necessary to carry out Congress'sintention that individuals injured by discriminationact as õprivate attorneys general,ö vindicating a policy that Congress considered of the highestpriority. *Indep. Fed'n of Flight Attendants v. Zipes*,491 U.S. 754, 759, 109 S.Ct. 2732, 105 L.Ed.2d639 (1989).

462.    õA prevailing party mustbe one who has succeeded on any significant claimaffording it some of the relief sought, either *pendent lite* or at the conclusion of the litigation.ö*Tex. State Teachers Ass'n v. Garland Indep. Sch.Dist*., 489 U.S. 782, 791, 109 S.Ct. 1486, 103L.Ed.2d 866 (1989).

463.    The Supreme Court has interpretedthe term õprevailing partyö generously, sothat plaintiffs may be considered prevailing partiesfor attorney's fees purposes if they succeed on anysignificant issue in litigation that achieves some ofthe benefit the parties sought in bringing suit. *Id*. at791õ92, 109 S.Ct. 1486; *Hensley v. Eckerhart*, 461U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40(1983).

464.    A plaintiff prevails when he obtains an enforceablejudgment against the defendant fromwhom fees are sought or comparable relief througha consent decree or settlement. *Farrar v. Hobby*,506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494(1992).

465.    A judicially sanctioned settlement, such asthrough the entry of a consent decree, may conferprevailing party status even without a judicial determinationthat the plaintiffs'

rights have been violated.*Maher v. Gagne*, 448 U.S. 122, 126 n. 8, 129,100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

466.     However,private settlements and a ödefendant's voluntarychange in conduct, although perhaps accomplishingwhat the plaintiff sought to achieve by the lawsuit,lack[] the necessary judicial imprimatur on thechange.ö *Buckhannon*, 532 U.S. at 605.

467.     öThe touchstone of the prevailing party inquiry ... is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.ö *Sole v. Wyner*, 551 U.S. 74, 82, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007).

468.     Based on these principles, the Fifth Circuit holds that, for prevailing-party status: (1) a plaintiff must obtain judicially sanctioned relief, such as a judgment on the merits or a consent decree (judicial imprimatur); (2) the relief must materially alter the legal relationship between the parties; and (3) the relief must modify the defendant's behavior in a way directly benefiting the plaintiff at the time the relief is granted. *Petteway v. Henry*, 738 F.3d 132, 136ó37 (5th Cir. 2013); *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir.2008).

## Duties of Elected Officials

469.     States have the affirmative duty to remedy racial inequality in the election process.  *Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1408 (1996).

470.     The Governor shall faithfully support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed.  La. Const. art. IV, § 5(A).

471.     The Governor has the authority to call special elections to fill vacancies.  La. R.S. §42:371.

472.    The Governor has taken no action in response to the failure to reapportion the election districts for the Baton Rouge City Court through two census cycles.

473.    The Attorney General has taken no action in response to the failure to reapportion the election districts for the Baton Rouge City Court through two census cycles.

474.    The Secretary of State's statutory duties include but are not limited to the provisions of La. R.S. §18:18.

475.    The Secretary of State shall make reports and recommendations on his own initiative to investigate allegations of election irregularities.La. R.S. §36:742.

476.    The Secretary of State is an ex officio member of the State Board of Election Supervisors that is housed in the secretary's department.  La. R.S. §18:23.

477.    The Board of Election Supervisors has authority to hold hearings, issue subpoenas and employ legal counsel.  La. R.S. §18:24A(2)(4).

478.    The Secretary of State has taken no action in response to the failure to reapportion the election districts for the Baton Rouge City Court through two census cycles.

479.    The Board of Election Supervisors has taken no action in response to the failure to reapportion the election districts for the Baton Rouge City Court through two census cycles.

480.    The Election Code is codified at Title 18.

481.    The Louisiana Election Code (La. R.S. §18:1 *et seq*.) applies to Baton Rouge City Court.

482.    Primary and general elections are held to elect persons to Congress and to all elective offices in this State.  La. R.S. 18 § 401.

483.    A candidate who receives a majority of the votes cast for an office in a primary election is elected.  La. R.S. 18 § 511.

484.    The candidate who receives the most votes cast for an office in a general election is elected. La. R.S. § 512.

485.    Baton Rouge City Court Judges are elected pursuant to La. R.S. §13:1952 Section 1(4)(a) (b) and (c).

**City of Baton Rouge**

486.    The Plan of Government for the Parish of East Baton Rouge, City of Baton Rouge, sets forth provisions for the City Court and its Judges.  Plan of Government Section 11.04.

**DEFENDANTS**

487.    The contested issues of law by the parties relate to whether the Plaintiff and the Defendant have met their burden of proof to establish a violation of Section 2 (a) of the Voting Rights Act, 42 U.S.C, 1973, as outlined by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

   A. The Plaintiff and Intervenor must prove that Defendants imposed a voting practice in manner which results in a denial or abridgement of their right to vote on account of race or color.

   B. Under the *Gingles* analysis, Plaintiff and Intervenor  must first prove that the minority group at issue is sufficiently large and geographically compact to constitute a majority in a single-member district.

   C. Plaintiff and Intervenor must secondly prove that the minority group is politically cohesive.

D. Plaintiff and Intervenor must thirdly prove that the white majority votes sufficiently as a bloc to enable itô in the absence of special circumstances, such as the minority candidate running unopposedô usually to defeat the minority's preferred candidate.

E. If all three of the *Gingles* preconditions are met, the Court must then determine under the õtotality  of circumstancesö whether there has been a violation of Section 2.

   i. The first factor to be considered under the õtotality of circumstancesö is the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

   ii. The second factor to be considered under the õtotality of circumstancesö is the extent to which voting in the elections of the state or political subdivision is racially polarized.

   iii. The third factor to be considered under the õtotality of circumstancesö is the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

   iv. The fourth factor to be considered under the õtotality of circumstancesö is if there is a candidate slating process, whether the members of the minority group have been denied access to that process.

    v.   The fifth factor to be considered under the "totality of circumstances" is the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

    vi.   The sixth factor to be considered under the "totality of circumstances" is whether political campaigns have been characterized by overt or subtle racial appeals.

    vii.   The seventh factor to be considered under the "totality of circumstances" isthe extent to which members of the minority group have been elected to public office in the jurisdiction.

488.    The contested issues of law by parties relate to whether the Plaintiff and Intervenor have met their burden of proof required to establish a violation of their right to vote under the Civil Rights Act., 42 U.S.C. 1983.

    A.  Section 1983 imposes liability on anyone, who under color of state law, deprives a person of rights, privileges and immunities secured by the Constitution and laws.

    B.  Section 1983 also safeguards certain rights conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (Citing *Maine v. Thiboutot*, 44 U.S. 1 (1980).

    C.  In order to state a claim of racial discrimination under the Equal Protection Clauseand § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race. See *Washington v.*

*Davis*, 426 U.S. 229, 238-42 (1976); *Vera v. Tue*, 73 F.3d 604, 609 (5th Cir. 1996).

D. Plaintiff and Intervenor claim is that their right to vote under the Fifteenth Amendment to the United States Constitution made applicable to the States by reason of the Due Process Clause of the 14th Amendment has been violated.

E. Plaintiff and Intervenor claim is that their right to vote under the Voting Rights Act and the First Amendment to the United States Constitution has been violated.

F. The Court dismissed   Plaintiffs 42 U.S.C 1983 claim against the State of Louisiana. Order, Rec. Doc. 174.

489.    The contested issues of law by parties relate to whether the Plaintiff and Intervenor have met their burden of proof required to establish a violation of their right to vote under the Fifteenth Amendment.

A. The Fifteen Amendment to the United States Constitution provides that the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude. Section 1, U.S. Const. amend. XV.

B. To prove racial discrimination in violation of the Fifteenth Amendment's right to vote, a plaintiff must prove the government acted with discriminatory intent. Order, Rec. Doc. 277.

C. Vote dilution does not give rise to a cause of action under the Fifteenth Amendment. See *Reno v. Bossier Parish*, 528 U.S. 320, 334 n.3 (2000); *Holder v. Hall*, 512 U.S. 874, 920 (1994) (Thomas, J. concurring in judgment); *Mobile v. Bolden*,446 U.S. 55, 84 n.3 (1980) (Stevens, J. concurring); see also *Tigrett v.*

*Cooper*, No. 10627246STA6tmp, 2012 WL 691892, at *10 (W.D.Tenn. Mar. 2, 2012) (summarizing Supreme Court precedent).

490.    The contested issues of law by parties relate to whether the Plaintiff and Intervenor have met their burden of proof required to establish a violation of their right to vote under the Fourteenth Amendment.

    A.    The Fourteenth Amendment to the United States Constitution provides that all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.

    B.    If a plaintiffœs claim implicates a specific constitutional right, then the claim should be analyzed under the standard that governs that right, and not under the due process clause of the 14th Amendment. *Robinson v. Pickett,* 16 Fed. Appx. 577 (9th Cir. 2001).

    C.    In order to state a claim of racial discrimination under the Equal Protection Clauseand § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race. *See Washington v. Davis*, 426 U.S. 229, 238-42 (1976); Vera v. Tue, 73 F.3d 604, 609 (5th Cir. 1996).

    D.    "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp*., 429 U.S. 252, 265 (1977).

E. Plaintiff's claim under the Privileges and Immunities Clause of the Fourteenth Amendment has been dismissed. Order, Rec. Doc. 240.

F. Intervenor's claim on the basis of the "one-person, one-vote" principle of the Equal Protection Clause of the Fourteenth Amendment has been dismissed. Order, Rec. Doc. 214.

491.    The contested issues of law by parties relate to whether the Plaintiff and Intervenor have met their burden of proof required to establish a violation of their right to vote under the First Amendment.

A. The First Amendment to the United States Constitution prohibits the making of any law respecting an establishment of religion, impeding the free exercise of religion, abridging the freedom of speech, infringing on the freedom of the press, interfering with the right to peaceably assemble or prohibiting the petitioning for a governmental redress of grievances.

492.    The contested issues of law by parties relate to whether the Plaintiff and Intervenor can prove that the Attorney General of the State of Louisiana failed to comply with the preclearance requirements of Section 5 of the Voting Rights Act, including but not limited to amendments to La. R.S. 13:1952(4).

A. Any alleged policy of any Attorney General not to seek preclearance under Section 5 the Voting Rights Act.

B. Plaintiff's and Intervenor's claims under Section 5 of the Voting Rights Act of l965were dismissed without prejudice. Order, Rec. Doc. 173.

493.    The contested issues of law by parties relate to the duties, responsibilities and authority of James "Buddy" Caldwell, Attorney General of the State of Louisiana with

respect to the alleged voting rights violation, ability to exercise legislative power including amendment of La. R.S. 13:1952 (4), refusal to enforce La. R.S. 13:1952 (4), and other claims made by the Plaintiff and the Intervenor.

A.  The powers of government of the State of Louisiana are divided into three separatebranches:  legislative, executive, and judicial.  La. Const. art. II, § 1.

B.  Except as otherwise provided by the Constitution of the State of Louisiana, no one of the branches of government, nor any person holding office in one of them, shall exercise power belonging to either of the others.  La. Const. art. II, § 2.

C.  The legislative power of the State of Louisiana is vested in the legislature, consisting of a Senate and a House of Representatives.  La. Const. art. III, § 1.

D.  The creation and/or assignment of voting districts is within the authority of the legislative branch of the State of Louisiana, who created the current Election Sections for the election of Baton Rouge City Court Judges and is the proper authority to change or amend the geographic boundaries of these election sections.  La. Const. art. III, § 1;  La. R.S. 13:1952.

E.  The Plan of Government for the Parish of East Baton Rouge, City of Baton Rouge,sets forth provisions for the City Court and its Judges.   Plan of Government SectionNo act or omission by the Attorney General can alter the Plan of Government.

F.  The Attorney General is a member of the executive branch of the Louisiana State Government.  See La. Const. art. IV, § 1.

G.  The powers and the duties of the Attorney General are set forth in La. Const. art. IV, §8.

H. The Attorney General does not have the power to legislate, which is a power vested in the legislature by the constitution. See La. Const. art. III, § 1; See also La. Const. art. IV, § 8.

I. The creation and/or assignment of voting districts is not within the authority of the Attorney General of the State of Louisiana. See La. Const. art. III, § 1; La. R.S. 13:1952.

J. The Attorney General has no authority to conduct elections for Baton Rouge City Court.

K. Plaintiff is required to notify the Attorney General of a constitutional challenge, but the Attorney General does not need to be made a defendant to the litigation. See La.Code Civ.P. art. 1880; La. R.S. 13:4448; 28 U.S.C. § 2403(b).

L. The relief requested by the Plaintiff and Intervenor exceeds the scope of powers and duties of the Attorney General.

494.     The contested issues of law by the parties relate to whether the Plaintiff and Intervenor can prove that James õBuddyö Caldwell, Attorney General of the State of Louisiana violated or acted with other defendants to violate their right to vote or any other right or under the Voting Rights Act, the Civil Rights Act, the Fifteen Amendment to the United States Constitution, the  Fourteen Amendment to the United States Constitution, the First Amendment to the United States Constitution.

A. Voting Rights Act, 42 U.S.C, 1973, as outlined by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

B.  Section1983 imposes liability on anyone, who under color of state law, deprives a person of rights, privileges and immunities secured by the Constitution and laws.

C.  The Fifteenth Amendment to the United States Constitution provides that the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude. Section 1, U.S. Const. amend. XV.

D.  The Fourteenth Amendment to the United States Constitution provides that allpersons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.

E.  The First Amendment to the United States Constitution prohibits the making of any law respecting an establishment of religion, impeding the free exercise of religion, abridging the freedom of speech, infringing on the freedom of the press, interfering with the right to peaceably assemble or prohibiting the petitioning for a governmental redress of grievances.

495.    The contested issues of law by the parties relate to whether the Plaintiff and Intervenor can prove that James õBuddyö Caldwell, Attorney General of the State of Louisiana intentionally, unintentionally or any manner discriminated against the Plaintiff and the Intervenor.

A.  To prove racial discrimination in violation of the Fifteenth Amendment's right to vote, a plaintiff must prove the government acted with discriminatory intent. Order, Rec. Doc. 277.

B. In order to state a claim of racial discrimination under the Equal Protection Clauseand § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race. See *Washington v. Davis*, 426 U.S. 229, 238-42 (1976); *Vera v. Tue*, 73 F.3d 604, 609 (5th Cir. 1996).

496.    The contested issues of law by parties relate to the duties, responsibilities and authority of Bobby Jindal, Governor of the State of Louisiana with respect to the alleged voting rights violation, ability to exercise legislative power including amendment of La. R.S. 13:1952 (4), refusal to enforce La. R.S. 13:1952 (4), and other claims made by the Plaintiff and the Intervenor.

A. The powers of government of the State of Louisiana are divided into three separatebranches:  legislative, executive, and judicial.  La. Const. art. II, § 1.

B. Except as otherwise provided by the Constitution of the State of Louisiana, no one of the branches of government, nor any person holding office in one of them, shall exercise power belonging to either of the others.  La. Const. art. II, § 2.

C. The legislative power of the State of Louisiana is vested in the legislature, consisting of a Senate and a House of Representatives.  La. Const. art. III, § 1.

D. The creation and/or assignment of voting districts is within the authority of the legislative branch of the State of Louisiana, who created the current Election Sections for the election of Baton Rouge City Court Judges and is the proper authority to change or amend the geographic boundaries of these election sections.  La. Const. art. III, § 1;  La. R.S. 13:1952.

E.  The Plan of Government for the Parish of East Baton Rouge, City of Baton Rouge,sets forth provisions for the City Court and its Judges.    Plan of Government Section

F.  No act or omission by the Attorney General can alter the Plan of Government.

G.  The Governor is a member of the executive branch of Louisiana State Government. See La. Const. art. IV, § 1.

H.  The powers and the duties of the Governor are set forth in La. Const. art. IV, § 5.

I.  The Governor does not have the power to legislate, which is a power vested in the legislature by the constitution.  See La. Const. art. III, § 1;  See also La. Const. art. IV, § 5.

J.  The creation and/or assignment of voting districts is not within the authority of the Governor of the State of Louisiana.  See La. Const. art. III, § 1; La. R.S. 13:1952.

K.  The Governor has no authority to conduct elections for Baton Rouge City Court.

L.  The relief requested by the Plaintiff and Intervenor exceeds the scope of powers and duties of the Governor.

M.  Governor Jindal has not vetoed any legislation relative to the creation and/or assignment of voting districts by the Baton Rouge City Court.

497.    The contested issues of law by the parties relate to whether the Plaintiff and Intervenor can prove that Bobby Jindal, Governor of the State of Louisiana violated or acted with other defendants to violate their right to vote or any other right or under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States

Constitution, the Fourteenth Amendment to the United States Constitution, the First Amendment to the United States Constitution.

498.    The contested issues of law by the parties relate to whether the Plaintiff and Intervenor can prove that Bobby Jindal, Governor of the State of Louisiana intentionally, unintentionally or any manner discriminated against them.

   A. To prove racial discrimination in violation of the Fifteenth Amendment's right to vote, a plaintiff must prove the government acted with discriminatory intent. Order, Rec. Doc. 277.

   B. In order to state a claim of racial discrimination under the Equal Protection Clauseand § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race. See *Washington v. Davis*, 426 U.S. 229, 238-42 (1976); *Vera v. Tue*, 73 F.3d 604, 609 (5th Cir. 1996).

499.    The contested issues of law by parties relate to the duties, responsibilities and authority of Tom Schedler, Louisiana Secretary of State with respect to the alleged voting rights violation, ability to exercise legislative power including amendment of La. R.S. 13:1952 (4), refusal to enforce La. R.S. 13:1952 (4), and other claims made by the Plaintiff and the Intervenor.

   A. The powers of government of the State of Louisiana are divided into three separatebranches: legislative, executive, and judicial. La. Const. art. II, § 1.

   B. Except as otherwise provided by the Constitution of the State of Louisiana, no one of the branches of government, nor any person holding office in one of them, shall exercise power belonging to either of the others. La. Const. art. II, § 2.

C.   The legislative power of the State of Louisiana is vested in the legislature, consisting of a Senate and a House of Representatives.  La. Const. art. III, § 1.

D.   The creation and/or assignment of voting districts is within the authority of the legislative branch of the State of Louisiana, who created the current Election Sections for the election of Baton Rouge City Court Judges and is the proper authority to change or amend the geographic boundaries of these election sections.  La. Const. art. III, § 1;  La. R.S. 13:1952.

E.   The Plan of Government for the Parish of East Baton Rouge, City of Baton Rouge,sets forth provisions for the City Court and its Judges.    Plan of Government Section

F.   No act or omission by the Secretary of State can alter the Plan of Government.

G.   The Secretary of State  is a member of the executive branch of Louisiana State Government.  See La. Const. art. IV, § 1.

H.   The powers and the duties of the Secretary of State are set forth in La. Const. art. IV, § 7.

I.   The Secretary of State does not have the power to legislate, which is a power vestedin the legislature by the constitution.  See La. Const. art. III, § 1;  See also La. Const. art. IV, §7.

J.   The creation and/or assignment of voting districts is not within the authority of the Secretary of State of the State of Louisiana.  See La. Const. art. III, § 1; La. R.S. 13:1952.

K.   The Secretary of State has no authority to conduct elections for Baton Rouge City Court.

L.  The relief requested by the Plaintiff and Intervenor exceeds the scope of powers and duties of the Secretary of State.

500.     The contested issues of law by the parties relate to whether the Plaintiff and Intervenor can prove that Tom Schedler, Louisiana Secretary of State violated or acted with other defendants to violate the Plaintiff's and the Intervenor's right to vote or any other right  or under the Voting Rights Act, the Civil Rights Act, the Fifteenth Amendment to the United States Constitution, the  Fourteenth Amendment to the United States Constitution, the First Amendment to the United States Constitution.

A.  Voting Rights Act, 42 U.S.C, 1973, as outlined by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

B.  Section1983 imposes liability on anyone, who under color of state law, deprives a person of rights, privileges and immunities secured by the Constitution and laws.

C.  The Fifteenth Amendment to the United States Constitution provides that the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude. Section 1, U.S. Const. amend. XV.

D.  The Fourteenth Amendment to the United States Constitution provides that allpersons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.

E. The First Amendment to the United States Constitution prohibits the making of any law respecting an establishment of religion, impeding the free exercise of religion, abridging the freedom of speech, infringing on the freedom of the press, interfering with the right to peaceably assemble or prohibiting the petitioning for a governmental redress of grievances.

501.    The contested issues of law by the parties relate to whether the Plaintiff and Intervenor can prove that Tom Schedler, Louisiana Secretary of State intentionally, unintentionally or any manner discriminated against them.

A. To prove racial discrimination in violation of the Fifteenth Amendment's right to vote, a plaintiff must prove the government acted with discriminatory intent. Order, Rec. Doc. 277.

B. In order to state a claim of racial discrimination under the Equal Protection Clauseand § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race. See *Washington v. Davis*, 426 U.S. 229, 238-42 (1976); *Vera v. Tue*, 73 F.3d 604, 609 (5th Cir. 1996).

502.    The contested issues of law by the parties relate to whether the Attorney General, Governor and Secretary of State have immunity under the Eleventh Amendment of the United States Constitution.

A. The defendants are entitled to immunity under the Eleventh Amendment to the United States Constitution.  *Ex Parte Young,* 209 U.S. 123, 155-56, 28 S.Ct. 441, 452, 52 L. Ed.  174 (1908); *Okapalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001).

503.     The contested issues of law by the parties relate to whether the Attorney General, Governor and Secretary of State, in their official capacities, can found liable under the provisions of 42 U.S.C. 1983.

504.     The contested issues of law by the parties relate to whether the Plaintiff∉s and the Intervenor∉s claims under Section 3 of the Voting Rights Act are before the Court at this time.

505.     The contested issues of law relate to whether the City of Baton Rouge, Parish of East Baton Rouge and/or the Mayor-President (collectively the ∂City-Parish Defendantsö) have authority under the Plan of Government of the City of Baton Rouge and the Parish of East Baton Rouge  (the ∂Plan of Governmentö) to reapportion the Election Sections for the election of judges to the Baton Rouge City Court that were created by the Louisiana Legislature by Act 609 of 1993.

506.     The contested issues of law relate to whether the City Parish Defendants have authority to alter the method of electing judges of the Baton Rouge City Court without amending Section of 11.04 of the Plan of Government, which amendment must comply with the provisions of Section 11.09 of the Plan of Government.

## EXHIBIT LIST

507.    **Joint Exhibits** - Plaintiff and Intervenor exhibits 1, 2, 15, 33, 34

508.    Legislative History to all House and Senate Bills seeking to amend Act 609 of 1993

509.    Plaintiff and Intervenor exhibits 76-79 (All have agreed to stipulate to certified election results)

510.    Plaintiff and Intervenor exhibits 61, 63, 67, 69 (All have agreed to be stipulated to CVs of all experts)

511.    Plaintiff and Intervenor exhibits 16-18, 145-147 (All have agreed to stipulate to Census data)

512.    See Attachment A to the Joint Pre-Trial Order for a listing of exhibits to be offered at trial by Plaintiff and Intervenor.

513.    The Plaintiff and Intervenor enter a general objection to the Defendants' list of exhibits to the extent that the exhibits were not disclosed until June 25, 2014, and the Defendants have not had an opportunity to review the exhibits as they have not been provided.

514.    Plaintiff and Intervenor object to the majority of the Defendants' Exhibits on the grounds that documents were never produced to Plaintiff and Intervenor in discovery or exchanged by Defendants during formulation of this pre-trial order until the day the pretrial order was due to be submitted.

515.    <u>Relevance: Fed. R. Evid. 401</u>: Plaintiff and Intervenor object to Exhibits 1, 1.12, 2, 2.2, 2.4-2.6, 2.7 as to Suzan Ponder, 2.8, 2.9 as to Alex Wall, 2.10, 2.11-2.14, 2.19-2.21, 2.26, 2.30, 2.36-2.37, 3, 3.2, 3.12-3.13, 4, 5, 10, 13-21, 25-27, 28, 56-62, 69-75, 81-

89, 96-119, 120-179, 180, 201, 204A, 204B, 204C, 204F, 205-210, 213, 214 on the grounds that they lack relevance to these proceedings.

516.     Hearsay: Fed. R. Evid. 801- Plaintiff and Intervenor object to the Exhibits 1, 2, 3, 5, 14-21, 24, 28, 57-62, 69-75, 81-89, 96-181, 182, 184, 186-187, 190, 194-198 on the grounds that it presents hearsay material which is inadmissible.  Witness must be present to testify under cross examination.

517.     Plaintiff and Intervenor object to Exhibits 193-197 as they have not been provided a copy of same to determine their relevance to these proceedings.

518.     Plaintiff and Intervenor object to Exhibits 14-22, 56, 89, 198, 201, 204A, 204B, 204C, 204F, 205-210, 213, 214 as they are overly broad.

519.     Plaintiff and Intervenor object to Exhibits 1, 1.12, 2, 2.36, 2.37, 3, 3.12, 3.13, 13 as to non-judicial elections, 204, as they are subject to Motions in *Limine*.

520.     See Attachment B to the Joint Pre-Trial Order for a listing of exhibits to be offered at trial by the State of Louisiana, Governor Bobby Jindal and Attorney General James Caldwell. The Plaintiff and Intervenor enter a general objection to the Defendants' list of exhibits as none of the exhibits were disclosed until June 25, 2014, and the Plaintiff and Intervenor have not had an opportunity to review the list.

521.     Defendants object generally to all exhibits as the Plaintiffs have failed to provide a description of the purpose for which the exhibits will be used in this case. This requirement is specifically stated in this Honorable Court's pretrial order.

522.     Defendants object to the majority of the Plaintiffs' Exhibits on the grounds that these documents were never produced to the Defendants in discovery or exchanged by

Plaintiffs during formulation of this pre-trial order until the day the pretrial order was due to be submitted.

523.     Defendants object to Exhibits 133-144 in globo, on the grounds that they are phrased as broad categories representing hundreds of pages of discovery material.

524.     Defendants object to Exhibit 79, as all the dates of 2012 elections consists of irrelevant material and possible relevant material. Therefore it is too broad of a statement.

525.     <u>Relevance: Fed. R. Evid. 401</u>: Defendants object to the Exhibits 3-14, 20-24, 29-32, 57-60, 62, 64-66, 68, 70-74, 80-84, 86-90, 98, 109, 116-120, 127-129, 131, 132, on the grounds that it lacks relevance to these proceedings.

526.     <u>Hearsay</u>: Defendants object to the Exhibits 23, 29-32, 59, 60, 62, 64, 65, 66, 68, 86-120, 128, 131, 132, on the grounds that it presents hearsay material which is inadmissible under Fed. R. Evid. 801.

527.     <u>Authentication</u>: Defendants object to the Exhibits 71, 73, and 126 on the grounds that the Exhibits are not authenticated in accordance with Fed. R. Evid. 901.

528.     Exhibits 151-154 were not provided to the Defendants until 4:47 pm on June 25, 2014 and the Defendants have not had sufficient time to authenticate these Exhibits.

529.     <u>Demonstrative Exhibits</u>: Defendants object to Exhibits 162. 163 and 164; these are demonstrative exhibits and the Defendants have not been provided copies of these Exhibits.

530.     Exhibit 165 was not provided to the Defendants until the evening of June 25, 2014.

## WITNESS LIST

531.    See Attachment C to the Joint Pre-Trial Order for a listing of the witnesses Plaintiff and Intervenor expect to call to testify.

532.    The Plaintiff and Intervenor enter a general objection to the Defendants' witnesses to the extent that all of the names of the witnesses were not disclosed until June 25, 2014, and the Plaintiff and Intervenor have not had an opportunity to review the list.

533.    See Attachment D to the Joint Pre-Trial Order for a listing of the witnesses Defendants State of Louisiana, Governor Bobby Jindal, Attorney General James Caldwell, Secretary of State Tom Schedler, City of Baton Rouge, Parish of East Baton Rouge and Mayor Melvin Holden expect to call to testify.

534.    Defendants object generally to all witnesses to the extent that the Plaintiffs did not disclose a large number of the witnesses until June 25, 2014.

535.    Defendants object to the majority of the Plaintiffsø witnesses on the grounds that there are not adequate descriptions of witness testimony.

536.    Defendants object to the majority of the witnesses to the extent that the description of their testimony is for totally irrelevant matters, and their testimony appears to be duplicative.

## EXPERT WITNESS STIPULATION

537.    The parties stipulate as to the qualifications of each expert witness, as set forth in the curriculum vitae of the experts which is attached hereto as Exhibits E - L.

538.    Dr. Richard Engstrom - Exhibit E

539.    Dr. Raphael Cassimere - Exhibit F

540.    Ms. Nancy Jenson - Exhibit G

541.     Mr. Jonathan Augustine - Exhibit H

542.     Dr. Ronald Weber - Exhibit I

543.     Mr. Michael Beychok - Exhibit J

544.     Mr. Bruce Adelson - Exhibit K

545.     Ms. Angele Romig - Exhibit L; she will be providing fact testimony, she will not be giving an expert opinion

## DEPOSITION TESTIMONY

546.     The parties do not intend for depositions or portions of transcripts to be read into the record or played at trial.  All parties reserve the right to amend the pre-trial order to include deposition testimony.

## DISPUTED EVIDENTIARY ISSUES

547.     Plaintiff Hall and Intervenor Sharper have filed a Motion in *Limine* to limit Dr. Weber's testimony to only endogenous City Court elections. The Fifth Circuit has cautioned the district courts about reading too much into "exogenous election results." *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1329 (5th Cir. 1989), on petition for rehearing, 897 F.2d 763 (5th Cir. 1990).*Westwego Citizens for Better Government v. City of Westwego*, 872 F.2d 1201, 1208, n. 8 (5th Cir. 1989); *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir. 1987); *Clark v. Calhoun County*, 88 F.3d 1393, 1397 (5th Cir. 1996) (stating that results of exogenous elections are "less probative" and of "limited relevance"); the Middle District followed suit in *Oren v. Foster*, Civil Action No. 96-3130 (M.D. La. 1999) *citing Clark v. Edwards*, 777 F.Supp. 445, 460 (M.D. La. 1990).

548.     Plaintiff Hall and Intervenor Sharper will file a Motion in *Limine* to limit the testimony of Dr. Weber's report and testimony regarding structural or election system

dilution as Mr. Weber did not opine or reach any conclusion with respect to Dr. Engstrom's Supplemental report on structural dilution.  Fed. R. 26.

549.      Plaintiff Hall and Intervenor Sharper will file a Motion in *Limine* to limit the testimony of Michael Beychok to preclude testimony lacking scientific analysis and acceptable research methods on which to base his opinion. Fed. R. E. 702 and 703; *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (U.S. 1993).

550.      Plaintiff Hall and Intervenor Sharper will file a Motion in *Limine* to limit the testimony of Bruce Adelson's testimony to preclude opinions based on Dr. Weber's and Angele Romig's reports.  Mr. Adelson has not utilized scientific methods to derive his opinions and has not utilized applied acceptable methods in which to base his opinions. Fed. R. E. 702 and 703;*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (U.S. 1993).

551.      Plaintiff and Intervenor enter a general objection to evidence since the Defendants did not provide exhibits or make exhibits available for review until June 25, 2014.

552.      Defendants enter a general objection to evidence since the Plaintiff's and Intervenor's exhibits were not provided until June 25, 2014.

553.      Defendants anticipate that motions in limine will be filed setting forth evidentiary issues.  The motion in limine deadline is June 30, 2014.

## PROPOSED VOIR DIRE QUESTIONS, JURY INSTRUCTIONS AND VERDICT FORMS

554.      Not applicable

## TRIAL BRIEFS

555.      The parties will submit proposed findings of fact and conclusions of law within 10 days of trial.

## TIME FOR TRIAL

556.     The Court has allocated five days for trial of this case.

557.     Plaintiff anticipate using all five days to present their case.

558.     Defendants anticipate that they will need four days to present their case.

## BIFRUCATION OF TRIAL

559.     Plaintiff does not agree to a bifurcation of issues of liability and damages. Defendants disagree with the Plaintiff as to bifurcation of issues.

560.     Defendants request that the trial be bifurcated as to the application of Section 3(c) of the Voting Rights Act. Because the determination of the imposition of this Section is based upon the Court's findings of constitutional violations in relation to this case as well as others, Defendants submit that in the interests of justice and efficiency, the Court should consider matters related to Section 3(c) after the trial of the merits.

561.     Defendants maintain the position that, as acknowledged by this Court, Section 3 of the Voting Rights Act provides a remedy, and therefore it should not be determined at this time.  Section 3 is a remedy that is only available after a finding of a constitutional violation.

## CONSENT TO PROCEED BEFORE MAGISTRATE

562.     Plaintiff does not consent to the reassignment of this case to a United States Magistrate Judge.

563.     Defendants consent to the reassignment of this case to a Magistrate Judge.

## SETTLEMENT NEGOTIATIONS

564.     Plaintiff's position on settlement efforts - possibility of settlement of this case was considered by the parties. Plaintiff and Intervenor's counsel met with Defendants'

counsel on April 23, 2013 in a court ordered settlement conference.    There was discussion of settlement as it related to the legislation that was pending in the Louisiana Legislature in 2013. Plaintiff and Intervenor's counsel also met with Defendants' counsel on June 6, 2014 to discuss settlement of the issues presented herein.  During the meeting none of the remaining defendants stated they had settlement authority as the Louisiana Legislature, a nonparty, is the only entity capable of granting Plaintiff and Intervenor the relief they request.

565.    Defendants provided settlement statements to the Magistrate Judge in April of 2013 in preparation of a settlement conference.  The settlement conference was converted to a status conference.  The Defendants do not have the authority to settle this matter.  As a matter of law, the judicial election plan would need to be modified by legislative act or by an amendment to the plan of government which requires a vote of the people.

RESPECTFULLY SUBMITTED,

**James D. "Buddy" Caldwell**
ATTORNEY GENERAL

/s/Angelique Duhon Freel
William P. Bryan, III (La. Bar Roll No. 26826)
Madeline Carbonette (La. Bar Roll No. 3873)
Angelique Duhon Freel (La. Bar Roll No. 28561)
Jessica MP Thornhill (La. Bar Roll No. 34118)
Assistant Attorneys General
Louisiana Department of Justice
Civil Division
P. O.  BOX 94005
Baton Rouge, Louisiana 70804-9005
Telephone:  (225) 326-6031
Facsimile:  (225) 326-6099
Emails:        bryanb@ag.state.la.us
                    carbonettem@ag.state.la.us
                    freela@ag.state.la.us
                    thornhillj@ag.state.la.us

**Counsel for the Defendants, State of Louisiana, and James D. "Buddy" Caldwell, Attorney General, and Bobby Jindal, Governor**

/s/ Beth Everett
Edmond Wade Shows
Elizabeth Everett
Grant Joseph Guillot
John Carroll Walsh
Shows, Cali & Walsh, LLP
628 St. Louis Street
Baton Rouge, LA 70802
Telephone:  (225) 346-1461
Facsimile:  (225)  346-1467
Emails:        wade@scwllp.com
                    bethe@scbllp.com
                    grantg@scbllp.com
                    johnw@scbllp.com


**Counsel for the Defendant, Tom Schedler, Louisiana Secretary of State**

/s/ Christina B. Peck
Christina Berthelot Peck
Roedel, Parsons, Koch, Blache, Balhoff &
          McCollister
8440 Jefferson Highway
Suite 301
Baton Rouge, LA 70809
Telephone: (225) 929-7033
Facsimile:  (225) 928-4925
Email:         cpeck@roedelparsons.com


**Counsel for the Defendants, City of Baton Rouge East Baton Rouge Parish Attorney's Office, and Melvin Kip Holden, in his official capacity as the the Mayor-President of Baton Rouge**

/s/ Ronald R. Johnson
Ronald R. Johnson
Law Offices of Ronald R. Johnson
5550 North Foster Drive
Baton Rouge, Louisiana 70805
Telephone:  225-356-3408
Facsimile:  225-356-4438
Email:  ronaldjohnson@bellsouth.net

*/s/ Stephen M. Irving*
Stephen M. Irving
Steve Irving, LLC
111 Founders Drive
Baton Rouge, LA 70810
Telephone:  225-752-2688
Facsimile:  2225-752-2663
Email:  steve@steveirvingllc.com

**Attorneys for the Plaintiff and Intervenor**