# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

KENNETH HALL                                         CIVIL ACTION

VERSUS

STATE OF LOUISIANA, ET AL.                  NO.: 12-00657-BAJ-RLB

## RULING, ORDER, AND JUDGMENT

This matter is before the Court pursuant to Section 2 of the Voting Rights Act of 1965 ("VRA") and the VRA amendments of 1982, 52 U.S.C. § 10301 (previously codified at 42 U.S.C. § 1973), the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and 42 U.S.C. §§ 1983, 1986.[1] Plaintiff Kenneth Hall and Plaintiff-Intervenor Byron Sharper (together, "Plaintiffs") are African American citizens of the United States and residents of the State of Louisiana. They are residents of the City of Baton Rouge and are registered to vote there.

Plaintiffs claim that the current districting system for election to the City Court of Baton Rouge effectively affords black minority voters of Baton Rouge less opportunity to elect judicial candidates of their choice to the City Court. Plaintiffs seek declaratory and injunctive relief pursuant to VRA Section 2; a "bail-in" of the

---

[1] Claims under the First Amendment, VRA Section 5, and the Privileges and Immunities Clause of the Fourteenth Amendment were included in the Complaints but have since been dismissed against all Defendants, either due to Court ruling or abandonment by Plaintiffs. (*See* Doc. 173; Doc. 240 at pp. 9–10; Doc. 359 at p. 30).

State of Louisiana pursuant to VRA Section 3(c);[2] damages, inclusive of costs and litigation expenses; and attorney's fees. (*See* Doc. 359 at ¶ 148).

Trial was held in this matter on August 4–6, 2014 and, due to a medical emergency that necessitated the recess and continuance of trial, on November 17–19, 2014. Having considered the parties' pre-trial and post-trial submissions, as well as the arguments and evidence presented at trial, the Court finds substantial grounds to support a conclusion that the current City Court election districting system results in *de facto* discrimination against African Americans residents of Baton Rouge, where African American group voting strength has decreased significantly since the current system was enacted in 1993. It is clear to the Court that, regrettably, the state legislature has thus far failed to adapt the City Court election system to adequately protect the voting rights of all Baton Rouge residents.[3]

However, Plaintiffs here expected the Court to rely on the results of only a single election cycle to support a finding of vote dilution while ignoring other relevant election data, whereas controlling legal authority, binding on this Court, restricts this Court from doing so. Thus, on the basis of the election data before this Court, the Court must conclude that Plaintiffs have not, at this time, satisfied their burden of proving that the current districting system of election to the City Court of

---

[2] Section 3(c) contains a "bail-in" process by which jurisdictions that fall outside the coverage formula of Section 4(b) may become subject to preclearance. *See* 52 U.S.C. § 10302(c).

[3] To be sure, the U.S. Supreme Court has made clear that redistricting is primarily within the province of the state legislature. "The task of redistricting is best left to state legislatures, elected by the people and as capable as the courts, if not more so, in balancing the myriad factors and traditions in legitimate districting policies." *Abrams v. Johnson*, 521 U.S. 74, 101, (1997).

Baton Rouge violates VRA Section 2, the Fourteenth Amendment, the Fifteenth Amendment, or 42 U.S.C. §§ 1983, 1986, as those provisions have been interpreted by the U.S. Supreme Court and the U.S. Court of Appeals for the Fifth Circuit.

Plaintiffs have provided undisputed evidence of racially polarized voting in three out of three City Court contests appropriate for the Court's consideration, and they have shown that white bloc voting defeated the African American candidate of choice in two out of two determinative City Court contests. The Court does not discount such compelling evidence. Data from one additional election cycle may very well have enabled Plaintiffs to meet their burden in proving vote dilution in violation of the VRA.

For reasons explained more fully herein, **JUDGMENT** is rendered **IN FAVOR OF** Defendants State of Louisiana, Piyush "Bobby" Jindal, James D. "Buddy" Caldwell, Tom Schedler, the City of Baton Rouge, Parish of East Baton Rouge, and Melvin "Kip" Holden and **AGAINST** Plaintiff Kenneth Hall and Plaintiff-Intervenor Byron Sharper.

## I.    JURISDICTION

The Court's jurisdiction over this matter is proper pursuant to 52 U.S.C. § 10308(f) (formerly 42 U.S.C. § 1973j(f)) and 28 U.S.C. §§ 1331, 1343, 1344. The Court has held in a prior ruling in this matter that sovereign immunity does not bar suit here against the State of Louisiana, or any other Defendants who may claim to be alter egos or arms of the State. (*See* Doc. 174).

## II.    BACKGROUND

The Parish of East Baton Rouge and City of Baton Rouge are subject to a joint Plan of Government and share a single governing body, the Metropolitan Council. (Ex. D-186 at § 2.01).

The City Court of Baton Rouge has five Judges and one Constable. La. R.S. § 13:1952(4)(a). The Court is divided into five divisions (A, B, C, D, and E), and its jurisdiction extends throughout the territorial area of the City of Baton Rouge. La. R.S. § 13:1952(4)(a). Citizens and voters within the City of Baton Rouge are the only qualified electors to vote for a judge of the City Court. (Doc. 359 at ¶ 215). For the purpose of electing judges, the City Court is divided into two election sections: Section One, which elects two judges, and Section Two, which elects three judges. La. R.S. § 13:1952(4)(b)–(c). The seats allocated to Section One are designated for Divisions B and D, while the seats allocated to Section Two are designated for Divisions A, C, and E. (*See* Ex. J-25, Bates No. 001358).

The City Court judges are elected to six-year terms. (Doc. 359 at ¶ 209). Candidates file to contest a particular seat and compete only with candidates filing for that same seat. (Ex. P-60 at ¶ 5). Voters may cast up to one vote in each contest, and a candidate must receive a majority of votes in order to win the seat. (Ex. P-60 at ¶ 5). If no candidate wins a majority, a runoff election is held between the top two vote recipients in the initial election, wherein the candidate who receives the majority of votes is declared the winner. (*See* Ex. P-60 at ¶ 5; Doc. 359 at ¶ 213).

The current districting scheme for the City Court was enacted via Act 609 by the Louisiana Legislature in 1993, replacing a citywide at-large election system. (Doc. 359 at ¶¶ 189, 204). According to the 1990 census, the general population of the City of Baton Rouge was 43.9% black and 53.9% white. (Ex. P-145). At that time, 39.12% of the City's voting age population was black. (Ex. P-62, Bates No. 00907). By the 2000 census, the City's general racial composition was 50.0% black and 45.7% white. (Ex. D-185, Bates No. 003063; Ex. P-146, Bates No. 02035). Then, blacks made up 44.93% of the City's voting age population. (Ex. D-185, Bates No. 003065; Ex. P-62, Bates No. 00907). As of the most recent 2010 census, the general population had shifted to become 54.5% black and 39.4% white. (Ex. D-185, Bates No. 003069; Ex. P-147, Bates No. 02039). According to data directly from the U.S. Census Bureau, the voting age population was 50.05% black (89,085 out of 177,987) in 2010. (*See* Ex. D-185, Bates No. 003067).[4]

Since 1993, all candidates elected to judgeships in Election Section One have been African American, while all candidates elected to judgeships in Election Section Two have been white. (Doc. 359 at ¶¶ 206, 208). In other words, the City Court judiciary in every term since 1993 has comprised of two African American judges and three white judges.

---

[4] It is well established that the Court is permitted to take judicial notice of U.S. census data. *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011). The Court notes, however, that the report submitted by Plaintiffs' own expert, Ms. Jensen, provides that black individuals comprised only 49.98% of Baton Rouge's voting age population in 2010. (Ex. P-62, Bates No. 00907). Despite the fact that they themselves furnished the 49.98% figure, Plaintiffs chose not to cite Ms. Jensen's report in their post-trial brief and instead elected to use the higher 50.1% figure (when rounded up) cited in Defendants' exhibits. (*See* Doc. 546 at ¶ 26).

In the 2013 and 2014 legislative sessions, three House bills were introduced to amend the current City Court districting plan. House Bills 318 and 198 both proposed a 3–2 redistricting of the City Court—that is, three majority African American districts and two majority white districts. (*See* Exs. J-13, J-15). Both 3–2 redistricting plans failed to pass through the House. (*See* Tr. IV at 225:16–225:25; Ex. J-15, Bates No. 002309). House Bill 1151 was introduced to provide for the at-large election of all five City Court judgeships. (*See* Ex. J-14). House Bill 1151 was passed by a vote of the House and was amended in Senate committee, but the amended bill was ultimately returned to the calendar, subject to call, and therefore was not passed. (*Id.* at Bates No. 002248).

## III.   SECTION 2 OF THE VOTING RIGHTS ACT

The VRA was enacted to address deeply entrenched racial discrimination in voting, "an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Shelby Cnty., Ala. v. Holder*, ___ U.S. ___, 133 S. Ct. 2612 (2013) (*South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966)). Congress had determined that attempts to vindicate then-existing federal anti-discrimination laws through case-by-case litigation were insufficient to overcome the resistance by state officials to the enforcement of the Fourteenth and Fifteenth Amendments. *See id.* at 2633–34.

At issue in this case is Section 2 of the VRA, which proscribes vote dilution whereby a class of citizens has "less opportunity than other members of the

electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301. Congress enacted Section 2 to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall be denied or abridged on account of race. *See Voinovich v. Quilter*, 507 U.S. 146, 152 (1993). Nonetheless, it is axiomatic that Section 2 does not establish a right to proportional representation. 52 U.S.C. § 10301(b).

In 1982, Congress amended the VRA in direct response to the U.S. Supreme Court's decision in *Mobile v. Bolden*, 446 U.S. 55 (1980), which required suits brought under the old Section 2 to meet the subjective-intent standard of proof. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). The amended (and current) "results test" of Section 2 hinges on a consideration of the totality of the circumstances surrounding the challenged election procedure, such that a court focuses on objective facets of the local political context instead of probing the minds of legislators. *See* Roy A. McKenzie & Ronald A. Krauss, *Section 2 of the Voting Rights Act: An Analysis of the 1982 Amendment*, 19 HARV. C.R.-C.L. L. REV. 155, 191–92 (1984).

Courts apply a two-step framework in analyzing Section 2 claims. *NAACP v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001). First, Plaintiffs challenging an electoral mechanism must satisfy the three preconditions for a Section 2 claim articulated by the U.S. Supreme Court in *Gingles*. *See id.* Plaintiffs bear the burden to show, by a preponderance of the evidence, that: (1) the affected minority group is sufficiently large and geographically compact to constitute a voting age majority in a district;

(2) the minority group is politically cohesive; *and* (3) the majority group votes sufficiently as a bloc that it is able—in the absence of special circumstances— usually to defeat the minority group's preferred candidate. *See id.* (emphasis added) (*Gingles*, 478 U.S. at 50–51). "[U]nder the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." *Gingles*, 478 U.S. at 63 (held by plurality). Accordingly, an analysis of racial polarization under Section 2 should not take into account variables that might explain voter support for certain candidates such as candidate age, religion, income, education, incumbency, campaign expenditures, name identification, or media use. *Gingles*, 478 U.S. at 61–62 (held by plurality).

If Plaintiffs are able to meet all three preconditions of the threshold *Gingles* test, the Court properly turns to evaluate the totality of the circumstances, including facets of the local political context enumerated in the Senate Judiciary Committee report accompanying the 1982 amendments to the Voting Rights Act. *See Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 869 (5th Cir. 2004). These factors include:

> (1) the history of official voting-related discrimination in the state or political subdivision;
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
> (3) the extent to which the state or political subdivision has used voting practices or procedures that may enhance[5] the opportunity

---

[5] The Senate Report lists this third factor as practices or procedures that "*tend to* enhance" the opportunity for discrimination against the minority group, language quoted in one portion of *Gingles*. *See* 478 U.S. at 45 (emphasis added). In another portion of *Gingles*, the Supreme Court characterized this factor as being practices or procedures that "*may* enhance" such discrimination. *See id.* at 37 (emphasis added). The Fifth Circuit consistently adopts the "may enhance" language for this third factor. *See, e.g.*, *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1147 (5th Cir. 1993); *Citizens for a Better*

for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet voting[6];

(4) the exclusion of members of the minority group from candidate slating processes;

(5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) the use of overt or subtle racial appeals in political campaigns; and

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pp. 28–29. The Judiciary Committee also noted that a court could consider additional factors, such as:

(8) whether there is a lack of responsiveness on the part of elected officials to the particularized needs of minority group members; and

(9) where the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is tenuous.

*Id.* The Judiciary Committee's report describes this list of factors as neither exclusive nor comprehensive. Moreover, a plaintiff need not prove any particular number or a majority of these factors in order to succeed in a vote dilution claim. *Id.* at 29. Instead of a mechanical point-counting assessment, courts must make a "searching practical evaluation of the [locality]'s 'past and present reality'" when evaluating the totality of the circumstances under the *Gingles* test. *Id.* at 30. To meet their burden, Plaintiffs must prove that, based on the totality of the

---

*Gretna v. City of Gretna, La.*, 834 F.2d 496, 498 (5th Cir. 1987). Accordingly, this Court also uses the "may enhance" standard.

[6] Bullet voting, also known as single-shot voting, refers to a voting practice in which voters are allowed to cast fewer than all of their votes. For instance, in an at-large election for five council members, a voter may have five votes. If the voter casts only one of those votes—that is, votes for only one person, and does not use her other votes—then she has engaged in bullet voting. An anti-bullet voting provision prohibits this practice. *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1113 n.3 (5th Cir. 1991).

circumstances, the challenged plan results in the denial of the right to vote based on color or race in violation of Section 2. *Fordice*, 252 F.3d at 366.

This Court further confirms, at the outset, that Plaintiffs' challenge to the electoral system of judges is cognizable under the VRA. *See Chisom v. Roemer*, 501 U.S. 380 (1991) (holding that the prohibitions of VRA Section 2 apply equally to districts for state judicial elections as they do to legislative elections). Hence, the Court now proceeds to analyze the preconditions of the *Gingles* analysis.

### A.    *Gingles* Precondition #1

Under *Gingles*, Plaintiffs alleging a Section 2 violation must first meet the threshold requirement of establishing "the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994). Plaintiffs must show that the minority group of which they are members is "sufficiently large and geographically compact to constitute a voting age majority in a district." *Fordice*, 252 F.3d 361, 366 (5th Cir. 2001).

At trial, the Court accepted Nancy Jensen as an expert witness for Plaintiffs in the fields of demography and the sub-specialization of population. (*See* Tr. II at 126:24–127:7). Relying on 2010 Census data, Ms. Jensen prepared two illustrative plans, Plan A and Plan B, both demonstrating that a single-member district, labeled District 2-1, could be drawn in which African Americans comprise a majority of the voting age population. (*See* Exs. P-62, P-64, P-65). The two plans

differ in that Precinct 1-10, as it currently exists, is divided in Plan A but remains whole in Plan B. (Ex. P-62, Bates No. 00906).

**Plan A**



**Plan B**



The accompanying statistics in Ms. Jensen's report showed that both Plan A and Plan B would produce a single-member district in which African Americans would make up 65.69% and 66.07% of the voting age population respectively, according to April 2013 voter registration statistics. (*See* Ex. P-64, Bates No. 00934; Ex. P-65, Bates No. 00939; Tr. II at 151:10–151:20).

In addition, the Court examines the maps provided by Ms. Jensen for the size and geographical compactness of Plaintiffs' exemplar plans. (*See* P-62, Bates Nos. 00916–18, 00925–27). "A proposed district is sufficiently compact if it retains a natural sense of community." *St. Bernard Citizens For Better Gov't v. St. Bernard Parish Sch. Bd.*, No. CIV.A. 02-2209, 2002 WL 2022589, at *5 (E.D. La. Aug. 26, 2002). In adjudging configuration, the Court looks to whether a district is "compact and reasonable in size and shape." *Id.*

After reviewing both illustrative districting plans and accompanying plan data, the Court finds that Plaintiffs have provided illustrative plans depicting a new District 2-1, which is a compact and reasonably shaped and sized single-member district that retains a natural sense of community, in which African Americans would constitute a majority of the voting age population. Therefore, the Court concludes that Plaintiffs have established by a preponderance of the evidence that the first *Gingles* precondition is satisfied.[7]

---

[7] Ms. Jensen's report notes that the creation of Plaintiffs' proposed majority-black district was guided primarily by the principle that the district "[h]ave at least a 65% African-American population and a 58% registered voter population" in accordance with guidance by the U.S. Department of Justice. (Ex. P-62, Bates No. 00905). The 65% guideline, however, is regarded as "a general remedial goal in Voting Rights Act cases that is irrelevant to the first part of the [*Gingles*] tripartite threshold test for liability." *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1397 (S.D. Miss. 1992), *aff'd*, 994 F.2d 1143 (5th Cir. 1993).

## B. *Gingles* Precondition #2

### 1. Scope of Relevant Election Data

Having found the first *Gingles* precondition to be met, the Court must delineate the relevant pool of elections to consider for its analysis of the second and third *Gingles* preconditions, which inquire into the respective voting patterns of minority group and majority group voters. Endogenous elections are, understandably, more probative than exogenous elections in determining whether racially polarized voting exists in Baton Rouge City Court elections.[8] Here, the parties analyzed voting data from three Baton Rouge City Court contests—two primaries and one runoff in the same 2012 election.

"[T]here is no simple doctrinal test for the existence of legally significant racial bloc voting." *Gingles*, 478 U.S. at 58. Indeed, there is no strict minimum of elections a court must consider to perform a complete analysis of *Gingles*

---

The Court acknowledges a distinction between an illustrative plan used to establish the first *Gingles* precondition, versus a redistricting plan submitted as a proposed remedy after a Section 2 violation has been found. In approving Ms. Jensen's submitted redistricting plans as fulfilling the first *Gingles* precondition, the Court emphasizes that it does not necessarily adjudge her plans to conform with the Fourteenth Amendment's Equal Protection Clause. For example, in the event that traditional districting criteria are found to have been subordinated to racial gerrymandering, the Court would apply strict scrutiny in evaluating a proposed redistricting plan. *Bush v. Vera*, 517 U.S. 952, 962 (1996).

By the same token, in finding the first *Gingles* factor satisfied, the Court does not decree that Plaintiffs' Plan A and Plan B are the only two permissible redistricting plans that would remedy a VRA violation. If a Section 2 violation were found in this case, legal precedent would guide this Court to first afford the Louisiana Legislature an opportunity to repair the defect in the current system. *See, e.g., Chisom v. Roemer*, 853 F.2d 1186, 1192 (5th Cir. 1988). *See also Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991) (holding that a district court properly deferred to state legislature in the first instance to remedy the existing Section 2 violations).

[8] Endogenous elections, sometimes referred to as indigenous elections, are those concerning the challenged office. Exogenous elections are those for an office other than the one at issue, regardless of whether the office's elections draw from the same electorate. *See Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996).

preconditions. The Fifth Circuit has upheld district court findings of racial polarization based on analyses of just four elections. *See League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 845 (5th Cir. 1997), *aff'g League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist.*, No. CIV.A.1:94-CV-104-C, 1996 WL 453584 (N.D. Tex. May 14, 1996) (voting patterns adduced from four contested races of school district's board of trustees). Yet, at the same time, a court cannot always glean sufficient insight from a limited number of elections. The Fifth Circuit opined in *Rangel v. Morales* that "evidence of one or two elections may not give a complete picture as to voting patterns within the district generally." 8 F.3d 242, 246 (5th Cir. 1993). In *Rangel*, the Fifth Circuit reversed a district court's decision finding legally significant white bloc voting based on a single contest.

Here, the fact that these three endogenous contests are in the same election cycle weighs heavily against their probativeness, particularly when the contests all take place in a span of thirty-two days. Further, one of the races, for City Court Section 2E, was a December runoff, necessitated by a November primary where no candidate garnered over 50% of the vote. In *Davis v. Bandemer*, a plurality of the U.S. Supreme Court opined that a district court's primary reliance on results from one election cycle did not satisfy the threshold condition to prove unconstitutionally discriminatory vote dilution. 478 U.S. 109, 134–35 (1986). There, where a district court had relied on statistics from multiple contests of a single election year, four Justices stated that "[r]elying on a single election to prove unconstitutional

discrimination is unsatisfactory." *Id.* at 135. Although neither the parties nor this Court have identified an instance in which a majority of the U.S. Supreme Court has held that a district court's reliance on multiple contests from a single election is *per se* insufficient to show a pattern of vote dilution, this Court is bound by the general principle set forth in *Gingles* that the "loss of political power through vote dilution is distinct from the mere inability to win a particular election." *Gingles*, 478 U.S. at 57.

Accordingly, the Court properly turns to consider exogenous elections to determine whether blacks and whites in Baton Rouge vote cohesively and differently under the second and third prongs of the *Gingles* analysis. Plaintiffs contend that the exogenous state judicial contests of the First Circuit Court of Appeals and the Louisiana Supreme Court, along with the endogenous contests, "constitute the entire universe of relevant judicial contests," and they argue that the Court need not look further for its analysis for the second and third *Gingles* prongs. (*See* Doc. 546 at ¶ 65). Plaintiffs' expert Dr. Richard L. Engstrom[9] focused his examination of these four state judicial contests from 2012 along with the three endogenous contests from 2012. These seven contests comprised, in his opinion, the only recent biracial elections proper for analysis.[10] (Tr. IV at 164:17–165:12).

---

[9] Dr. Engstrom, without objection, was qualified as an expert in the field of political science, including the analysis of elections for racially polarized voting, and in the subject of opportunities for minority voters to elect candidates of their choice. (Tr. III at 13:9–13:17).

[10] In the history of the elections of the current City Court districting system, there was also a biracial contest in 1993. (Tr. IV at 167:22–168:8). Neither of the experts analyzed this race, and thus the results from that contest are not before the Court.

Furthermore, for the purposes of examining minority and majority voter cohesion in the City Court elections, the Court only considers election results under the challenged plan and does not

The Court agrees that results of exogenous judicial contests are more probative here than the results of exogenous non-judicial contests. At trial, multiple witnesses testified about important distinctions between elected judicial offices versus other elected offices, either in relation to districting standards, (Tr. IV at 223:24–224:2), or to campaign strategy, (Tr. V at 84:15–85:10, 218:12–220:9)[11]. The proffered contests for exogenous judicial races, however, are just as temporally limited as the endogenous races. Dr. Engstrom and Dr. Weber performed their own analyses of results from four exogenous judicial contests: the November 2012 primary and December 2012 runoff with candidate Gideon T. Carter, III for the First Circuit Court of Appeals, and the November 2012 primary and December 2012 with candidate Judge John Michael Guidry for the Louisiana Supreme Court. All of these contests are from the same 2012 election cycle, and two are runoffs of the other two.

Despite their arguments that the Court may limit its analysis to the judicial elections proffered and exclude consideration of the non-judicial elections, Plaintiffs have not directed the Court to any controlling authority—nor can the Court find

consider election results from the at-large City Court election system in place prior to 1993. Such results from the at-large election would be relevant, however, to the totality of circumstances analysis, if the Court were to proceed to that prong of the *Gingles* analysis.

[11] Some testimony on judicial election campaign strategy was elicited from Bruce Adelson, Defendants' expert who was qualified in the areas of civil rights, the VRA, redistricting, election matters, and allegations of discrimination. (Tr. V at 209:20–210:13). According to Mr. Edelson, this case marks the first time he has testified as an expert in federal court. (Tr. V at 205:16–206:4). Ultimately, Mr. Adelson's testimony only minimally aided the trier of fact. The Court most certainly would have scrutinized Mr. Adelson's qualifications and expertise more closely had a *Daubert* motion been presented to the Court, but no party filed such a motion.

any—in which vote dilution was established through examination of contests solely from a single election cycle.[12]

Thus, the Court finds it appropriate to consider the results of additional exogenous non-judicial contests presented by Defendants' expert Dr. Ronald E. Weber,[13] specifically the biracial contests for Baton Rouge Mayor-President, Baton Rouge City Constable,[14] and U.S. President for the period from 2000 to 2012. Dr. Weber's report presented results and analyses of four election cycles he considered to fall within the relevant period of recency, (Tr. VI at 28:12–28:18), with contests analyzed within City of Baton Rouge precincts and also within Baton Rouge City Court's Section 2, (*see* Ex. D-1 at pp. 50–93). The Court recognizes that such exogenous elections in reality draw from a larger electorate than do the City Court elections and voter considerations may vary significantly among city, state, and national elections. Yet exogenous elections where Baton Rouge voters had the opportunity to vote for a black candidate are proper for consideration, particularly

---

[12] At trial and in their post-trial brief, Plaintiffs argued that *Magnolia Bar Association*, 994 F.2d 1143 (5th Cir. 1993), is instructive because, there, two endogenous contests were deemed sufficient for a district court's analysis of the third *Gingles* precondition. (Tr. VI at 204:18–205:23; Doc. 546 at ¶ 20). Plaintiffs' position mischaracterizes *Magnolia Bar Association*. In that case, the Fifth Circuit held that the lower court did not err in concluding that two particular elections were not aberrational within the aggregate of data. *Id.* at 1149. But the lower court there had in fact considered far more than two elections, viewing local, state, and federal elections in Mississippi over a *twenty-year* period. *See Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1404 (S.D. Miss. 1992).

[13] Dr. Weber was qualified, without objection, as an expert in the fields of political science, vote dilution, voter participation, and racially polarized voting. (Tr. VI at 13:3–14:7).

[14] Dr. Weber included in his report the 2012 City Constable election, which was held between two black candidates. (Ex. D-1 at p. 63). Dr. Weber testified that he had only analyzed this race because he did not become aware that the candidate Jones was not black until late in the process of creating his report, and that he would have not included this race had he known both candidates were black. (Tr. VI at 108:25–109:14). Because both experts otherwise confined their analyses to biracial contests, the Court here excludes the 2012 City Constable election.

here where the three endogenous contests presented by Plaintiffs are from a single election cycle. *See Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 502 n.15 (5th Cir. 1987) (data from U.S. President and Louisiana Secretary of State election contests rightly considered in case challenging electoral scheme of city aldermanic elections).

Trial, which began in August, would not have been continued in November but for a medical emergency. When trial resumed on November 17, 2014, results of the November 2014 elections in Baton Rouge, all of which were exogenous elections, were available. The Court determined, however, that there was insufficient time for the parties to have a fair opportunity to conduct discovery and properly analyze the data, which had not been included in any expert reports. The Court thus informed the parties that such evidence would not be admitted. (Tr. IV at 105:19–106:5). Accordingly, the November 2014 election results are not within the scope of the Court's consideration in the instant Ruling.

The Court proceeds, then, to the second and third *Gingles* preconditions with consideration of the following sixteen biracial contests:

| City Court of Baton Rouge (Endogenous) | First Circuit Court of Appeals (Exogenous) | Louisiana Supreme Court (Exogenous) | Baton Rouge Mayor-President (Exogenous) | Baton Rouge City Constable (Exogenous) | U.S. President (Exogenous) |
|---|---|---|---|---|---|
| Nov. 2012 (Section 2C Primary) | Nov. 2012 Primary | Nov. 2012 Primary | 2000 Primary | 2000 Primary | 2008 |
| Nov. 2012 (Section 2E Primary) | Dec. 2012 Runoff | Dec. 2012 Runoff | 2000 Runoff | | 2012 |
| Dec. 2012 (Section 2E Runoff) | | | 2004 Primary | | |
| | | | 2004 Runoff | | |
| | | | 2008 Primary | | |
| | | | 2012 Primary | | |

## 2. Political Cohesion

To satisfy the second *Gingles* precondition, Plaintiffs must show that the black minority group of the City of Baton Rouge is politically cohesive. The Court inquires into the existence of racially polarized voting in order "to ascertain whether minority group members constitute a politically cohesive unit." *Gingles*, 478 U.S. at 56. Racial polarization exists where there is "a consistent relationship between the race of the voter and the way in which the voter votes." *Id.* at 53 n.21 (internal quotation marks and alterations omitted). In *Gingles*, the Court did not provide a definitive metric of "political cohesiveness" but explained, "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Id.* at 56.

Experts from both Plaintiffs and Defendants employed the widely recognized Ecological Inference procedure developed by Dr. Gary King to derive their conclusions of voter preferences in this case.[15] (Ex. P-59 at ¶ 10; Ex. D-1 at ¶ 10). In all three endogenous City Court contests, Dr. Engstrom and Dr. Weber concurred that African Americans voted cohesively. (Tr. III at 22:25–23:3, Tr. VI at 51:20–52:7). With no disagreement between the parties' experts in their conclusions regarding the endogenous elections, the Court may properly conclude that those races exhibited minority cohesion without delving into a comparison of the statistical evidence provided in the expert reports. *See Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991).

With respect to the four exogenous judicial elections—the 2012 contests for the First Circuit Court of Appeals and the Louisiana Supreme Court—Dr. Engstrom and Dr. Weber also reached similar conclusions, both finding *minority* cohesion in voter preferences. (Tr. IV at 141:22–143:16; Tr. VI at 109:24–110:4).[16] The experts,

---

[15] Ecological Inference (EI) is a mathematical technique similar to, but largely regarded as an improvement upon, the traditional Ecological Regression (ER) technique approved in *Gingles* to analyze aggregate level data. EI is similar to ER but abandons the assumption of linearity underpinning the ER method. EI also applies a principle called the method of bounds to constrain estimates to real limits between 0% and 100%. *See Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, No. 13-20491, 2015 WL 525464 (5th Cir. Feb. 9, 2015). (*See also* Tr. IV at 118:19–120:24).

[16] The experts, in their reports and in testimony would often refer to findings of "racial polarization." In this Ruling, the Court is careful to note that racial polarization is related to, but distinct from, political cohesion, the latter of which is the subject of the second *Gingles* precondition:

> The notion of political cohesiveness contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues. . . . The term racially polarized voting, on the other hand, describes an electorate in which white voters favor and vote for certain candidates or propositions, and minority voters vote for other candidates or propositions.

due to different classification techniques, diverged in their conclusions of whether the non-minority voters exhibited cohesion, particularly in the November 2012 primary for the Louisiana Supreme Court race. (*See* Tr. VI at 110:5–110:10). That classification distinction, however, is appropriately examined under the third, and not the second, *Gingles* precondition. Thus, the Court also concludes that the four exogenous judicial contests exhibited minority cohesion.

As Plaintiffs contend that the relevant pool of election contests does not extend beyond judicial contests, the exogenous non-judicial elections for Mayor-President, City Constable, and U.S. President were analyzed only by Dr. Weber, who found that African Americans voted cohesively in every one of these contests. (Ex. D-1 at ¶ 61, p. 95 tbl.19). Plaintiffs do not contest these findings, only their relevance.

With minority cohesion found by both experts in every single election under consideration here, the Court concludes that Plaintiffs have met their burden to prove, by a preponderance of the evidence, that minority African American voters of the City of Baton Rouge vote as a cohesive political unit. The Court finds the second *Gingles* precondition satisfied.

## C. *Gingles* Precondition #3

For Plaintiffs to satisfy the third *Gingles* precondition, they must prove that the majority group votes sufficiently as a bloc that it is usually able to defeat the

---

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 744 (5th Cir.) *on reh'g*, 999 F.2d 831 (5th Cir. 1993) (internal citations omitted). Accordingly, an expert's finding of racial polarization presupposes a finding of minority cohesion (the second *Gingles* precondition), but not vice versa.

minority group's preferred candidate. With respect to the size of the pool of relevant elections, Plaintiffs argue that the Court should afford *no* probative value to the exogenous non-judicial elections. For reasons explained above, the Court rejects that argument. Section 2 claims are based on a pattern of vote dilution, which is "distinct from the mere inability to win a particular election." *Gingles*, 478 U.S. at 57. "Racial polarization should be seen as an attribute not of a single election, but rather of a polity viewed over time." *See id.* Thus, judicial precedent steers the Court to broaden the scope of its inquiry beyond just one election cycle.

A district court is permitted to examine the election results offered by both sides and make an independent assessment rather than accept any expert's conclusion. *See Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993). At trial, there was conflicting expert testimony between Dr. Engstrom and Dr. Weber as to how one determines whether the non-African American community votes as a bloc, that is, cohesively. Dr. Weber employed a classification rule that requires a non-African American candidate to garner at least 60% of the non-African American community's vote in a two-candidate election in order to determine whether there is racial polarization. (Tr. VI at 111:4–112:18). Dr. Weber admitted, however, that he is unaware of any expert witness who has employed that classification rule in a federal case and is also unaware of any federal court that has adopted that classification rule. (Tr. VI at 112:19–113:4). Another federal court has characterized Dr. Weber's rule as an "arbitrary threshold approach," noting that it has been rejected by the Eighth and Ninth Circuits. *Large v. Fremont Cnty., Wyo.*,

709 F. Supp. 2d 1176, 1215 (D. Wyo. 2010). Similarly, the Court here rejects Dr. Weber's classification rule. The third *Gingles* precondition only requires that non-minority voters vote *sufficiently* as a bloc to usually defeat the minority group's candidate of choice. *See also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1026–27 (8th Cir. 2006) ("Nothing in the case law prescribes that the white majority bloc must be of a certain size beyond the requirement that the bloc be large enough to defeat the [minority preferred candidate]."). It is of no import to the dilution analysis whether that defeat is due to less or more than 60% of non-African American voters supporting a single candidate, when the ultimate result is a defeat of the preferred candidate of African American voters.

Having rejected Dr. Weber's classification rule, the Court must examine the ultimate outcomes of the relevant contests, whether the candidate of choice of the politically cohesive African American group was usually defeated. Here, the Court is compelled to address the probative value of primary elections in which no candidate received the requisite percentage of votes to win, i.e., contests that proceeded to runoffs. Plaintiffs present these contests as ones in which the Court may find winners and losers based on relative totals of votes cast per candidate, but the Court disagrees. Because Section 2 focuses on whether minority members have less opportunity "to participate in the political process and *to elect* representatives of their choice," 52 U.S.C. § 10301 (emphasis added), preliminary races in which candidates merely qualified for a runoff do not speak to the defeat *vel non* of the minority group's candidate under the third *Gingles* precondition. An opinion issued

by the federal district court of the Western District of Tennessee, though non-binding, is highly persuasive in that it expressly addresses the relevance of these preliminary races in Section 2 vote dilution cases:

> While preliminary races which lead to a runoff may be probative on the issue of racially polarized voting, they are not necessarily probative on the issue of whether blacks have an opportunity to elect candidates of their choice. . . . The outcome of an election, not a preliminary or intermediate step in that election, demonstrates whether members of a minority have an opportunity to elect candidates of their choice.

*Buchanan v. City of Jackson, Tenn.*, 683 F. Supp. 1515, 1530 & n.14 (W.D. Tenn. 1988). Although the Court finds that the primary races to be helpful in assessing the second *Gingles* precondition of minority cohesion, the Court declines to "double-count" these November primary elections in which the African American candidate of choice was not "defeated" but instead proceeded to a December runoff.[17]

Both experts employed some use of "reconstituted elections," where analysis is confined to the election results in the jurisdiction at issue, although the elections were held in a broader jurisdiction. (*See* Tr. VI at 145:10–145:17). Using a reconstituted election analysis, a researcher extracts election results from a variety of races to determine the racial composition of the vote and the "winner" within the jurisdiction at issue, "to determine how an individual candidate performed within the boundaries of the target district even though the actual election covered a different geographical area." *Rodriguez*, 385 F.3d at 861.

---

[17] For example, in the 2012 City Court election for Section 2E, the African American candidate of choice, Tiffany Foxworth, garnered the second highest number of votes in the November contest. No candidate received over 50% of the vote in the November contest, thus necessitating a runoff contest in December. In the December contest, Ms. Foxworth was defeated, and her opponent, incumbent candidate Suzan Ponder, was re-elected to the Section 2E seat. The Court declines to find that Ms. Foxworth could be defeated twice for the same seat in the same election cycle.

Dr. Engstrom admitted that he used reconstituted elections for his own analysis, but added the caveat that he used them for the purposes of identifying racial polarization and not for the ultimate determination of whether there was vote dilution. (Tr. VI at 145:18–149:24). The Court is well aware of the decreased probative value of reconstituted elections. When a race takes place on a larger scale, for example a U.S. presidential election, a candidate need not carry the smaller jurisdiction of the challenged system—in this case, the City of Baton Rouge—in order to prevail. However, reconstituted elections are valuable in demonstrating voting patterns within the relevant electorate, to elucidate voting patterns within the jurisdiction when voters have an opportunity to vote for an African American candidate. Further, the Fifth Circuit has held that a district court, once it determines that it is appropriate to look to exogenous elections as relevant data with which to conduct its *Gingles* analysis, commits clear error when it wholly disregards reconstituted exogenous elections. *Rodriguez*, 385 F.3d at 860–63.

With the foregoing in mind, the results for all sixteen elections in the Court's consideration, when reconstituted to reflect voting of precincts contained in Baton Rouge, are as follows:

| Election Cycle | Contest | African American Candidate of Choice | Election Results (within Baton Rouge) |
|---|---|---|---|
| 2012 | City Court 2C Primary | Joel G. Porter | Defeat |
| 2012 | City Court 2E Primary | Tiffany Foxworth | (Went to Runoff) |
| 2012 | City Court 2E Runoff | Tiffany Foxworth | Defeat |
| 2012 | First Circuit Appeals Primary* | Gideon T. Carter, III | (Went to Runoff) |
| 2012 | First Circuit Appeals Runoff * | Gideon T. Carter, III | Defeat |
| 2012 | Supreme Court Primary* | John M. Guidry | (Went to Runoff) |
| 2012 | Supreme Court Runoff* | John M. Guidry | Non-Defeat^ |
| 2000 | Mayor President Primary· | Melvin L. Holden | (Went to Runoff) |
| 2000 | Mayor President Runoff· | Melvin L. Holden | Non-Defeat^ |
| 2004 | Mayor President Primary· | Melvin L. Holden | (Went to Runoff) |
| 2004 | Mayor President Runoff· | Melvin L. Holden | Non-Defeat |
| 2008 | Mayor President Primary· | Melvin L. Holden | Non-Defeat |
| 2012 | Mayor President Primary· | Melvin L. Holden | Non-Defeat |
| 2000 | City Constable· | Reginald R. Brown, Sr. | Non-Defeat |
| 2008 | U.S. President· | Barack Obama | Non-Defeat |
| 2012 | U.S. President· | Barack Obama | Non-Defeat |

\* Exogenous Judicial Contest
· Exogenous Non-Judicial Contest
^ Reconstituted election result differs from actual election result

While cognizant of that fact that endogenous elections are most probative and exogenous non-judicial elections the next most probative, the Court, for reasons stated *supra* regarding the inadequacy of one election cycle of data, cannot in this case altogether ignore the exogenous non-judicial elections. Viewing the election data of sixteen contests, of which eleven resulted in the election of a candidate to office, the Court finds that in only three contests was the African American candidate of choice defeated within the City of Baton Rouge. Hence, Plaintiffs have

not met their burden to prove, by a preponderance of the evidence, that white voters vote sufficiently as a bloc that they are able to *usually* defeat the preferred candidate of the African American minority group.

Having concluded that Plaintiffs have not satisfied the third *Gingles* precondition, Plaintiffs have failed to prove a violation of VRA Section 2. *See Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004) (stating that, regarding the preconditions, "[f]ailure to establish all three of these elements defeats a Section 2 claim"); *Rodriguez*, 385 F.3d at 860 (declaring that plaintiffs could not succeed in their Section 2 claim if they lacked proof on the third *Gingles* factor). The Court is mindful of the extensive documentary and testimonial evidence presented at trial which went toward the totality of circumstances under *Gingles*, but it is futile for the Court to reach the totality of circumstances here, for no Section 2 violation can be found where fewer than all three *Gingles* preconditions are satisfied.

## IV. CONSTITUTIONAL CLAIMS

Notably, Plaintiffs' post-trial brief contained no argument regarding their constitutional claims. (*See* Doc. 546). It is apparent that the keystone of their case was their VRA Section 2 claim. However, since Plaintiffs have not expressed their intent to abandon the following constitutional claims under the Due Process Clause, the fundamental right to vote, vote dilution, and related claims under 42 U.S.C. §§ 1983, 1986, the Court addresses each in turn here.

## A. Due Process Clause of the Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment declares that "no State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. In the context of elections, the Due Process Clause "prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981). The Fifth Circuit has cautioned that such claims of constitutional deprivation must be distinguished from "garden variety" election disputes. *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985).

Here, where Plaintiffs' claims are based on the apportionment of City Court seats between election sections, Plaintiffs have no cognizable due process claim absent a showing of intentional discrimination. *See Leyva v. Bexar Cnty. Republican Party*, No. CIV.A. SA-02-CA-408, 2002 WL 34729181, at *8 (W.D. Tex. Dec. 5, 2002) (dismissing due process claim where many voters experienced problems finding polling locations on election day after state officials consolidated polling places "[b]ecause no evidence of intentional discrimination exists, and the entire election process did not fail to afford fundamental fairness"); *Goodloe v. Madison Cnty. Bd. of Election Comm'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985) (affirming previous order to dismiss constitutional claims, due to "lack of any intentional discrimination" in case in which election commissioners blanket-invalidated absentee ballots from a specific notary). *See also Shannon v. Jacobowitz*, 394 F.3d 90, 97 (2d Cir. 2005) (finding no cognizable federal due process claim in voting

machine malfunction and resulting miscount "because no conduct is alleged that would indicate an intentional deprivation of the right to vote").

Plaintiffs have failed to argue, much less establish, that Defendants possessed the requisite showing of intentional discrimination. The record provides no evidence of willful discrimination by Defendants in carrying out their official duties or maintaining the duly enacted districting system. Nor does the record reveal any violation of official duties regarding the City Court elections. Absent proof of discriminatory intent and with no action by Defendants shown to "seriously undermine the fundamental fairness of the electoral process," the Court finds that Plaintiff have failed to prove their claim of denial of due process under the Fourteenth Amendment.

### B. Fundamental Right to Vote Under the Fourteenth Amendment

Plaintiffs argue that the current City Court electoral scheme violates the Equal Protection Clause of the Fourteenth Amendment for abridging their fundamental right to vote. Plaintiff Hall testified that he does not feel his vote, as an African American resident of Baton Rouge, "counts the same" in Baton Rouge City Court elections as a vote by a white resident. (Tr. I at 97:18–98:4).

The right to vote is a fundamental right protected by the Fourteenth Amendment. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."). A cause of action arises under the Fourteenth Amendment's protections against restrictions on the right to vote when a state "classifies voters in

disparate ways, or places restrictions on the right to vote." *Veasey v. Perry*, No. 13-CV-00193, 2014 WL 5090258, at *41 (S.D. Tex. Oct. 9, 2014). *See also Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (arbitrary and disparate treatment of votes violates equal protection).

The instant matter is not one in which Plaintiffs allege straight vote denial or undue burden on their right to exercise their franchise. Both Plaintiffs testified they did not encounter any problems registering to vote. (Tr. I at 104:24–104:25, 120:6–120:7). Plaintiffs have not identified any problems casting their votes absentee or at the polls, respectively. (Tr. I at 101:6–101:16, 120:8–120:10). There are no allegations that Plaintiffs' votes for City Court judges were not counted or were otherwise disqualified in a literal sense.

Plaintiffs have not adduced sufficient evidence to support a fundamental-right-to-vote claim. The harm they allege to have suffered based on the current City Court districting system is instead more aptly considered within the framework of a constitutional claim of vote dilution, which the Court addresses next.

### C.  Vote Dilution Under the Fourteenth and Fifteenth Amendments

Claims of racially discriminatory vote dilution exist under the Equal Protection Clause of the Fourteenth Amendment. *See Backus v. South Carolina*, 857 F. Supp. 2d 553, 567 (D.S.C. 2012), *aff'd*, ___ U.S. ___, 133 S. Ct. 156 (2012). Further, the Fifth Circuit, amidst a circuit split on this issue, recognizes congruent claims of racially discriminatory vote dilution under the Fifteenth Amendment. *See e.g.*, *Rodgers v. Lodge*, 458 U.S. 613 (1982) (affirming Fifth Circuit and district

court's finding that a county's at-large voting method impermissibly diluted the vote of black residents in violation of, *inter alia*, their Fifteenth Amendment rights); *see also Terrebonne Parish NAACP v. Jindal*, No. CIV.A. 14-069-JJB, 2014 WL 3586549, at *7 (M.D. La. July 21, 2014) (noting circuit split but finding that plaintiffs could bring a vote dilution claim under the Fifteenth Amendment within the Fifth Circuit).

To prevail on either their Fourteenth or Fifteenth Amendment claims, Plaintiffs must show that the voting scheme has a discriminatory effect and was enacted with a discriminatory purpose. *See Backus*, 857 F. Supp. 2d at 567; *Terrebonne Parish NAACP*, 2014 WL 3586549, at *7 (Fifteenth Amendment vote dilution elements mirror those of Fourteenth Amendment vote dilution claim). Plaintiffs must also offer "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Id.*

To prove discriminatory effect, Plaintiffs must show that the black minority's voting potential has been minimized or cancelled out, or their political strength adversely affected. *See Backus*, 857 F. Supp. 2d at 567–68. To prove discriminatory purpose, Plaintiffs may provide direct evidence of discriminatory intent, or they may ask the Court to infer discriminatory purpose from the totality of relevant facts. *Id.* at 568. Relevant considerations for the Court to weigh include:

    (1)  whether bloc voting along racial lines exists;
    (2)  whether minorities are excluded from the political process;
    (3)  whether minority voter registration is low;
    (4)  whether elected officials are unresponsive to the needs of
    minorities;

(5) whether the minority group occupies a depressed socioeconomic status because of inferior education or employment and housing discrimination;

(6) the historical backdrop leading to the passage of the redistricting legislation;

(7) the specific sequence of events leading up to the challenged decision;

(8) whether the redistricting body departed from the normal procedural sequence for passing redistricting legislation;

(9) whether the voting strength of a cohesive minority group has decreased or "retrogressed"; and

(10) whether district boundaries have been manipulated to adjust the relative size of minority groups, including instances of "packing."

*Id.*

As to purpose, Plaintiffs presented no direct evidence of discriminatory purpose underlying the current electoral system for the City Court of Baton Rouge. In addition, Plaintiffs have not provided guidance as to how the Court should infer a discriminatory purpose based on circumstantial evidence in the record. During summation, Plaintiffs' counsel conceded that the record in this case is "not primarily built" in order to arrive at the conclusion that intentional discrimination exists here. (Tr. VI at 203:13–203:20). The Court, assuming without deciding that Plaintiffs have established discriminatory effect, proceeds to weigh factors that would provide circumstantial evidence of discriminatory intent.

### 1.    Factors Weighing in Favor of Finding Discriminatory Purpose

In its assessment of circumstantial evidence based on the facts of this case, the Court finds that a few factors weigh in favor of Plaintiffs:

### *Whether bloc voting along racial lines exists*

As discussed *supra*, the expert witnesses Dr. Engstrom and Dr. Weber concur that all three City Court contests analyzed demonstrate racially polarized bloc voting. (*See* Tr. III at 22:25–23:3, Tr. VI at 51:20–52:7). This factor points in favor of a finding of discriminatory intent.

### *The historical backdrop leading to the passage of the redistricting legislation*

Plaintiffs also elicited testimony of Dr. Raphael Cassimere, who was qualified as an expert in the history of racial discrimination in Louisiana and its impact on the ability of African Americans to participate in the political process. (Tr. IV at 50:17–50:24). Dr. Cassimere provided expert testimony regarding a general historical overview of race relations within the city of Baton Rouge. (*See generally* Tr. IV at 52:16–63:19). He described the historical backdrop of Baton Rouge in the years prior to 1993, where employment opportunities for African Americans were limited, segregated school systems were inequitable, and racial discrimination was rampant in transportation, housing, recreation, the criminal justice system, and the election system. (Tr. IV at 54:1–56:10). The Court has held in a prior ruling in this matter that it shall take judicial notice of the fact of litigation and the factual findings of various cases within the lineage and procedural history of *Clark v. Roemer*, 750 F. Supp. 200 (M.D. La. 1990) and *Chisom v. Roemer*, 501 U.S. 380 (1991). (*See* Doc. 556 at pp. 3–4). Those cases of the late 1980s and early 1990s involved voting rights challenges to systems of electing various district, family court, and court of appeals judges, as well the justices of the Supreme Court of

Louisiana. Although none of these cases adjudicated the constitutionality of the Baton Rouge City Court's electoral system, the Court here takes notice of their judicial findings of racial discrimination in voting, at various levels and types of courts within Louisiana, prior to the enactment of the current City Court election system in 1993. Judge John Michael Guidry, legal author of the bill that would become Act 609, testified at trial that Act 609 was intended to district the City Court seats so as to preempt voting rights litigation. (Tr. II at 192:12–193:21). Such legislative action, according to Judge Guidry, was a response to the contentious and protracted *Clark* and *Chisom* lawsuits, although the City Court of Baton Rouge was not the subject of either of those suits, nor was its redistricting required as part of a consent judgment. (*See id.*).[18] The judicial findings contained within the *Clark* and *Chisom* opinions prove a history of *de jure* and *de facto* racial segregation and discrimination in Baton Rouge, satisfying this factor.

### Whether the minority group occupies a depressed socioeconomic status because of inferior education or employment and housing discrimination

Plaintiffs adduced evidence tending to show that African Americans currently occupy a depressed socioeconomic status because of inferior education and employment. Some such testimony was heard during the examination of Mr. Bernard Johnson, Superintendent of the East Baton Rouge Parish School System and a fact witness for Plaintiffs. Mr. Johnson testified that the school district of East Baton Rouge Parish, which encompasses the City of Baton Rouge, has a student population upwards of 80% African American. (Tr. II at 235:2–235:4). Mr.

---

[18] Judge Guidry's testimony is discussed in greater detail *infra*.

Johnson estimated that close to 84% of the student population is eligible for free or reduced lunch, which is a proxy for low annual family income according to federal guidelines. (Tr. II at 235:22–236:25). He also testified that he estimates a racial achievement gap between African American students and non-African American students of 15–20% in performance scores. (Tr. II at 240:14–242:9). The Court notes that Mr. Johnson's testimony alone would not satisfy this factor, for a correlation among race, socioeconomic status, and educational opportunities does not in itself provide a factual basis for the Court to conclude that African Americans in Baton Rouge occupy a depressed socioeconomic status *because of* inferior education.

Additionally, however, Dr. Cassimere testified that inequities exist today in Louisiana's higher education system as well, where predominantly black public universities were historically equipped with fewer graduate and professional programs than their previously segregated counterpart universities and have not been appropriated sufficient funding to equalize the disparity. (Tr. IV at 58:18–59:22). He testified that deficiencies in education have, in turn, led to decreased employment opportunities for African Americans. (Tr. IV at 61:2–61:17).

In their post-trial brief, Plaintiffs further provided education, income and employment, and housing statistics for Baton Rouge, which they calculated based on 2010 census data already in evidence. (*See* Doc. 546 at ¶ 96). Plaintiffs' analysis of census data demonstrates that African Americans in Baton Rouge generally have lower educational attainment, lower average household income, and lower rates of home ownership than white residents of the City.

Defendants do not contest the validity of Plaintiffs' evidence regarding the general education or employment opportunities available to African Americans in Baton Rouge.[19] Hence the Court finds that this factor is satisfied, going toward an inference of discriminatory purpose requisite for a constitutional vote dilution claim.

### *Whether the voting strength of a cohesive minority group has decreased or "retrogressed"*

From the 1990 census until the most recent 2010 census, the African American population in the City of Baton Rouge increased from 43.9% to 54.5%, while the white population decreased from 53.9% to 39.4%. (Ex. P-145; Ex. P-147, Bates No. 02039).

Yet, since 1993, all candidates elected to judgeships in Election Section One have been African American, while all candidates elected to judgeships in Election Section Two have been white. (Doc. 359 at ¶¶ 206, 208). The City Court judiciary in every term since 1993 has been comprised of two African American judges and three white judges, despite a significant rise in the City's African American population. Under the districting plan enacted via Act 609, the per capita voting strength of African American residents in Baton Rouge has decreased over the last two decades. The Court finds this factor satisfied.

---

[19] The Court notes Defendants' argument that any effects of discrimination in education, employment, or housing have not hindered the ability of African Americans to vote or participate politically within Baton Rouge. (*See* Doc. 547 at p. 47). In the totality of relevant facts to be considered for a constitutional vote dilution claim, however, considerations of voting ability and political participation are separate factors.

## 2. Factors Weighing Against Finding Discriminatory Purpose

On the other hand, several factors marshal against a finding of inferred discriminatory intent:

### Whether minorities are excluded from the political process; whether minority voter registration is low

Plaintiffs have not shown that African Americans are "excluded" from the political process. Plaintiffs' testimony reflected that they have been both active in local political campaigns. (Tr. I at 85:10–85:20, 90:11–90:20, 107:18–107:21). Plaintiff-Intervenor Sharper himself ran for the Baton Rouge Metropolitan council, won, and served two terms for a total of eight years. (Tr. I at 107:21–108:6). Additionally, Plaintiffs have made no showing that African American voter registration is low. According to unrefuted statistics provided in Dr. Weber's report, black voter registration in the City of Baton Rouge has been approximately 51–53% from 2008 through the most recently considered 2012 election year, surpassing white voter registration, which has remained between 42–45% during the same period. (*See* Ex. D-26 at p. 26 tbl.4).

### Whether elected officials are unresponsive to the needs of minorities

Judge Trudy White, a current district court judge of the Nineteenth Judicial Court and former City Court judge, testified that she observed a philosophical difference between herself and some of her former colleagues on the City Court. Specifically, Judge White mentioned that her colleagues imposed court fees that functioned as taxes on predominantly poor, African American individuals. (Tr. I at

278:5–279:2). While the Court views this testimony as relevant to this factor of elected official responsiveness, Plaintiffs produced no evidence regarding what amount of discretion lies with the City Court judges in imposing court fees. No additional evidence was proffered by Plaintiffs to establish that City Court judges were made aware of specific minority needs such that they could be responsive to them. Further, at no point did Plaintiff Hall or Plaintiff-Intervenor Sharper—or any other witness—testify about any concrete need or concern of a minority member that was ignored by an elected official, either judicial or non-judicial, in Baton Rouge.[20] Accordingly, an unsubstantial showing on this factor weighs against an inference of discriminatory purpose.

> ***The specific sequence of events leading up to the challenged decision; whether the redistricting body departed from the normal procedural sequence for passing redistricting legislation; whether district boundaries have been manipulated to adjust the relative size of minority groups, including instances of "packing"***

Particularly persuasive to the Court is the evidence regarding the decision and process to enact the current City Court election districting system. Judge Guidry, former Louisiana state senator who, in 1993, lead author and introducer of Senate Bill 1126, the bill that would become Act 609. (*See* Ex. J-17). Judge Guidry testified at trial that he introduced legislation to divide the City Court into districts for the purpose of preempting voting rights litigation. (Tr. II at 192:7–194:2). The districts were drawn to reflect the racial makeup of the City of Baton Rouge at that

---

[20] Plaintiff Hall testified about a shared desire within the African American community of Baton Rouge to elect more African American candidates. (Tr. I at 95:12–95:22, 97:13–97:17). Such a desire, reasonable as it may be, does not in itself establish the non-responsiveness of current elected officials to minority needs.

time, approximately 43% African American, such that two of the five City Court seats comprised an Election Section that Judge Guidry termed a "minority subdistrict" and the other three seats comprised a "majority subdistrict." (Tr. II at 192:17–193:2). Judge Guidry testified that the districts were drawn to comport with the pre-clearance requirements of Section 5 of the VRA in effect at the time. (Tr. II at 194:14–194:23; *see also* Ex. J-25 for Section 5 pre-clearance submission sent to the Civil Rights Division of U.S. Department of Justice).

Senator Charles Jones, former Louisiana state senator and co-author of Senate Bill 1126, testified at trial that districts proposed in Senate Bill 1126 were configured with the purpose of providing a fair opportunity for African Americans to elect candidates of their choice to the City Court. (Tr. I at p. 153:16–153:23). Senator Jones had been the lead author of several other bills to create judicial subdistricts around the state. He testified that the procedure he followed for creating judicial subdistricts in Monroe, Shreveport, Alexandria, Lake Charles, Lafayette, Iberia, St. Landry, the Twenty-Third Judicial District, and the River Parishes was identical to the procedure he followed for creating subdistricts in Baton Rouge, differing only in that he was a co-author and not a lead author for the Baton Rouge bill. (Tr. I at 173:24–174:6).

The testimony presented at trial reveals a good-faith effort by state legislators to, in response to legal challenges of other voting systems around the state, comport with voting rights law and preempt a lawsuit on the grounds of voting discrimination when proposing and passing the current districting plan.

Plaintiffs have not presented any evidence that the districting plan created by Act 609 departed from the normal procedural sequence for passing redistricting legislation. Further, they do not assert that the districting plan of Act 609 manipulated district lines to adjust the relative political power of African Americans. By all accounts, Act 609 reflected distribution of political power directly proportional to the racial composition of the total City population at the time of its passage.

### 3. Discriminatory Purpose in the Failure to Amend

Based on these facts, for Plaintiffs to prevail on this issue, the Court would be required to find that an inference of discriminatory purpose inheres not in the enactment of the current districting plan but instead in Defendants' failure to implement a new plan that better represents the current demographics of the City.

Both parties presented evidence regarding recent unsuccessful attempts in the Louisiana state legislature to redistrict the City Court of Baton Rouge.[21] In 2013, Representative Alfred Williams introduced House Bill 318, which proposed a 3–2 redistricting of the City Court, that is, three African American districts and two white districts. (*See* Ex. J-13). House Bill 318 failed to pass the House floor. (*See* Tr. IV at 225:16–225:25). In 2014, Representative Williams introduced House Bill 198, which proposed the same 3–2 districting plan as the House Bill 318 from the previous session. (*See* Ex. J-15). House Bill 198 was involuntarily deferred in committee. (*Id.* at Bates No. 002309). Also in 2014, Representative Erich Ponti

---

[21] Representatives Alfred Williams and Erich Ponti, the legislators who introduced respective bills in 2013 and 2014, testified at trial.

introduced House Bill 1151, which provided that all five City Court judgeships be elected at large. (*See* Ex. J-14). House Bill 1151 passed through committee, was passed by a full House vote, and was referred to the Senate committee. (*Id.* at Bates No. 00248). In the Senate committee, the bill was amended to reflect a 2–2–1 districting plan (two African American, two white, one at-large); the amended bill was ultimately returned to the Senate calendar, such that a vote would be necessary to pull the bill back up for debate. (Ex. J-14, Bates No. 002248; Tr. IV at 230:2–236:4).

As mentioned above, Plaintiffs offered no argument at trial or in their post-trial brief regarding the merits of their constitutional claims. Implicit in Plaintiffs' constitutional claims of vote dilution, however, is that the Court may infer discriminatory purpose in Defendants' failure to amend the City Court election plan adopted in 1993 in response to evolving demographics of the City. The Court disagrees, reiterating that the controlling standard for a vote dilution claim under the Fourteenth and Fifteenth Amendments dictates that Plaintiffs show the current voting scheme has a discriminatory effect *and was enacted with a discriminatory purpose. See Backus*, 857 F. Supp. 2d at 567 (emphasis added).

Senator Jones testified that, unlike with Louisiana legislative districts, there is no provision of law requiring the redistricting of judicial districts every ten years. (Tr. I at 175:15–176:6). Representative Ponti's testimony corroborated that congressional districting standards do not apply to judicial redistricting standards in Louisiana. (Tr. IV at 223:24–224:2). Plaintiffs did not controvert such a

proposition. With no *legal* obligation on behalf of lawmakers to update judicial districts with every census, it is even more unlikely that discriminatory purpose can be inferred in the continued use of the City Court districting scheme. The Court refuses to derive an inference of *intentional* discrimination from the enactment of a law, where a discriminatory effect would be attributable to evolved circumstances that could not realistically have been taken into account at the time of the law's enactment.

Moreover, the Court is cognizant that it is a rare case in which a party will have been found to prove a Fourteenth or Fifteenth Amendment vote dilution claim where it has not satisfied the test for a VRA Section 2 claim. The Eleventh Circuit, in *dicta*, has questioned "as a legal proposition, whether vote dilution can be established under the Constitution when the pertinent record has not proved vote dilution under the more permissive section 2." *See Johnson v. DeSoto County Bd. of Comm'rs*, 204 F.3d 1335, 1344–45 (11th Cir. 2000). Indeed, the Court is unable to identify any such case. Having found *supra* that the record in this matter is insufficient to prove a VRA Section 2 violation, the Court is further persuaded of the correctness of its holding that Plaintiffs have failed to prove their vote dilution claims under either the Fourteenth or Fifteenth Amendments.

The Court observes that such a conclusion, though legally sound, leads to a troubling practical result, given that Plaintiffs have established in Baton Rouge a history of discrimination against African Americans, a depressed socioeconomic status of African Americans as a general group, and a decrease in African American

voting strength. But the Court cannot on these facts alone ascribe a discriminatory purpose to the enactment of the current electoral scheme. In this particular case, at this particular time, the prerogative lies with the legislature, not with the Court, to redistrict the City Court of Baton Rouge in accordance with the principles of constituent representation that should be strived toward in any elected body.

### D.  Section 1983

Title 42 United States Code, Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). There are three elements to establish liability through a § 1983 action: "there must be (1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004). With no remaining constitutional claims against Defendants after the Court's rulings *supra*, Plaintiffs thus have no available relief under § 1983.

### E.  Section 1986

Title 42 United States Code, Section 1986 extends liability in damages to those persons "who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do . . . ." Section 1986 does not provide an independent cause of action but instead requires the existence of a valid claim under the civil conspiracy statute of § 1985.

*See Bradt v. Smith*, 634 F.2d 796, 801 (5th Cir. 1981); *Bread v. Wolf*, No. CIV.A. 13-4772, 2014 WL 7330606, at *3 (E.D. La. Dec. 18, 2014).

Here, where Plaintiffs have not alleged a claim under § 1985 and certainly have not presented any evidence in support of such a claim, their action under § 1986 must fail.

## V. CONCLUSION

**IT IS ORDERED, ADJUDGED,** and **DECREED** that **JUDGMENT** is hereby rendered **IN FAVOR OF** Defendants State of Louisiana, Piyush "Bobby" Jindal, James D. "Buddy" Caldwell, Tom Schedler, the City of Baton Rouge, Parish of East Baton Rouge, and Melvin "Kip" Holden and **AGAINST** Plaintiff Kenneth Hall and Plaintiff-Intervenor Byron Sharper as to alleged violations of **Section 2 of the Voting Rights Act**, **the Fourteenth and Fifteenth Amendments to the U.S. Constitution**, and **42 U.S.C. §§ 1983, 1986**.

**IT IS FURTHER ORDERED** that Plaintiffs' requests for declaratory and injunctive relief pursuant to **Voting Rights Act Section 2 and Section 3(c)** are **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' requests for attorney's fees, expert's fees, and costs are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' request for attorney's fees in the instance of their prevailing is **DENIED**.[22]

Baton Rouge, Louisiana, this 9th day of June, 2015.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[22] To award attorney's fees to a defendant in a civil rights action brought under 42 U.S.C. § 1983, the plaintiff's action must be "meritless in the sense that it is groundless or without foundation. The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees." *Hughes v. Rowe*, 449 U.S. 5, 14 (1980). The Court does not find this matter to be one that is groundless or without foundation.